## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**ETHAN SEITZ,**<br><br>          **Defendant.** | **Case No. 21-cr-279 (DLF)** |

## MOTION TO DISMISS COUNTS TWO AND THREE

Ethan Seitz, through undersigned counsel, and pursuant to Federal Rule pursuant to Rule of Criminal Procedure 12(b)(3)(B)(v), hereby respectfully requests that the Court dismiss Counts two and three of the Indictment, which charge him with violations of 18 U.S.C. §§ 1752(a)(1) and (a)(2).

### BACKGROUND

The Indictment alleges various counts against Mr. Seitz relating to the events at the Capitol on January 6, 2021. This motion concerns counts two and three of the counts against Mr. Seitz, which allege that he entered and remained on the Capitol grounds unlawfully during a time when it was "restricted," within the meaning of 18 U.S.C. § 1752(a)(1), (c)(1)(B). Section 1752(a)(1) criminalizes the act of unlawfully entering and remaining in certain areas, and it defines those areas. Specifically, subsection (a)(1) makes it illegal to "knowingly enter[] or remain[] in any restricted building or grounds without lawful authority to do so" or to "attempt[] or conspire[] to do so." 18 U.S.C. § 1752(a)(1). And subsection (c) defines "restricted buildings or grounds" as follows:

(1)    the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

    (A)    of the White House or its grounds, or the Vice President's official residence or its grounds;

    (B)    of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

    (C)    of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

*Id.* § 1752(c)(1). In addition, the statute defines "other person protected by the Secret Service" to mean "any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection." *Id.* § 1752(c)(2). The Vice President is a Secret Service-protectee. *Id.* § 3056(a)(1).

### A. Counts two and three depend on the Vice President's presence at the United States Capitol building on January 6, 2021, qualifying as a "temporary visit."

Counts two and three allege violations of 18 U.S.C. § 1752(a)(1) and (a)(2) on the theory that Mr. Seitz entered and remained in the Capitol building and grounds at a time when they were "restricted" by reason of the Vice President's "temporarily visiting" the building. *See* Indict. ¶ two and three; *see also* 18 U.S.C. § 1752(a)(1), (c)(1)(B). Thus, Counts two and three rise and fall on the Vice President being a Secret Service protectee who can "temporarily visit" the Capitol, within the meaning of the statute. In light of these allegations, the nature of the Vice President's relationship to Congress and the Capitol building is central to Counts two and three.

The Vice President is an institutional player in Congress. Their role in the Senate is embedded in the very structure of the Legislative Branch: they serve as the President of the Senate and are responsible for providing the tie-breaking vote. U.S. CONST. art. I, § 3, cl. 4. The Vice President routinely is present in the Capitol building to fulfill their constitutional obligations. By way of example, Vice President Pence traveled to the Senate thirteen times in his tenure just to cast tie-breaking votes; meanwhile, Vice President Kamala Harris visited the Senate fifteen times in 2021 alone to cast tie-breaking votes.[1] Further, the Constitution and federal law obligate the Vice President, at a set date and time, to preside over and participate in the process by which electoral votes for the office of the Presidency and Vice Presidency are opened, counted, and certified. U.S. CONST. amend. XII; 3 U.S.C. § 15.

To that end, the Vice President has a dedicated, *permanent* office reserved for their use in the Senate. That office has existed since at least the early nineteenth century.[2] The Vice President's "close proximity . . . to the Senate chamber has allowed the vice president easy access to the members when the Senate is in session," including "lobbying senators to vote against legislation [s]he oppose[s] and frequently lecturing senators on procedural and policy matters."[3] The Vice President's Room in

---

[1] U.S. Senate, *Votes to Break Ties in the Senate*, https://tinyurl.com/ye8t4nu8 (last visited Mar. 10, 2022) [hereinafter "*Votes to Break Ties in the Senate*"].

[2] U.S. Senate, *About the Vice President (President of the Senate)*, https://tinyurl.com/2p8n43y9 (last visited Mar. 10, 2022).

[3] Office of the Senate Curator, *The Vice President's Room*, S. Pub. 106–7, https://tinyurl.com/3wyb9web (last visited Mar. 10, 2022) [hereinafter "*The Vice President's Room*"], at 3 (first quotation); *see* U.S. Senate, *About the Vice President — Historical Overview*, https://tinyurl.com/46rhuwyk (last visited Mar. 10, 2022) [hereinafter "*Historical Overview*"] (second quotation) (describing "active role" of John Adams).

the Senate building has hosted "ceremonial functions, informal party caucuses, press briefings, and private meetings" for decades.[4] Unsurprisingly, given its frequent and important use, the office is not a drab holding space; it is appointed with mahogany furniture, a marble fireplace mantel, and fine art.[5] In contrast to their longstanding office in Congress, the Vice President did not have an office in the West Wing of the White House until 1977.[6]

## ARGUMENT

The Court must dismiss any count in the indictment that fails to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). An indictment must "inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense." *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014). And Rule 7(c) of the Federal Rules of Criminal Procedure "effectuates that understanding, requiring an indictment to contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018) (quoting Fed. R. Crim. P. 7(c)(1)).

It is not enough for an indictment simply to parrot the statute and its generic terms. To survive a defendant's motion to dismiss, the indictment must set forth, on

---

[4] *The Vice President's Room*, supra note 3, at 3.

[5] *Id.* at 4–6.

[6] "Mondale was the first vice president to have an office in the West Wing of the White House." *The career of Walter Mondale, Carter's vice president, in pictures*, NBC, Apr. 19, 2021, https://tinyurl.com/5bxc5xns; *accord* Brock Brower, *The Remaking of the Vice President*, N.Y. TIMES, June 5, 1977, https://tinyurl.com/7td4wu7f ("Jimmy Carter allowed Fritz Mondale not just Whi[t]e House-room but his pick of any office that wasn't oval.").

its face, the "essential facts" of the offense and "descend to particulars," beyond statutory boilerplate. Fed. R. Crim. P. 7(c)(1); *Russell v. United States*, 369 U.S. 749, 765 (1962); *United States v. Ballestas*, 795 F.3d 138, 148–49 (D.C. Cir. 2015). In other words, "the indictment may use the language of the statute, but that language must be supplemented with enough detail to apprise the accused of the particular offense with which he is charged." *United States v. Conlon*, 628 F.2d 150, 155 (D.C. Cir. 1980).

The indictment's sufficiency is based on its four corners. The court "is limited to reviewing the *face* of the indictment, and more specifically, the *language used* to charge the crimes." *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (emphasis in original). "Adherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury." *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001).

These pleading requirements align with the twin aims of an indictment. First, they ensure that it "furnish[es] the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, . . . [that it] inform[s] the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had." *Hunter v. District of Columbia*, 47 App. D.C. 406, 409–10 (D.C. Cir. 1918); *accord Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Hillie*, 227 F. Supp. 3d 57, 78–79 (D.D.C. 2017) (criminal charges must "be specific enough to

protect defendants from th[e] danger" of double jeopardy; the allegations must "establish the boundaries of the charged conduct" so that "a future prosecution for conduct arising out of these same charges would be barred"). As such, the sufficiency of the allegations in an indictment dovetail with a criminal defendant's rights under the Fifth and Sixth Amendments and the court's ability to answer questions of law concerning the charges.[7]

The indictment against Mr. Seitz fails to adequately allege a violation of either § 1752(a)(1) or 1752(a)(2). Specifically, Counts two and three do not allege the "restricted buildings or grounds" element. Accordingly, both Counts must be dismissed.

## I.   Count two and three must be dismissed because they fail to allege a violation of § 1752(a)

For Counts two and three to allege the "restricted buildings or grounds" element of § 1752(a)(1), as charged, the Capitol must be a place the Vice President is "temporarily visiting" when presiding over the opening, counting, and certification of electoral votes. The meaning of "temporarily visiting" and, in turn, the sufficiency of

---

[7] Courts in this District regularly dismiss counts in indictments that do not allege "essential facts." *See, e.g.*, Mem. Op., *United States v. Miller*, Case No. 21-cr-119 (CJN) (D.D.C. Mar. 7, 2022), ECF No. 72 [hereinafter "*Miller* slip op."], at 28–29 (in Capitol breach case, dismissing count that failed to allege violation of § 1512(c)(2)); *United States v. Guertin*, Case No. 1:21-cr-262 (TNM), 2022 WL 203467 (D.D.C. Jan. 24, 2022) (dismissing indictment that failed to allege violations of §§ 1343 and 1512(c)(2)); *United States v. Payne*, 382 F. Supp. 3d 71, 74–77 (D.D.C. 2019) (dismissing charge under § 922(g)(1)); *Hillie*, 227 F. Supp. 3d at 72–74 (dismissing child pornography-related charges); *United States v. Singhal*, 876 F. Supp. 2d 82, 95–96 (D.D.C. 2012) (dismissing charges under § 1001); *Sunia,* 643 F. Supp. 2d at 69, 78–81 (dismissing counts that failed to allege offenses under § 666(a)(1) and § 1505); *United States v. Brown*, Case No. 07-75 (CKK), 2007 WL 2007513, at *3–5 (D.D.C. July 9, 2007) (dismissing counts that failed to allege violation of § 1512(c)(2)).

the allegations in these Counts, are questions of law for the Court to decide. *See United States v. Jabr*, Crim. No. 18-0105 (PLF), 2019 WL 13110682, at *6–7 (D.D.C. 2019).

For the reasons discussed below, these Counts cannot stand. "Temporarily visiting" does not encompass travel to and from one's own office or place of business. And if the term could plausibly encompass that conduct (contrary to the ordinary person's understanding), then it is ambiguous and lenity counsels in favor of the narrower construction. Because the Government chose to proceed exclusively on a narrow "temporarily visiting" theory, Counts two and three must be dismissed.

**A.   The Vice President does not "temporarily visit" the United States Capitol building when fulfilling their constitutional obligations.**

      *1.   The ordinary person understands that even the Vice President does not "temporarily visit" their own office.*

The phrase "temporarily visiting" is not defined by the statute, so its ordinary meaning, fixed at the time of enactment, controls. *See, e.g., Burrage v. United States*, 571 U.S. 204, 210–12 (2014) (where Controlled Substances Act did not define "results from," the Court gave that phrase its "ordinary meaning"). Based on dictionary definitions of "temporarily" and "visiting" from about 1971, when § 1752 was enacted, "someone is 'temporarily visiting' a location if they have gone there for a particular purpose, be it business, pleasure or sight-seeing, and for a limited time, which could be brief or extended while nonetheless remaining temporary." *United States v. McHugh*, Crim. Action No. 21-453 (JDB), 2022 WL 296304, at *20 (D.D.C. Feb. 1, 2022) (internal quotation marks omitted).

Two guardrails attend that definition. First, the phrase "temporarily visiting" includes an implicit normally-lives-or-works carveout, because the ordinary person would not "describe an ordinary commute from home to one's regular workplace as 'temporarily visiting' the office." *Id.* at \*22; *see Wooden v. United States*, 595 U.S. ___, ___, Case No. 20-5279, 2022 WL 660610, at \*\*4–5 (2022) (construing "occasions" in § 924(e)(1) in light of "how an ordinary person . . . might describe" it "*and how she would not*" (emphasis added)); *see also, e.g.*, *Young v. United States*, 943 F.3d 460, 463 (D.C. Cir. 2019) (construing "imposed" in § 401(c) of the First Step Act according to its "ordinary usage"). Second, "temporarily visiting" should not be interpreted as though it means "physically present"—that is not what Congress wrote. *See McHugh*, 2022 WL 296304, at \*22. If Congress wanted to define "restricted building or grounds" to encompass anywhere a Secret Service protectee is or will be physically present, then it would have omitted the phrase "temporarily visiting" or actually written "physically present."

It follows that Vice President Pence was *not* "temporarily visiting" the Capitol when fulfilling his constitutional obligations. Instead, he was simply going to work. The Constitution obligates the Vice President to be physically present in the Senate with some frequency, not only to preside over the opening, counting, and certification of electoral votes every four years but also to cast tie-breaking votes as needed on legislation and judicial nominations. And the number of times Vice Presidents Pence and Harris have been present in Congress over the last five years solely to provide tie-breaking votes—28 times—speaks to the frequent, routine nature of the Vice

President's work in the Capitol.[8] In other words, the Vice President does not "temporarily visit" the Capitol—they work there.

That conclusion is consistent with the weight of history. The Vice President has had an office in Congress and conducted official business from that office since nearly the Founding. Historically, vice presidents are in the Capitol not only for the electoral vote certification, but also to cast tie-breaking votes, lobby senators, and hold "informal party caucuses, press briefings, and private meetings" from that office.[9] And, critically, when Congress enacted § 1752 in 1971, the Vice President *did not even have an office in the West Wing*.[10] In other words, Congress enacted § 1752(a)(1) with the background understanding that the Vice President's office historically has been and remained in the Capitol building. *See, e.g.*, *Abuelhawa v. United States*, 556 U.S. 816, 823–24 (2009) (declining to interpret 21 U.S.C. § 843(b) to reach a result in conflict with the background understanding against which Congress legislated). Accordingly, there is no reason to think that, at the time it enacted § 1752, Congress understood the Capitol to be somewhere the Vice President "temporarily visit[s]."

A more capacious reading of "temporarily visiting" would transform that phrase into a mere "physically present" requirement. Treating the Vice President's performance of her constitutional obligations in her established place of work as a "temporary visit" blurs the distinction between travel to ordinary places of business

---

[8] *Votes to Break Ties in the Senate*, *supra* note 1.

[9] *The Vice President's Room* at 3; *Historical Overview*, *supra* note 4.

[10] *See* Pub. L. No. 91–644, 84 Stat. 1891 § 18 (Jan. 2, 1971).

for repeat purposes and limited travel to a location "for a particular purpose . . . and for a limited time." *See McHugh*, 2022 WL 296304, at *20 (internal quotation marks omitted). As the court in *McHugh* pointed out, the dictionary definition of "temporarily visiting," coupled with commonsense and everyday experience, means § 1752(c)(1)(B) refers to the latter, not the former. *See id.* Otherwise, *everywhere* the Vice President travels outside her residence would qualify as somewhere she is "temporarily visiting." And if Congress wanted to define "restricted building or grounds" to encompass anywhere the President or a Secret Service protectee is or will be physically present, then it would have done so. *See id.* at *22; *see also, e.g.*, *Fresco Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021) (where plaintiffs' preferred interpretation simply was "not what the statute says," court of appeals declined to "scrub up for statutory surgery, excising some words and engrafting others," in order to adopt it).

The poor fit of treating the Capitol as a "restricted building" under § 1752(c)(1)(B) merely on account of the Vice President's physical presence there to do her job is cast in high relief when compared to the statute's application in other cases. For example, courts have held that "temporarily visiting" reaches an area near an airport hangar and a portion of a park restricted by the Secret Service ahead of a rally at which the President or Vice President appeared. *See United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (airport hangar); *United States v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (unpublished) (park). Airport hangars and parks are natural fits for the phrase "temporarily visiting," given the ordinary person's understanding that she

"temporarily visits" a location where the person does not normally live or work. *See McHugh*, 2022 WL 296304, at *21. Meanwhile, the Vice President's time in the Capitol, where she has a permanent office and frequently appears to fulfill her constitutional obligations, is entirely unlike a brief stop in an airport hangar or park to give a one-off speech. *See also Jabr*, 2019 WL 13110682, at *7–10 (plain meaning of "the White House or its grounds" in § 1752(c)(1)(A) did not include "the U.S. Treasury Building and its grounds").

      2.    *The court in* McHugh *reached a contrary decision based on faulty reasoning.*

Upon information and belief, at least three courts have addressed the application of Section 1752 to January 6 cases.  Recently, Judge Nichols gave the government one week to correct the Indictment in response to the issue that Mr. Seitz raises here.[11] Prior to Judge Nichols's Order in *Fischer*, the court in *McHugh* reached a contrary conclusion based on what Mr. Seitz respectfully submits was faulty reasoning. Judge McFadden referenced the *McHugh* decision in an oral ruling denying a similar argument, however, in that case, the court did not have the benefit of full briefing on the issue and noted that "Mr. Griffin did actually elicited very little testimony about how often the vice president does visit the Capitol."[12] In *McHugh*, the court declined to apply the ordinary meaning of "temporarily visiting," including

---

[11] Judge Nichols's Order reads: with regards to Counts Four and Five, the Government has 14 days to either amend the Superseding Indictment to allege that one of then Vice President Pence's family members attended the certification of the electoral vote at the Capitol on January 6 or to explain to the Court why it will not do so. *United States v. Fischer*, 1:21CR234, ECF No. 65.

[12] *United States v. Griffin*, 21-CR-92, Trial Transcript, March 22, 2022, at pp. 333-334.

its normally-live-or-work carveout, to the allegations that the Capitol was "restricted" due to the Vice President's presence there. It reasoned that "the Vice President's working office is in the West Wing" and "anyone with a working knowledge of modern American government" understands that the Vice President "is principally an executive officer who spends little time at the Capitol and likely even less in her 'office' there." *McHugh*, 2022 WL 296304, at *22. Thus, according to *McHugh*, Vice President Pence was "temporarily visiting" his own office at the Capitol (even though the ordinary person understands that one does not "temporarily visit" one's own office) because the Vice President has another office that everyone knew he used more frequently. In other words, in shoehorning this theory into § 1752(c)(1)(B), the court rejected the ordinary person's understanding of what "temporarily visiting" means when it comes to the Vice President, specifically, without any basis in the statutory text.

Mr. Seitz respectfully submits that that logic creates fair notice problems. Due process requires that "a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Nothing in the statutory text signals to the reader that the ordinary meaning of "temporarily visiting" applies to the Vice President differently than any other Secret Service protectee. Plus, under *McHugh*'s reasoning, the regularity of the Vice President's physical presence in the Capitol building, judged against "modern" practice, dictates whether they are "temporarily visiting" that building, which, in turn, dictates whether an individual is unlawfully

in a "restricted area." This means the statute's reach expands and contracts based on fluid, unidentified factors—the frequency with which the Vice President casts a tie-breaking vote, their personal preference for working in their Senate office, their travel schedule, etc. Such indeterminacy provides no parameters by which the ordinary person can discern when the Vice President is "temporarily visiting" the Capitol and, in turn, know when the building is "restricted" for purposes of § 1752(a)(1); it specifies "no standard of conduct at all." *See United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)); *see also, e.g.*, *United States v. Davis*, 588 U.S. ___, ___, 139 S. Ct. 2319, 2324, 2336 (2019) (holding that § 924(c)(3)(B) is unconstitutionally vague, given that its "language, read in the way nearly everyone (including the government) has long understood it, provides no reliable way to determine which offenses qualify as crimes of violence").

A comparison is helpful and further counsels against reaching the same result as in *McHugh*. In *United States v. Class*, the D.C. Circuit recently assessed whether 40 U.S.C. § 5104(e), which prohibits the possession of firearms on the grounds of the Capitol, was unduly vague on account of the law making it difficult to determine whether a certain parking lot fell within the restricted area. 930 F.3d 460 (D.C. Cir. 2019). The Court of Appeals held that the law was not vague because it defined the restricted area "by a map and a specific list of intersections and streets that are part of the public law," meaning, "[a] citizen concerned about violating the ban need not . . . speculate about the uses the various parcels of land. He must simply . . . open the

statute book—even if here he may need two." *Id.* at 468–69. By comparison, under *McHugh*'s reading of § 1752(c)(1)(B), the ordinary person could not look to a statute book (or even along a "circuitous route" of resources) to determine if the Capitol building is "restricted" on account of the Vice President "temporarily visiting" it. *Cf. Class*, 930 F.3d. at 467. Instead, the law would be fluid and subject to sudden change. Indeed, even if the "ordinary person" is someone "with a working knowledge of modern American government" (which the defense doubts; *contra McHugh*, 2022 WL 296304, at \*22), they would have no reason to think the modern Vice President "likely spends little time" in their Senate office based on recent observations—Vice Presidents Pence and Harris have been in the Capitol nearly thirty times in the last few years *just* to provide a tiebreaker vote. As such, *McHugh*'s interpretation of § 1752(c)(1)(B) does not provide the "sufficient definiteness" that due process requires.

### B. To the extent "temporarily visiting" is ambiguous, principles of lenity and constitutional avoidance counsel in favor of a narrower construction.

At best, the term "temporarily visiting" is ambiguous. The most straightforward (and correct) reading of "temporarily visiting" is the one *McHugh* discerned and should have applied: a Secret Service protectee's travel to a location for a particular purpose and lasting a limited time, excluding travel to and from the protectee's own place of work. Alternatively, as the court in *McHugh* concluded, the phrase might be read more broadly to reach a Secret Service protectee's temporary travel to their own office, provided the ordinary person knows that, in recent years,

14

the protectee does not spend much time in that office (but instead, uses another office). 2022 WL 296304, at *22.

Principles of lenity demand that the court adopt the narrower construction. A defendant should not suffer surprise at the hands of an ambiguous law; "when the government means to punish, its commands must be reasonably clear." SCALIA & GARNER at 299; *accord Wooden*, 2022 WL 660610, at *15 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws."). Thus, when a reasonable doubt persists about a statute's meaning even after employing tools of statutory interpretation to try to resolve it, the court should adopt the reading that favors the defendant. *See Moskal v. United States*, 498 U.S. 103, 108 (1990); *accord, e.g.*, *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1246 (D.C. Cir. 2008) (rule of lenity, as described in *Moskal*, supported adopting narrower construction of 18 U.S.C. § 1028A(a)(1)).[13] Here, applying the rule of lenity, the Court should read "temporarily visiting" in § 1752(c)(1)(B) to exclude the Vice President's trips to her own office—

---

[13] There is ambiguity in the case law over the level of ambiguity required to trigger the rule of lenity. While some statements from the Supreme Court suggest the rule applies only where there is a "grievous ambiguity," the rule's historical origins indicate a less stringent standard. *See, e.g.*, *Wooden*, 2022 WL 660610, at *17 (Gorsuch, J., concurring) ("This 'grievous' business does not derive from any well-considered theory about lenity or the mainstream of this Court's opinions. Since the founding, lenity has sought to ensure that the government may not inflict punishments on individuals without fair notice and the assent of the people's representatives."); *Miller* slip op. at 9 (describing conflicting standards for applying rule of lenity); *see also* SCALIA & GARNER at 298–99 (acknowledging various standards exist for applying rule of lenity and opining that *Moskal*-stated standard most closely aligns with the rule's policy interest in visiting the consequences of an ambiguous law "on the party more able to avoid and correct the effects of shoddy legislative drafting"). Even if the standard is "grievous ambiguity," rather than persistent doubt, lenity counsels in favor of the narrower construction of § 1752(c)(1)(B) at issue here.

whether in the Capitol building or the West Wing. That reading is consistent with the ordinary person's understanding of the phrase and avoids a vague and obscure description of when a protectee's travel to a place triggers criminal liability under § 1752(a)(1) for those in the vicinity. And it accords with the course the Supreme Court has charted. *See, e.g.*, *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 403 n.8, 408–09 (2003) (applying rule of lenity when construing "obtain" in the Hobbs Act and favoring "the familiar meaning of the word" over a "vague and obscure" description); *Miller* slip op. at 28 (after concluding § 1512(c)(2) was subject to "two plausible interpretations," adopting the narrower interpretation in light of principle of lenity and dismissing count for failure to allege an offense within that narrower meaning); *Guertin*, 2022 WL 203467, at **3–4 (to the extent any question remained about whether indictment alleged an offense under § 1343 based on whether "obtaining money or property" could mean "maintaining money or property," lenity counseled in favor of resolving that ambiguity in defendant's favor; count dismissed).

Similarly, principles of constitutional avoidance counsel in favor of adopting the reading of the statute that does not raise questions about the statute's legitimacy. The presumption of constitutionality and the constitutional-doubt canon allow the judiciary to uphold ambiguous legislation. The former "holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional" and the latter "militates against not only those interpretations that would render the statute unconstitutional but also those that would even raise serious questions of constitutionality." *Davis*, 139 S. Ct. at 2332 & n.6; SCALIA & GARNER at 247–48. In

light of the due process concerns that attend construing the statute to reach a Secret Service protectee's travel to and from their own office, contrary to ordinary understanding and based on that individual protectee's personal predilections and practices, this Court should decline to adopt that reading. *See, e.g.*, *United States v. Cano-Flores*, 796 F.3d 83, 91–94 (D.C. Cir. 2015) (constitutional avoidance principles counseled reading statute not to authorize imposition of forfeiture based on total revenue of conspiracy on mid-level manager defendant, given Eighth Amendment concerns).

### C.    Counts two and three should be dismissed for failure to allege an offense.

It follows that Counts two and three must be dismissed because its allegations simply do not align with the statute's text. A person does not "temporarily visit" their own office or place of business, even when that person is the Vice President of the United States. Accordingly, these Counts must be dismissed because its allegations, even if proven, would not be sufficient to permit a jury to find a violation of § 1752(a)(1) was committed. *See, e.g.*, *Guertin*, 2022 WL 203467, at *2–6 (dismissing count that could not state an offense under § 1343 as a matter of law based on theory alleged; wire fraud statute does not criminalize scheme to "maintain" something); *Payne*, 382 F. Supp. 3d at 76–77 (dismissing indictment that could not state an offense under § 922(g)(1) as a matter of law based on theory alleged; prior convictions had been expunged by certificates that did not expressly include prohibition on firearm possession and, therefore, could not support § 922(g)(1) charge); *Brown*, 2007 WL 2007513, at *3–5 (dismissing counts in indictment that failed to allege violation

of § 1512(c)(2) as a matter of law based on theory alleged; D.C. Superior Court grand jury allegedly obstructed was not a "Federal grand jury" within the meaning of § 1515(a)(1)).

If there is a hole in the statute, then it is for the legislature, not the judiciary, to patch. Congress can write another law if it decides § 1752(a)(1) should reach the allegations here. But stretching § 1752(c)(1)(B) to fit this indictment is not the solution. Instead, "[r]espect for due process and the separation of powers suggests a court may not, in order to save Congress th[at] trouble, . . . construe a criminal statute to penalize conduct it does not clearly proscribe." *Davis*, 139 S. Ct. at 2333. The Constitution envisions that expansions of law come from Congress, not courts. *See, e.g.*, *Scheidler*, 537 U.S. at 409 ("a significant expansion of the law's coverage must come from Congress, and not from the courts.").

To be clear, concluding that the allegations here fall outside the ambit of § 1752(c)(1)(B) does not undermine the government's ability to prosecute those who enter the Capitol building or grounds unlawfully or those who threaten the Secret Service's protection of the Vice President. The government has plenty of other provisions in the United States Code to prosecute similar alleged misconduct, and it has done so in numerous other cases arising from the Capitol breach. *See, e.g.*, 18 U.S.C. § 3056(d); 40 U.S.C. § 5104(e)(2)(D). Further, the government remains free to prosecute violations of § 1752(a)(1) based on the Vice President's travel to any other location "for a particular purpose . . . and for a limited time" that is *not* a trip to her own office building. *Cf. McHugh*, 2022 WL 296304, at *20. Put simply, the

government had other charging choices, and it chose wrongly here. Counts two and

three must be dismissed.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____

JOSE GERMAN
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500