**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-279 (DLF)** |
| **v.** | : | |
| | : | |
| **ETHAN C. SEITZ,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**
**OBSTRUCTION CHARGE**

The United States of America, by and through its attorney, United States Attorney for the District of Columbia, hereby respectfully submits this opposition to defendant Ethan Seitz's motion to dismiss Count One of the Indictment, charging him with obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (ECF No. 41). Several courts in this district, including this Court, have rejected many, if not all, of the challenges that Seitz raises in his motion.  *See, e.g.*, *United States v. Reffitt,* 21-cr-32 (DLF), 2022 WL 1404247 (D.D.C. May 4, 2022); *United States v. Sandlin,* 21-cr-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. McCaughey et al.*, 21-cr-40 (TNM), ECF No. 388 (D.D.C. July 20, 2022); *United States v. Robertson*, 21-cr-34, 2022 WL 2438546 (D.D.C. July 5, 2022); *United States v. Williams*, 21-cr-618 (ABJ), 2022 WL 2237301 (D.D.C. June 22, 2022); *United States v. Fitzsimons*, 21-cr-158 (RC), 2022 WL 1698063 (D.D.C. May 26, 2022); *United States v. Bingert*, 21-cr-91 (RCL), 2022 WL 1659163 (D.D.C. May 25, 2022); *United States v. McHugh*, No. 21-cr-453 (JDB), 2022 WL 296304 (D.D.C. Feb. 1, 2022) and 2022 WL 1302880 (D.D.C. May 2, 2022); *United States v. Puma*, 21-cr-454 (PLF), 2022 WL 823079 (D.D.C. Mar. 19, 2022); *United States v. Grider*, 21-cr-22 (CKK), 2022 WL 392307 (D.D.C. Feb. 9, 2022); *United States v. Nordean*, 21-cr-175 (TJK), 2021 WL 6134595 (D.D.C. Dec. 28, 2021); *United States v.*

*Montgomery*, 21-cr-46 (RDM), 2021 WL 6134591 (D.D.C. Dec. 28, 2021); *United States v. Mostofsky*, No. 21-cr-138 (JEB), 2021 WL 6049891 (D.D.C. Dec. 21, 2021); *United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718 (APM) (D.D.C. Dec. 20, 2021).

Following its own sound reasoning in *Sandlin* and *Reffitt,* and the well-reasoned view of the overwhelming majority of district judges to have considered the issues, the Court should deny the motion to dismiss.

## **FACTUAL BACKGROUND**

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress convened in the United States Capitol building.  The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election.  With the Joint Session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol.  At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over erected barricades.  The crowd, having breached police officer lines, advanced to the exterior façade of the building.  Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol.  At approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to – and did – evacuate the chambers.

On January 13, 2021, the FBI received a tip that Ethan Seitz had entered the Capitol building during the January 6 attack, posting statements on his Facebook account indicating that he had entered the building.  The FBI obtained a search warrant for Seitz's Facebook account, and found messages in which Seitz discussed his participation.  At 12:48 p.m. on January 6, 2021, Seitz wrote, "There is a militia here that wants to storm the Capitol and take the building after Trumps speech ☺."  Later, Seitz then narrated his participation in the breach in nearly real time.

At 2:25 p.m., Seitz wrote "I'm goin in the capitol."  Two minutes later: "I just climbed in through a broken window."  According to U.S. Capitol Police surveillance footage, Seitz entered the Capitol Building at approximately 2:25 p.m. (when he climbed in through a broken window near the Senate Wing Doors).  Inside the Capitol Building, Seitz traveled to the Crypt, and upstairs to the Rotunda, East Foyer, and Ohio Clock corridor, before returning downstairs to climb out another window near the Senate Wing Doors at approximately 2:25 p.m.  At 3:03 p.m., Seitz sent another series of Facebook messages describing what he had done, stating "I was inside the capitol and was smashed in a group of people. They fuckin pepper sprayed us and hit us with tear gas canisters inside the capitol building," and "I was inside upstairs in the capitol pushing with a group of people and they fuckin gassed us again. And pepper sprayed us."  He continued, "I had to climb out a window.  Couldnt breath or see."  To another individual, he wrote, "I climbed through a broken window of the capitol. We pushed and pushed bro. I've been gassed 2 or 3 times. And pepper sprayed. I had to climb back out I couldnt breath."

Seitz remained in the area of the Capitol Building at least as of 4:28 p.m., grabbing a police officer's baton as the officer pushed him back.  Later that evening, near the Capitol, an individual interviewed Seitz and posted the interview on social media.  In the interview, Seitz claimed that he "made it to the other side of the building" before encountering a door locked by the "cops" that his group pushed through in order to let rioters through another entrance.  He said his group had been tear gassed and pepper sprayed.  In another Facebook message, he wrote, "Yeah I didnt really prepare for that. I didnt expect to be on the frontline storming the capitol and taking the building lol."  He also explained that he had come to Washington, D.C. because he was concerned about a "fraudulent election," which he saw as a "coup against Trump."

On March 18, 2021, Seitz was charged by complaint in connection with his participation in the Capitol breach.  The following day, he was arrested in Bucyrus, Ohio.  ECF No. 5.  Seitz

spoke with the FBI, and agreed that he had been trying to send a message to Congress on January 6 because of his belief that the presidential election was fraudulent. He also agreed that the crowd inside the Capitol was trying to stop Congress from "doing what they were doing." He again acknowledged that he had been part of a group inside the Capitol that was pushing and "going where the cops didn't want people."

## PROCEDURAL HISTORY

On April 2, 2021, the grand jury returned an indictment charging Seitz with five offenses: obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One), entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).

On March 4, 2022, the government moved to strike references to then Vice President-elect Kamala Harris in the counts charging Seitz with violations of 18 U.S.C. § 1752. ECF No. 36. On March 8, the Court granted the government's motion in a Minute Order. On July 14, 2022, Seitz filed three motions to dismiss. ECF Nos. 41-43. This opposition addresses the two motion addressed to Count One (ECF No. 41).

## LEGAL STANDARD

A defendant may move to dismiss an indictment or count thereof for failure to state a claim prior to trial. *See* Fed. R. Crim. P. 12(b)(3)(B)(v). "[A]n indictment must be viewed as a whole, and the allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011). The question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes

charged were committed. *Id.* "An indictment must contain every element of the offense charged, if any part or element is missing, the indictment is defective and must be dismissed." *See United States v. Hillie*, 227 F. Supp. 3d 57, 70 (D.D.C. 2017).

## **ARGUMENT**

The Court should deny Seitz's motion to dismiss Court One.  Count One of the Indictment charges him with corruptly obstructing, influencing, or impeding an "official proceeding," – *i.e.*, Congress's certification of the Electoral College vote on January 6, 2021 – in violation of 18 U.S.C. § 1512(c)(2).  In 2002, Congress enacted Section 1512(c)'s prohibition on "[t]ampering with a record or otherwise impeding an official proceeding" as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745, 807.  Section 1512(c)'s prohibition applies to

> [w]hoever corruptly--
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so*.

18 U.S.C. § 1512(c) (emphasis added).  Section 1515(a)(1), in turn, defines the phrase "official proceeding" to include "a proceeding before the Congress."  18 U.S.C. § 1515(a)(1)(B).  By the statute's plain terms, then, a person violates Section 1512(c)(2) when, acting with the requisite *mens rea*, he engages in conduct that obstructs a specific congressional proceeding, including, as here, Congress's certification of the Electoral College vote.

Seitz's statutory and constitutional arguments lack merit.  At least 13 judges of this district—including this Court—have considered, in other cases arising out of the events at the Capitol on January 6, 2021, one or more of the arguments raised by Seitz.  *See supra* pp. 3-4 (citing cases).  Every district judge to have reached the issue has concluded that Congress's certification

of the Electoral College is an "official proceeding" within the meaning of 18 U.S.C. 1512(c)(2) and that Section 1512(c)(2) is not unconstitutionally vague.  In addition, every reported court of appeals decision to have considered the scope of Section 1512(c)(2), and all but one of the district judges of this Court to have considered the issue in cases involving January 6, 2021, have concluded that Section 1512(c)(2) prohibits obstruction regardless of its connection to documentary or tangible evidence.  And, in any event, even if a nexus to documentary or tangible evidence were required, the allegations in the Indictment, which track the statutory language, more than adequately informed Seitz about the charge against him; nothing more was or is required. *See, e.g.*, *United States v. Williamson*, 903 F.3d 124, 130-131 (D.C. Cir. 2018).  Seitz's claim that Section 1512(c)(2) is unconstitutionally vague is also meritless.  This Court should deny the motion to dismiss Count One.

## I.      Section 1512(c)(2) applies to the conduct alleged in the indictment.

Seitz advances two distinct statutory arguments for the notion that Section 1512(c)(2) does not reach the conduct alleged in the indictment: (1) that Section 1512(c)(2) is limited to obstruction tied to documentary or tangible evidence (Mot. at 3-9); and (2) that Congress's certification of the Electoral College vote is not an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2) (Mot. at 9-14).  Neither claim has merit, as the Court and other judges in this district have concluded with near-perfect uniformity.  The former would fail even on its own terms.

### A.      Section 1512(c)(2)'s prohibition on obstructive conduct does not require a nexus to documentary or tangible evidence.

Citing *Miller*, 2022 WL 823070, and a memo written by Bill Barr before he was the Attorney General, Seitz contends that Section 1512(c)(2) is limited to obstruction tied to documentary or tangible evidence.  ECF No. 41.  He is incorrect, as at least 13 judges of this Court have concluded in rejecting analogous claims by other defendants charged in connection with the

events of January 6, 2021. *See McCaughey*, 21-cr-40, ECF No. 388 at 2 (McFadden, J.) (rejecting defendants' argument premised on *Miller* and observing that "*Miller* has also persuaded no other judge on this question"); *Reffitt,* 2022 WL 1404247, at *5-10 (Friedrich, J.); *Sandlin*, 2021 WL 5865006, at *5-9 (Friedrich, J.); *Caldwell*, 2021 WL 6062718, at *11-21 (Mehta, J.); *Mostofsky*, 2021 WL 6049891, at *11 (Boasberg, J.); *Montgomery*, 2021 WL 6134591, at *10-18 (Moss, J.); *Nordean*, 2021 WL 6134595, at *6-8 (Kelly, J.); *United States v. Bozell*, 21-cr-216, 2022 WL 474144, at *5 (D.D.C. Feb. 16, 2022) (Bates, J.); *Grider*, 2022 WL 392307, at *5-6 (Kollar-Kotelly, J.); *Fitzsimons*, 2022 WL 1698062, at *6-*11 (Contreras, J.); *Puma*, 2022 WL 823079, at *7-9, 12 & n.4 (Friedman, J.); *Bingert,* 2022 WL 1659163, at *7-8 (Lamberth, J.); *Williams,* 2022 WL 2237301, at *10-13 and *17 n.13 (Berman Jackson, J.); *Robertson,* 2022 WL 2438546, at *3-*4 (Cooper, J.).

> **1.     Section 1512(c)(2)'s text and structure demonstrate that its prohibition on obstructive conduct covers Seitz's actions on January 6, 2021.**

In Section 1512(c)(2), Congress comprehensively prohibited conduct that intentionally and wrongfully obstructs official proceedings. The ordinary meaning of "obstruct[], influence[], or impede[]" encompasses a wide range of conduct designed to frustrate an official proceeding. That conduct can include lying to a grand jury or in civil proceedings, exposing the identity of an undercover agent, and burning a building to conceal the bodies of murder victims. It also includes storming into the Capitol to derail a congressional proceeding. A defendant who, acting with the necessary *mens rea*, obstructs (or attempts to obstruct) Congress's certification of the Electoral College vote, commits a crime under Section 1512(c)(2).

Section 1512(c)(2)'s text and structure demonstrate that it serves as a comprehensive prohibition on corrupt conduct that intentionally obstructs or impedes an official proceeding. When interpreting a statute, courts look first to the statutory language, "giving the words used their

ordinary meaning." *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (internal quotation marks omitted). If the statutory language is plain and unambiguous, this Court's "inquiry begins with the statutory text, and ends there as well." *National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617, 631 (2018) (internal quotation marks omitted). Here, the meaning of "obstruct[], influence[], or impede[]" is controlled by the ordinary meaning of those words.

The verbs Congress selected in Section 1512(c)(2) reach broadly. For example, the words "obstruct" and "impede" can "refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'" *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (brackets omitted) (citing dictionaries). Similarly, "influence" includes "affect[ing] the condition of" or "hav[ing] an effect on." *Influence*, Oxford English Dictionary, *available at* http://www.oed.com. By their plain meaning, therefore, the string of verbs in Section 1512(c)(2) are properly viewed as "expansive" in their coverage. *See United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013).

Section 1512(c)'s structure confirms that straightforward interpretation. Section 1512(c) consists of two provisions, which both require the defendant to act "corruptly." First, Section 1512(c)(1) criminalizes "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding." Section 1512(c)(2), by contrast, applies more generally to any acts that "otherwise obstruct[], influence[], or impede[]" an official proceeding. The term "otherwise," consistent with its ordinary meaning, conveys that Section 1512(c)(2) encompasses misconduct that threatens an official proceeding "beyond [the] simple document destruction" that Section 1512(c)(1) proscribes. *Id.; United States v. Petruk*, 781 F.3d 438, 446-47 (8th Cir. 2015) (noting that "otherwise" in Section 1512(c)(2), understood to mean "in another manner" or "differently," implies that the obstruction prohibition in that statute applies "without regard to whether the action relates to documents or records") (internal quotation marks omitted); *see also United States v.*

*Ring*, 628 F. Supp. 2d 195, 224 n.17 (D.D.C. 2009) (noting that Section 1512(c)(2) is "plainly separate and independent of" Section 1512(c)(1), and declining to read "otherwise" in Section 1512(c)(2) "as limited by § 1512(c)(1)'s separate and independent prohibition on evidence-tampering"); *Otherwise*, Oxford English Dictionary, *available at* http://www.oed.com (defining otherwise as "in another way" or "in any other way"); *see also Gooch v. United States*, 297 U.S. 124, 127-28 (1936) (characterizing "otherwise" as a "broad term" and holding that a statutory prohibition on kidnapping "for ransom or reward or otherwise" is not limited by the words "ransom" and "reward" to kidnappings for pecuniary benefit); *Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004) (construing "otherwise" in 28 U.S.C. § 2466(1)(C) to reach beyond the "specific examples" listed in prior subsections, thereby covering the "myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court").

In this way, Section 1512(c)(2) criminalizes the same *result* prohibited by Section 1512(c)(1) – obstruction of an official proceeding – when that result is accomplished by a different *means, i.e.*, by conduct other than destruction of a document, record, or other object. *Cf. United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir. 1978) (explaining that 18 U.S.C. § 1503, which criminalizes the result of obstructing the due administration of justice, provides specific means of accomplishing that result and then a separate catch-all clause designed to capture other means). Section 1512(c)(2), in other words, "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense involving documents or records under Section 1512(c)(1). *Petruk*, 781 F.3d at 447 (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)); *cf. United States v. Aguilar*, 515 U.S. 593, 598 (1995) (describing similar "[o]mnibus" clause in 18 U.S.C. § 1503 as a catchall that is "far more general in scope than the earlier clauses of the statute").

Consistent with that interpretation, courts have upheld convictions under Section 1512(c)(2) for defendants who attempted to secure a false alibi witness while in jail for having stolen a vehicle, *Petruk*, 781 F.3d at 440, 447; disclosed the identity of an undercover federal agent to thwart a grand jury investigation, *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009); lied in written responses to civil interrogatory questions about past misconduct while a police officer, *Burge*, 711 F.3d at 808-09; testified falsely before a grand jury, *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); solicited information about a grand jury investigation from corrupt "local police officers," *Volpendesto*, 746 F.3d at 286; and burned an apartment to conceal the bodies of two murder victims, *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (unpublished); *see also United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects before issuance or execution of search warrants), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-26 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target).

Here, Section 1512(c)(2) also applies to Seitz's conduct, which involved entering the Capitol through a broken window and pushing against the police to access areas of the Capitol that the police were trying to protect.  In so doing, Seitz hindered and delayed the certification of the Electoral College vote, an "official proceeding" as that term is defined in the obstruction statute. *See* 18 U.S.C. § 1515(a)(1)(B); *supra* pp. 3-4 (listing cases).   Because construing Section 1512(c)(2) to reach that conduct would neither "frustrate Congress's clear intention" nor "yield patent absurdity," this Court's "obligation is to apply the statute as Congress wrote it." *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted).

In contrast, reading Section 1512(c)(2) as limited only to obstructive acts akin to the document destruction or evidence tampering captured in Section 1512(c)(1) (as Seitz suggests)

suffers at least three flaws. *First*, it would give rise to unnecessarily complex questions about what sort of conduct qualifies as "similar to but different from" the proscribed conduct "described in [Section 1512](c)(1)." *United States v. Singleton*, No. 06-CR-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished); *see id.* (concluding that Section 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-CR-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of Section 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceedings [*sic*] through his conduct in relation to a tangible object"). So construed, for example, Section 1512(c)(2) may not encompass false statements made to obstruct a proceeding – though courts have widely upheld convictions for such conduct. *See Petruk*, 781 F.3d at 447 (collecting cases).

Limiting Section 1512(c)(2) in that way would effectively render that provision superfluous considering the comprehensive prohibitions against document and evidence destruction in both Sections 1512(c)(1) and 1519. *See Yates v. United States*, 574 U.S. 528, 541 n.4 (2015) (Section 1512(c)(1) provides a "broad ban on evidence-spoliation") (internal quotation marks omitted). By contrast, the straightforward interpretation that treats Section 1512(c)(2) as a catch-all for corrupt obstructive conduct not covered by Section 1512(c)(1) would "give effect to every clause and word" of Section 1512(c). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013); *cf. United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1991) (explaining that limiting the catch-all provision in Section 1503's omnibus clause to obstructive acts "directed against individuals" would render that catch-all superfluous because "earlier, specific[] prohibitions" in Section 1503 "pretty well exhaust such possibilities") (internal quotation marks omitted); *United States v. Watt*, 911 F. Supp. 538, 546 (D.D.C. 1995) (rejecting interpretation of the Section 1503 omnibus clause that would "serve no other purpose than to prohibit acts already

prohibited in the first part of the statute" because that reading would "reduce[] the omnibus clause to mere redundancy").

Contrary to Seitz's assertions (ECF No. 41, at 8), the fact that Congress adopted a more general catch-all in Section 1512(c)(2) does not render superfluous other obstruction prohibitions found in Chapter 73, the criminal code's chapter on obstruction of justice. *See, e.g.*, *Montgomery*, 2021 WL 6134591, at *13 ("[T]he Court is also unpersuaded by Defendants' more general superfluity argument, which posits that, unless Section 1512(c)(2) is narrowly construed, much of Chapter 73 would be rendered superfluous.").  Instead, the catch-all in Section 1512(c)(2) serves to capture "known unknowns." *Yates*, 574 U.S. at 551 (Alito, J., concurring) (quoting *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009)).  Indeed, "the whole value of a generally phrased residual clause … is that it serves as a catchall" to ensure that the full range of conduct Congress sought to regulate comes within the statute, including "matters not specifically contemplated" by more specific provisions. *Beaty*, 556 U.S. at 860.  In any event, "[r]edundancies across statutes are not unusual events in drafting," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), and the "rule[] of thumb" that statutes should be interpreted to avoid superfluity necessarily yields to the "cardinal canon" that Congress "says in a statute what it means and means in a statute what it says there," *id.* at 253-54.

Judicial treatment of the nearby omnibus clause in Section 1503, which prohibits "corruptly … influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice," 18 U.S.C. § 1503, is instructive.  Drafted in "very broad language," the omnibus clause or "catchall provision," see *Aguilar*, 515 U.S. at 599, principally operates to criminalize obstructive conduct that falls outside the narrower prohibitions within Section 1503 and neighboring provisions. *See, e.g.*, *United States v. Sussman*, 709 F.3d 155, 168-170 (3d Cir. 2013) (removing gold coins from safe-deposit box); *United States v. Frank*, 354 F.3d

910, 916-919 (8th Cir. 2004) (removing car to avoid seizure); *United States v. Lefkowitz*, 125 F.3d 608, 619-620 (8th Cir. 1997) (instructing employee to remove documents from a house); *United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir. 1984) (hiding a witness); *United States v. Brown*, 688 F.2d 596, 597-598 (9th Cir. 1982) (warning suspect about impending search warrant to prevent discovery of heroin); *Howard*, 569 F.2d at 1333-1334 (attempting to sell grand jury transcripts). No court has held that the omnibus clause's broad language should be given an artificially narrow scope to avoid any overlap with Section 1503's other, more specific provisions.  *Cf. Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005) ("The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either.").  The same is true for the catch-all provision in Section 1512(c)(2).

Similarly, Section 1512(c)(2)'s partial overlap with other obstruction statutes does not render those other provisions superfluous.  For example, the omnibus clause in 1503 and the congressional obstruction provision in 1505 both reach an "endeavor[] to influence, obstruct, or impede" the proceedings – a broader test for inchoate violations than Section 1512(c)(2)'s "attempt" standard. *See United States v. Sampson*, 898 F.3d 287, 301 (2d Cir. 2018) ("[E]fforts to witness tamper that rise to the level of an 'endeavor' yet fall short of an 'attempt' cannot be prosecuted under § 1512."); *United States v. Leisure*, 844 F.2d 1347, 1366-1367 (8th Cir. 1988) (collecting cases recognizing the difference between "endeavor" and "attempt" standards). Section 1519, which covers destruction of documents and records in contemplation of an investigation or agency proceeding, does not require a "nexus" between the obstructive act and the investigation or proceeding – but Section 1512(c)(2) does.  Again, the existence of even "substantial" overlap is not "uncommon" in criminal statutes. *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014).  But given that Sections 1503, 1505, and 1519 each reach conduct that Section 1512(c)(2) does not, the overlap provides no reason to impose an artificially limited construction

on the latter provision. *See, e.g.*, *Sandlin*, 2021 WL 5865006, at *8 ("[T]he fact that there is overlap between § 1512(c)(2) and the rest of § 1512, or other provisions in Chapter 73, is hardly remarkable.").

Importing into Section 1512(c)(2) a nexus-to-tangible-evidence-or-documents requirement would require inserting an extratextual gloss that would render the verbs in Section 1512(c)(2) nonsensical. *See Dean v. United States*, 556 U.S. 568, 572 (2009) (courts "ordinarily resist reading words or elements into a statute that do not appear on its face") (internal quotation marks omitted). The *actus reus* that those verbs encompass is obstructing, influencing, and impeding; a defendant cannot "obstruct" a document or "impede" a financial record. *Cf. Yates*, 574 U.S. at 551 (Alito, J., concurring) (rejecting interpretation of "tangible object" in Section 1519 that would include a fish in part because of a mismatch between that potential object and the statutory verbs: "How does one make a false entry in a fish?"); *id.* at 544 (plurality opinion) ("It would be unnatural, for example, to describe a killer's act of wiping his fingerprints from a gun as 'falsifying' the murder weapon.").

> **2.      Legislative and statutory history do not establish that Section 1512(c)(2) requires a nexus to documents or tangible evidence.**

Because "the statutory language provides a clear answer," the construction of Section 1512(c)(2) "ends there" and it is unnecessary to resort to legislative history. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999); *see Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 599 (2011) (same); *see also United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237, 251-52 (S.D. Tex. 2020) (declining to consider Section 1512's legislative history). Regardless, the legislative history of Section 1512(c)(2) – particularly when considered alongside the history of Section 1512 more generally – provides no support for a different conclusion, contrary to Seitz's assertions (*e.g.*, ECF No. 41 at 6-8). *See, e.g.*, *Montgomery*, 2021 WL 6134591, at *15-17.

14

When Congress in 1982 originally enacted Section 1512, that legislation did not include what is now Section 1512(c).  *See* VWPA, Pub. L. No. 97-291, § 4(a), 96 Stat. 1248, 1249-1250. Its title then, as now, was "Tampering with a witness, victim, or an informant."  *Id.*; 18 U.S.C. § 1512.  As that title suggested, Section 1512 as originally enacted targeted conduct such as using intimidation, threats, or corrupt persuasion to prevent testimony or hinder, delay, or prevent communication of information to law enforcement or the courts as well as intentionally harassing another person to hinder, delay, or prevent that person from taking certain actions.  *See* Pub. L. No. 97-291, § 4(a) (now codified as Section 1512(b) and Section 1512(d)).

Twenty years later, following the collapse of the Enron Corporation, Congress passed the Sarbanes-Oxley Act of 2002. Pub. L. No. 107-204, 116 Stat. 745; *see Yates*, 574 U.S. at 535 (plurality opinion). That legislation, which principally aimed to "prevent and punish corporate fraud, protect the victims of such fraud, preserve evidence of such fraud, and hold wrongdoers accountable for their actions," S. Rep. No. 107-146, at 2 (2002), included several different provisions, *id.* at 11 (describing different components of the law); *see also* 148 Cong. Rec. H4683-84 (daily ed. July 16, 2002) (outlining new provisions). Foremost among them were two new criminal statutes, 18 U.S.C. § 1519 and 18 U.S.C. § 1520, which were intended to "clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records."  S. Rep. No. 107-146, at 14. The Senate Judiciary Committee Report discussed those two provisions in detail. *See id.* at 14-16.

By contrast, the Sarbanes-Oxley Act's legislative history provides limited explanation of Congress's objective in enacting Section 1512(c). The only discussion of Section 1512 in the Senate Judiciary Committee Report, for example, noted that the pre-existing prohibition in Section 1512(b) made it a crime to induce "another person to destroy documents, but not a crime for a person to destroy the same documents personally"—a limitation that "forced" prosecutors to

"proceed under the legal fiction that the defendants [in then-pending *United States v. Arthur Andersen*] are being prosecuted for telling other people to shred documents, not simply for destroying evidence themselves."  S. Rep. No. 107-146, at 6-7. Similarly, Senator Hatch observed that the legislation "broaden[ed]" Section 1512 by permitting prosecution of "an individual who acts alone in destroying evidence."  148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch). At a minimum, nothing in these passing references casts doubt on the plain meaning of Section 1512(c)(2), which is reflected in the interpretation described above.

Section 1512(c) also differed from the newly enacted Sections 1519 and 1520 in that Congress added the former to an existing statutory section: Section 1512. *See Yates*, 574 U.S. at 541 (plurality opinion) (noting that, unlike Section 1519, Section 1512(c)(2) was placed among the "broad proscriptions" in the "pre-existing" Section 1512). Moreover, although Section 1512(c) as enacted in the Sarbanes-Oxley Act recognized two distinct prohibitions, *see* Pub. L. No. 107-204, § 1102, 116 Stat. 807 ("Tampering with a record *or* otherwise impeding an official proceeding") (emphasis added; capitalization altered), Congress did not amend Section 1512's title. That title, "Tampering with a witness, victim, or an informant," § 1512, thus encompassed the pre-existing provisions aimed at a defendant's obstructive conduct directed toward another person,[1] but did not reflect the newly enacted prohibitions in Section 1512(c) that criminalized a defendant's own obstructive act, either through destroying documents (§ 1512(c)(1)) or otherwise impeding a proceeding (§ 1512(c)(2)). *See Yates*, 574 U.S. at 541 n.4 (plurality opinion) (noting

---

[1]      *See* § 1512(a) (applies to killing, attempting to kill, or using physical force or the threat of physical force against a person to prevent testimony or induce a witness to withhold information); § 1512(b) (applies to using intimidation, threats, or corrupt persuasion against a person to prevent testimony or hinder, delay, or prevent communication of information to law enforcement or the courts); § 1512(d) (applies to intentionally harassing another person to hinder, delay, or prevent that person from taking certain actions).

that Congress added Section 1512(c)(1), which covered evidence-spoliation, to Section 1512 "even though § 1512's preexisting title and provisions all related to witness-tampering").

Section 1512(c)'s legislative and statutory history thus offers two reasons to interpret Section 1512(c)(2) consistently with its plain text and structure. First, Section 1512(c) aimed at closing a "loophole" in Section 1512: the existing prohibitions did not adequately criminalize a defendant's *personal* obstructive conduct *not* aimed at another person. *See* 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch). Read together in this light, Section 1512(c)(1) criminalizes a defendant's firsthand destruction of evidence (without having to prove that the defendant induced another person to destroy evidence) in relation to an official proceeding, and Section 1512(c)(2) criminalizes a defendant's firsthand obstructive conduct that *otherwise* impedes or influences an official proceeding (though not necessarily through another person). *See Burge*, 711 F.3d at 809-10. Second, no substantive inference is reasonably drawn from the fact that the title of Section 1512 does not precisely match the "broad proscription" it in fact contains, given that the Sarbanes-Oxley Act unequivocally and broadly entitled the new provisions now codified in Section 1512(c), "Tampering with a record *or* otherwise impeding an official proceeding." Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered). Section 1512's title is more limited simply because Congress did not amend the pre-existing title when it added the two prohibitions in Section 1512(c) in 2002. *Cf. Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (describing "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text").

### 3.   This Court should not adopt the outlier construction reflected in *United States v. Miller*

Seitz urges this Court to adopt the reasoning of *United States v. Miller*, No. 21-cr-119, 2022 WL 823070 (D.D.C. Mar. 7, 2022) (Nichols, J.), the sole decision in which a judge of this

Court has construed Section 1512(c)(2) to require proof that "the defendant ha[s] taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *Id.* at *15. *Miller*'s outlier reasoning is unpersuasive for several reasons.

Focusing on the word "otherwise" in Section 1512(c)(2), *Miller* identified "three possible readings" of Section 1512(c)(2). 2022 WL 823070, at *6. First, Section 1512(c)(2) could serve as a "clean break" from Section 1512(c)(1), *id.* at *6, a reading that "certain courts of appeals have adopted," *id.* at *7. *Miller*, however, identified multiple "problems" with that interpretation, all rooted in the interpretation of the term "otherwise." It stated that reading "otherwise" in Section 1512(c)(2) to mean "in a different way or manner" is "inconsistent" with *Begay v. United States*, 553 U.S. 137 (2008), which considered whether driving under the influence qualified as a "violent felony" under the now-defunct residual clause of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1). 2022 WL 823070, at *7. Second, *Miller* hypothesized that Section 1512(c)(1) could "provide[] examples of conduct that violates" Section 1512(c)(2). 2022 WL 823070, at *8. Third, *Miller* stated that Section 1512(c)(2) could be interpreted as a "residual clause" for Section 1512(c)(1), such that both provisions are linked by the document-destruction and evidence-tampering "conduct pr[o]scribed by" Section 1512(c)(1). 2022 WL 823070, at *9. After considering Section 1512(c)'s structure, "historical development," and legislative history, *Miller* found "serious ambiguity" as to which of the two "plausible" readings – the second and third readings identified above – Congress intended. *Id.* at *15. Applying what it described as principles of "restraint," *Miller* then interpreted Section 1512(c)(2) to mean that a defendant violates the statute only when he or she "take[s] some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence an official proceeding" (the third reading). *Id.*

*Miller*'s reasoning is unpersuasive. *Miller* ultimately turned on the Judge Nichols's determination that no "single obvious interpretation of the statute" controlled and that the rule of lenity was applicable and was dispositive. 2022 WL 823070, at *15. Seitz, too, invokes the rule. (ECF No. 41 at 21-22). The rule of lenity, however, "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019). Some ambiguity is insufficient to trigger the rule of lenity; instead, a court must find "grievous ambiguity" that would otherwise compel guesswork. *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted). "Properly applied," then, "the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to complex rules, can often be solved.'" *Wooden*, 142 S. Ct. at 1074 (Kavanaugh, J., concurring).

"[C]ontrary to *Miller*'s conclusion, the rule of lenity does not apply here." *Reffitt,* 2022 WL 140427, at * 10. For the reasons set forth above, Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings – regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself. Any such distinction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who threatens to use force against the officers conducting that proceeding escapes criminal liability under the statute. Such an outcome would, ironically, lose sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted. *See Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring)

19

("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws.").  It would strain credulity for any defendant who was focused on stopping an official proceeding from taking place to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] [any] official proceeding or attempt[] to do so."  18 U.S.C. § 1512(c)(2).

None of the grounds identified in *Miller* for finding "serious ambiguity," 2022 WL 823079, at *15, withstand scrutiny.  *Miller* stated that the government's reading either "ignores" that the word "otherwise" is defined with reference to "something else" (namely Section 1512(c)(1)) or fails to "give meaning" to the term "otherwise."  2022 WL 823079, at *7.  That is incorrect.  Far from suggesting that Section 1512(c)(2) is "wholly untethered to" Section 1512(c)(1), *id.*, under the government's reading, the word "otherwise" in Section 1512(c)(2) indicates that Section 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in Section 1512(c)(1).  That understanding of "otherwise" is both fully consistent with the definitions of the term surveyed in *Miller*, *see* 2022 WL 823079, at *6 (noting that "otherwise" in Section 1512(c)(2) may be read as "in a different way or manner; differently"; "in different circumstances: under other conditions"; or "in other respects") (internal quotation marks omitted), and ensures that the term is not rendered "pure surplusage," *id.* at *7.  In other words, "otherwise" makes clear that Section 1512(c)(1)'s scope encompasses document destruction or evidence tampering that corruptly obstructs an official proceeding, while Section 1512(c)(2)'s ambit includes "other" conduct that corruptly obstructs an official proceeding.

Seitz relatedly argues that the government's interpretation would render Section 1512(c)(1) surplusage.  (ECF No. 41 at 8).  But, as already noted, overlap is "not uncommon in criminal statutes," *Loughrin* 573 U.S. at 358 n.4, and Section 1512(c)(2)'s broader language effectuates its design as a backstop in the same way that a "generally phrased residual clause … serves as a

catchall for matters not specifically contemplated." *Beaty*, 556 U.S. at 860.  And, in any event, interpreting the interplay of Sections 1512(c)(1) and 1512(c)(2) in this way does not foreclose a defendant from arguing that his conduct falls outside Section 1512(c)(2)'s scope because his document destruction or evidence concealment is prohibited and punishable only under Section 1512(c)(1).  A defendant prevailing on such a theory may be securing a Pyrrhic victory – where success leads to reindictment under Section 1512(c)(1) – but those practical considerations provide no reason to depart from the plain meaning of Section 1512(c).  And, in any event, the "mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino*, 544 U.S. at 358 n.4.

The *Miller* court and Seitz (ECF No. 41 at 4, 8) also posit that the government's reading is inconsistent with *Begay*.  That conclusion is flawed in several respects.  *See, e.g., Reffitt*, 2022 WL 1404247, at *8 (distinguishing *Begay* on multiple grounds).  First, in considering whether driving under the influence was a "violent felony" for purposes of the ACCA's residual clause – which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury," 18 U.S.C. § 924(e)(2)(B)(ii) – the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure from Section 1512(c)(2).  *See, e.g.*, *Sandlin*, 2021 WL 5865006, at *6 (distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in Section 1512(c)(2) is "set off by both a semicolon and a line break"); *United States v. Ring*, 628 F. Supp. 2d 195, 224 n.17 (D.D.C. 2009).  Differently from the ACCA residual clause, the "otherwise" phrase in Section 1512(c)(2) "stands alone, unaccompanied by any limiting examples." *Ring*, 628 F.Supp.2d at 224 n.17.  In other words, the "key feature" in Section 924(e)(2)(B)(ii) at issue in *Begay* – "namely, the four example crimes," 553 U.S. at 147 – is "absent" in Section 1512(c)(2).  *Caldwell*, 2021 WL 6062718, at *14.

Second, *Miller*'s assertion that the meaning of "otherwise" was "[c]rucial" to the Supreme Court's decision in *Begay* misapprehends *Begay*'s express analysis.  The majority in *Begay* noted first that the "listed examples" in Section 924(e)(2)(B)(ii) – burglary, arson, extortion, or crimes involving explosives – indicated that the ACCA residual clause covered only similar crimes. *Begay*, 553 U.S. at 142.  The majority next drew support from Section 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" and described Section 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples. *Id.* at 143-144.  Only in the final paragraph of that section of the opinion did the majority address the word "otherwise," noting that the majority "[could] not agree" with the government's argument that "otherwise" is "sufficient to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' can (we do not say must, cf. post at [150-52] (Scalia, J. concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others." *Id.* at 144.  A tertiary rationale responding to a party's argument where the majority refrains from adopting a definitive view of "otherwise" cannot plausibly be described as "crucial." Rather, the majority's "remarkably agnostic" discussion of "otherwise" in *Begay* explicitly noted that the word may carry a different meaning where (as here) the statutory text and context suggests otherwise. *Montgomery*, 2021 WL 6134591, at *11; *see also Caldwell*, 2021 WL 6062718, at *14 (declining to depart from the "natural reading" of "otherwise" as "'in a different way or manner'" based on the discussion in *Begay*).  In short, the majority in *Begay* actually "placed little or no weight on the word 'otherwise' in resolving the case." *Montgomery*, 2021 WL 6134591, at *11.

Third, whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s ultimate holding demonstrates why this Court should not embark on imposing an extra-textual requirement within Section 1512(c)(2).  The Supreme Court held in *Begay* that Section 924(e)(2)(B)(ii) encompassed only crimes that, similar to the listed examples, involve "purposeful,

violent, and aggressive conduct."  553 U.S. at 144-145; *see also Reffitt,* 2022 WL 1404247, at *8

(noting that Section 1512(c), unlike the ACCA, does not contain language, like "serious," that

demands a quantitative analysis of the degree to which certain conduct obstructs a proceeding") .

But "*Begay* did not succeed in bringing clarity to the meaning of the [ACCA's] residual clause."

*Johnson v. United States*, 576 U.S. 591, 600 (2015).  Whatever the merits of grafting an atextual

(and ultimately unsuccessful) requirement in the context of the ACCA, that approach is

unwarranted in the context of Section 1512(c)(2).  In the nearly 20 years between Congress's

enactment of Section 1512(c)(2) and *Miller*, no reported cases adopted the document-only

requirement urged by Seitz.[2]

Seitz also suggests that the government's position is inconsistent with the Supreme Court's

decision in *Yates*. (ECF No. 41, at 4 n.3, 8, 21).  He is incorrect.  *See Sandlin,* 2021 WL 5865006,

at *6-7 (distinguishing *Yates*).  In *Yates*, five Justices concluded, in a fractured decision, that a

fisherman who ordered his crew to throw his catch back into the sea to prevent federal authorities

from determining whether he had harvested undersized fish did not violate Section 1519's

prohibition on "knowingly alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[]

a false entry in any record, document, *or tangible object* with the intent to impede, obstruct, or

influence" a federal investigation.  *Yates*, 574 U.S. at 531 (plurality opinion).  Accordingly, five

Justices in *Yates* concluded that "tangible object" as used in Section 1519 did not include a fish.

---

[2]     Seitz also frequently cites a memo written by former Attorney General William
Barr. (ECF No. 41 at 3, 4, 5, 6, 7, 8 (quoting Memorandum from William Barr to Rod Rosenstein,
Deputy Att'y Gen., Dep't of Justice (June 8, 2018), *available at*
https://s3.documentcloud.org/documents/5638848/June-2018-Barr-Memo-to-DOJ-Muellers-
Obstruction.pdf).  But the memoranum was written by private citizen William Barr.  It was not
issued while Mr. Barr was the Attorney General of the United States, and the Department of Justice
has not adopted the memo or its reasoning. The memo is simply one private citizen's take on a
legal issue.  "[A]ny suggestion that the memorandum represents the views of the Department of
Justice is inaccurate."  *Montgomery*, 2021 WL 6134591, at *10.

Neither the *Yates* plurality nor Justice Alito's controlling concurrence support Seitz's position in this case.  For one thing, the two textual canons that the majority and Justice Alito found significant in interpreting Section 1519 in *Yates* – *i.e.*, that "a word is known by the company it keeps" (*noscitur a sociis*) and that general words that follow specific ones should be construed as limited to the "same kind" as the specific ones (*ejusdem generis*) – "have little bearing on the interpretative question" of Section 1512(c)(2), which involves entirely different statutory text.  *See Montgomery*, 2021 WL 6134591, at \*14.  "The verbs in (c)(2) do not appear in a list with those in (c)(1); rather, they are distinct offenses." *Sandlin,* 2021 WL 5865006, at \*6.  For another, whereas, in *Yates*, the statutory title of Section 1519 ("Destruction, alterative, or falsification of records in Federal investigations and bankruptcy") weighed against interpreting "tangible object" to include fish, *see* 574 U.S. at 552 (Alito, J., concurring in the judgment), no comparable inference can be drawn with respect to Section 1512(c)(2).  *See supra* p. 16-17 (Congress did not amend Section 1512's preexisting title in the U.S. Code when it added Section 1512(c), but Section 1512(c)'s title in the Sarbanes-Oxley Act of 2002 ("Tampering with a record *or* otherwise impeding an official proceeding" (emphasis added)) supports a broad reading of the prohibition); *see Montgomery*, 2021 WL 6134591, at \*15.  Finally, while the *Yates* plurality (but not Justice Alito) found Section 1519's origin in the Sarbanes-Oxley Act probative that the provision was not intended to prohibit the destruction of a fish, *see* 574 U.S. at 546 (plurality), "the inclusion of [Section 1512(c)(2)] in the Sarbanes-Oxley Act and the placement of that provision in an existing section of Chapter 73, make sense." *Montgomery*, 2021 WL 6134591, at \*15.

### 4.    Even if it agrees with *Miller*, this Court should not dismiss Count One of the Indictment, which merely tracks Section 1512(c)(2)'s operative statutory text.

In any event, even under Seitz's theory, Count One sufficiently alleges a violation of Section 1512(c)(2) by tracking the provision's "operative statutory text." *Williamson*, 903 F.3d at

130.  It is well-settled that it is "'generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'"  *Id.* (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  The indictment in this case therefore did not need to more specifically allege that the obstruction took the form of taking some action with respect to a document.  *Id.*; *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 108-109 (2007).  In other words, the indictment's allegations, by charging the operative statutory text, permissibly embrace two theories: (1) that Seitz obstructed an official proceeding by taking some action with respect to a document; and (2) that Seitz obstructed an official proceeding without taking some action with respect to a document.  Even a ruling finding the second theory invalid would leave the first theory intact.  For that reason alone, at this stage in the proceedings, dismissal of Count One would be unwarranted.

**B.      Congress's Joint Session to certify the Electoral College vote is a "proceeding before the Congress" under Section 1515(a)(1)(B) and, therefore, an "official proceeding" under Section 1512(c)(2)**

Seitz's alternative statutory argument – that Congress's Joint Session to certify the Electoral College vote is not a "proceeding before the Congress" under the statute (ECF No. 41, at 9-14) – also lacks merit and accordingly was rejected by the Court in *Sandlin*, 2021 WL 5865006, at *3-5.

**1.      The plain text of the statute establishes that the Joint Session is an "official proceeding."**

To determine the meaning of a statute, a court "look[s] first to its language, giving the words used their ordinary meaning."  *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted).  Section 1515(a)(1)(B), as noted, defines "official proceeding" as a "proceeding before the Congress."  In ordinary parlance, a gathering of the full Congress to certify

25

the Electoral College vote is a congressional proceeding, or "a proceeding before the Congress." Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation omitted).

Congress's Joint Session to certify the Electoral College vote constitutes a "proceeding" under any interpretation of that term. In its broadest and most "general sense," a "proceeding" refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) (quoting *Proceeding*, Oxford English Dictionary, available at http://www.oed.com). Seitz does not meaningfully contend that Congress's Joint Session to certify the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding – and indeed an official proceeding – under that broad definition.

A narrower definition of the term "proceeding" would look to the "legal – rather than the lay – understanding" of the term. *Ermoian*, 752 F.3d at 1170. This narrower definition includes the "business conducted by a court or other official body; a hearing." Black's Law Dictionary, "Proceeding" (11th ed. 2019). Taken with its modifier "official," the term "proceeding" thus "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170. But even under this narrower definition, Congress's Joint Session to certify the Electoral College vote – business conducted by an official body, in a formal session – would easily qualify.

The formality involved in the certification of the Electoral College vote places it well within the category of an official proceeding, even under the narrower legal definition of the term "proceeding." Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true for Congress's certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Required by law to begin at 1:00 pm on the

January 6 following a presidential election, Congress's meeting to certify the Electoral College vote is both a "hearing" and "business conducted by … [an] official body." *See* Black's Law Dictionary, "Proceeding."   The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15.  As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection.  *Id.*  And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall."  *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform").  Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared."  *Id.*

Under the plain meaning of Sections 1512(c)(2) and 1515(a)(1)(B), Congress's Joint Session to certify the Electoral College vote is a "proceeding before the Congress."  That alone disposes of Seitz's contentions.

### 2. The statutory phrase "proceeding before Congress" is not limited to "tribunal-like proceedings relating to the "administration of justice."

Seitz nevertheless argues (ECF No. 41, at 9-13) that the phrase "official proceeding" in Section 1512 applies only to "tribunal-like proceedings relating to the administration of justice." But this narrow reading of the statute finds no textual support when applied to Section 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress."  Had Congress wanted to impose a definition that more closely resembled a quasi-adjudicative setting (as Seitz

contends), it needed look only a few provisions away to 18 U.S.C. § 1505, which criminalizes, among other things, the obstruction of (i) "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency; and (ii) "the due and proper exercise of the power of inquiry under which any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees. 18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020). If Congress wished to similarly limit the obstruction prohibition under § 1512(c)(2) to congressional investigations and the like, it could have enacted language similar to Section 1505. Instead, Congress chose different terms, with different meanings. See *Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship."). Congress enacted broader language ("a proceeding before the Congress") that covers a broader range of proceedings than only the "inquir[ies] and investigation[s]" envisioned in Section 1505. That broader definition includes the Electoral College vote certification that Seitz obstructed on January 6, 2021.

None of Seitz's contrary arguments have merit. He cites (ECF No. 41 at 10) the Ninth Circuit's decision in *Ermoian*, 752 F.3d 1165. But *Ermoian* involved a different statutory definition, 18 U.S.C. § 1515(a)(1)*(C)*, and an entirely different issue: whether an FBI investigation counts as "a proceeding before a Federal Government agency which is authorized by law" under Section 1515(a)(1)(C). In *Ermoian*, the Ninth Circuit reasoned at the outset that the term "proceeding" did not "conclusively resolve whether an FBI investigation qualifies" because narrower definitions of the term "would exclude criminal investigations in the field." 752 F.3d at 1170. The same is true of his other citations: in *United States v. Guertin*, No. 21-cr-262 (TNM), 2022 WL 203467 (D.D.C. Jan. 24, 2022), Judge McFadden considered whether a security

clearance investigation qualified as an an "official proceeding" under 18 U.S.C. § 1515(a)(1)(C); in *United States v. Ramos,* 537 F.3d 439, 462 (5th Cir. 2008), the Fifth Circuit addressed the meaning of an "official proceeding" under 18 U.S.C. § 1515(a)(1)(C) in the context of an internal investigation conducted by Customs and Border Patrol.

This case, which involves a proceeding before Congress and implicates Section 1515(a)(1)*(B)* (and not *(C)*), presents no such question. And, in any event, the Joint Session of Congress to certify the Electoral College vote would satisfy even the narrower formulations of "proceeding" cited by the courts in *Ermoian, Ramos,* and *Guertin* (which cited this Court's decision in *Sandlin,* 2021 WL 5865006). The Joint Session plainly constitutes "*business conducted* by a court *or other official body*; a *hearing*," or "[a] legal … process." *Id.* at 1169 (emphasis added). And there can be no serious dispute that the Joint Session is a "proceeding … authorized *by law*" or that it has the "sense of formality" that *Ermoian, Ramos,* and *Guertin* found absent from mere investigations. *Id.* at 1170 (emphasis added).

Judge McFadden, the author of *Guertin,* has held that the Joint Session qualifies as an official proceeding. Order, *United States v. McCaughey,* 21-cr-40 (TNM), ECF No. 388, at 2 (D.D.C. July 20, 2022). This Court, in *Sandlin,* also applied the reasoning of *Ermoian* and *Ramos,* and found that the Joint Session satisfied the standard set forth in those cases because it is a "formal hearing," unlike the investigations those cases considered. *Sandlin,* 2021 WL 5865006, at *3. As this Court recognized in *Sandlin*, *Ermoian* and *Ramos* held that ongoing law-enforcement or internal agency investigations were not "official proceedings" not because they do not involve the "administration of justice," but because "[t]hey are not formal hearings conducted before official bodies." *Id.*

In total, since the events of January 6, 2021, at least 11 judges on this Court have considered whether Congress's certification of the Electoral College vote constitutes an "official proceeding"

for purposes of Section 1512(c)(2).  All 11 have ruled that it does, largely adopting the government's rationale and rejecting the arguments that Seitz presses in this case.  *See Sandlin*, 2021 WL 5865006, at *4 (Friedrich, J.); *Caldwell*, 2021 WL 6062718, at *7 (Mehta, J.); *Mostofsky*, 2021 WL 6049891, at *10; *Montgomery*, 2021 WL 6134591, at *4-10 (Moss, J.); *Nordean*, 2021 WL 6134595, at *4-6 (Kelly, J.); *McHugh*, 2022 WL 296304, at *5-9 (Bates, J.); *Grider*, 2022 WL 392307 (Kollar-Kotelly, J.); *Miller*, 2022 WL 823070 (Nichols, J.), at *5; *Fitzsimons*, 2022 WL 1698062, at *3-5 (Contreras, J.); *Puma*, 2022 WL 823079, at *4-9 (Friedman, J.); *United States v. Bingert*, 2022 WL 1659163, at *3 (Lamberth, J.); *Williams,* 2022 WL 2237301, at *8 (Jackson, J). Nothing in Seitz's briefing warrants departing from that well-reasoned line of decisions.

### 3. In the alternative, Congress's certification of the Electoral College vote would qualify as an adjudicatory proceeding.

In any event, even if the statute required the "administration of justice" gloss urged by Seitz, Congress's certification of the Electoral College vote as set out in the Electoral Count Act of 1887 would satisfy it.  The certification of the Electoral College vote involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]."  3 U.S.C. § 15.  That Joint Session renders judgment on whether to certify the votes cast by Electors in the presidential election.  Under the Constitution, the Electors create "lists" of the presidential and vice-presidential candidates, which they "sign" and "certify" before sending to Congress.  U.S. Const. amend. XII.  Congress then decides whether to count those certified lists, or certificates in conformity with the Electoral Count Act.  3 U.S.C. § 15.  As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it.  3 U.S.C. § 15.  And just as a jury does not (barring a mistrial) recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared"

a "result." 3 U.S.C. § 16. Even under Seitz's theory, Congress's certification of the Electoral College vote possesses sufficient "tribunal-like" characteristics to qualify as an "official proceeding," as the Court and other judges in this district have already concluded. *See Sandlin*, 2021 WL 5865006 at *4; *Caldwell*, 2021 WL 6062718, at *11; *Nordean*, 2021 WL 6134595, at *6; *McHugh*, 2022 WL 296304, at *9.

Contrary to Seitz's argument that the certification is merely "ceremonial and administrative," (ECF No. 41 at 11) therefore, "it is inaccurate to characterize the Certification that occurred on January 6 as a purely ministerial, legislative vote-counting event." *Caldwell*, 2021 WL 6062718, at *7 (citation omitted); *see also United States v. Bingert*, No. 21-cr-91 (RCL), 2022 WL 1659163, at *4 (D.D.C. May 25, 2022); *Puma,* 2022 WL 823079, at *6 (observing that "Congress' role in certifying the Electoral College vote includes ensuring that the requirements for certification have been followed, which by any commonsense understanding requires more than a 'ceremonial' or 'ministerial' function") (citation omitted); *McHugh,* 2022 WL 296304, at *4 ("[T]he fact that Congress's adjudicative domain is limited to procedural disputes . . . does not render the quadrennial certification of the electoral vote 'ceremonial.'"). Seitz notes that Congress's role resolving disputes about electors is limited, with much of the power residing in the states instead. (ECF No. 41 at 13). But the existence of limitations on Congress's authority, or on the proper scope of objections in the Joint Sesssion, does not make the Joint Session a meaningless exercise, as several judges of this Court have recognized.

## II.      Section 1512(c)(2) is not unconstitutionally vague.

Seitz next contends that Section 1512(c)(2) is unconstitutionally vague. (*See* ECF No. 41, at 14-21). He is incorrect, as every judge on this Court to have considered the issue has concluded.

**A.    A law is unconstitutionally vague only if it invites arbitrary and "wholly subjective" application**

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law."  U.S. Const. amends. V, XIV. An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'"  *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'"  *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)). A provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of vagueness analysis "is whether the statute, either standing alone

32

or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

## B.   The term "corruptly" does not make Section 1512(c)(2) unconstitutionally vague.

Seitz fails to overcome the "strong presumpti[on]" that Section 1512(c)(2) is constitutional. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). Section 1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604. Section 1512(c)(2)'s prohibition on "corruptly … obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306. The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding. While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and intent – the state of men's minds – having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

Seitz's claim that the word "corruptly" in Section 1512(c)(2) is unconstitutionally vague (ECF No. 41, at 15-18) is mistaken. As Judge Friedman recently observed, "[j]udges in this district have construed 'corruptly' to require 'a showing of "dishonesty" or an 'improper purpose'[;], 'consciousness of wrongdoing'[;] or conduct that is 'independently criminal,' 'inherently malign, and committed with the intent to obstruct an official proceeding.'" *Puma*, 2022 WL 823079, at *10 (quoting *Montgomery*, 2021 WL 6134591, at *19; *Bozell*, 2022 WL 474144, at *6; *Caldwell*,

2021 WL 6062718, at *11; and *Sandlin*, 2021 WL 5865006, at *13) (alterations omitted).  Under any of these common-sense constructions, the term "corruptly" "not only clearly identifies the conduct it punishes; it also 'acts to shield those who engage in lawful, innocent conduct – even when done with the intent to obstruct, impede, or influence the official proceeding.'"  *Id.* (quoting *Sandlin*, 2021 WL 5865006, at *13).  It presents no vagueness concern.

### C.    *Poindexter* is distinguishable.

Seitz's reliance on *Poindexter* is unavailing.  The D.C. Circuit in *Poindexter* held that the term "corruptly" was "vague … in the absence of some narrowing gloss."  951 F.2d at 378. *Poindexter* is inapposite for multiple reasons, as this Court and several judges in this district have explained.  *See, e.g.*, *Sandlin*, 2021 WL 5865006, at *10-11; *Caldwell*, 2021 WL 6062718, at *8-10; *Montgomery*, 2021 WL 6134591, at *18; *Nordean*, 2021 WL 6134595, at *9-12; *United States v. Andries*, No. 21-cr-93 (RC), 2022 WL 768684, at *10-12 (D.D.C. March 14, 2022); *McHugh*, 2022 WL 296304, at *10-11; *Grider*, 2022 WL 392307, at *6-7; *Williams,* 2022 WL 2237301, at *13-15.[3]

*First*, the D.C. Circuit narrowly confined *Poindexter*'s analysis to *Section 1505*'s use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct."  951 F.2d at 385.  Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial.  *Id.* at 629-630.  Other courts have similarly recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual circumstances."  *United*

---

[3]    *Poindexter* was also superseded in significant part by the False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459.  As codified at 18 U.S.C. § 1515(b), the Act provides that the term "corruptly" in § 1505 "means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement."

*States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see also, e.g.*, *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503). Hale's invocation of *Poindexter* accordingly fails to establish that Section 1512(c) suffers the same constitutional indeterminacy.

*Second*, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt" and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id.* at 705 (citation omitted). In doing so, the Court "did not imply that the term was too vague." *Edwards*, 869 F.3d at 502.

*Third*, and as noted above, courts have encountered little difficulty when addressing "corruptly" in Section 1512(c)(2) following *Arthur Andersen*. That history demonstrates that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries.

**D.     Decisions rejecting vagueness challenges to "corruptly" do not support Seitz's position that "corruptly" is, in fact, vague.**

Seitz claims that, because some judges have used varying definitions of "corruptly", he was not on notice that it could be applied to his conduct. (ECF No. 41 at 18-21). Ironically, he relies on decisions uniformly holding that the same term in the same statute he challenges is not vague. (ECF No. 41 at 18-20) (citing *Sandlin, Caldwell, Montgomery*, *Nordean,* and *Mostofsky*).

The opinions that Seitz cites, however, are all from decisions on motions to dismiss; deciding that "corruptly" was not unconstitutionally vague at this stage did not require a judge to formally define the term, as some of the judges quoted by Seitz have recognized. *See, e.g.,*

35

*Caldwell,* 2021 WL 6062718, at *11 ("The court need not adopt a firm definition of "corruptly" at this point. Courts have approved various formulations of the term."); *Montgomery,* 2021 WL 6134591, at *22 ("because the Court has yet to hear from the parties on the proper jury instructions, the Court will leave for another day the question whether this formulation—or a slightly different formulation—will best guide the jury").

Moreover, the existence of "various formulations" of corruptly does not make the term constitutionally vague.  As noted, "[a] statute is unconstitutionally vague only if, "applying the rules for interpreting legal texts, its meaning 'specifie[s]' 'no standard of conduct ... at all.' " *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982) (alterations in original) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).  As courts have repeatedly found, "corruptly" is not vague under this standard.  And there is substantial consensus even among the (non-binding) definitions advanced by judges of this Court; as synthesized by Judge Friedman in *Puma* and quoted above.  *Puma,* 2022 WL 823079, at *10  (noting that courts have required "a showing of "dishonesty" or an 'improper purpose'[;], 'consciousness of wrongdoing'[;] or conduct that is 'independently criminal,' 'inherently malign, and committed with the intent to obstruct an official proceeding.'").  There is also near uniformity in how judges in this district, including this Court, have defined the term in jury instructions.  *See, e.g.*, *United States v. Reffitt*, 21-cr-32, ECF No. 119 at 25-26 (D.D.C. Mar. 7, 2022); *United States v. Robertson*, 21-cr-34, ECF No. at 12-13 (D.D.C. April 8, 2022); *United States v. Thompson*, 21-cr-161, ECF No. 83 at 25-27 (D.D.C. Apr. 14, 2022); *United States v. Hale-Cusanelli*, 21-cr-37, ECF No. 84 at 27 (D.D.C. May 27, 2022); *United States v. Williams*, 21-cr-377, ECF No. 112 at 7 (D.D.C. June 30, 2022).

The purported discrepancies Seitz identifies – a potential question regarding whether trespass qualifies as illegal means or malign conduct;[4] whether unlawful purposes (without unlawful means) qualify – are differences at the margins of the type that do not trigger constitutional vagueness concers. *Williams*, 553 U.S. at 306.  Accordingly, none of the judges to consider the issue have viewed these unresolved questions as the type that might render "corruptly" vague.  Nor do any of the purported discrepancies indicate that the statute would be vague as to Seitz, who climbed in through a broken window and pushed against the police, whose conduct exceeded simply entering the Capitol Building on January 6.

## III.   The rule of lenity does not apply.

Finally, the rule of lenity does not require dismissal here, as Seitz urges.  (ECF No. 41 at 21-22).  As explained above, *Miller*'s finding that the use of "otherwise" in Section 1512(c)(2) triggers the rule of lenity is incorrect.   Nor does the rest of the statute suffer from grievous ambiguity.  *See Sandlin,* 2021 WL 5865006, at *10; *Caldwell,* 2021 WL 6062718, at *21.  It "identifies the conduct it punishes" and "acts to shield those who engage in lawful, innocent conduct."  *Sandlin*, 2021 WL 5865006, at *13.[5]

---

[4]    Seitz claims that Judge Mehta found that trespass "apparently would not" qualify as conscious wrongdoing.  ECF No. 41 at 20 (discussing *Caldwell*, 2021 WL 6062718, at *13).  *Caldwell* did not decide this point.  The defendants in *Caldwell* were accused of storming the Capitol in paramilitary gear and, like Seitz, pushing against the police.  *Id.*  These allegations (which "readily" satisfy Section 1512(c)(2), Judge Mehta found), he observed, are "no political protest or mere trespass."  *Caldwell,* 2021 WL 6062718, at *13.  Judge Mehta was not asked to pass judgment on an obstruction charge in a case involving "mere trespass."  The point is, whatever the applicability of 1512(c)(2) in closer cases may be, *Caldwell* is not a close case.

[5]    Even if "corruptly" were grievously ambiguous, Seitz proposes no narrower reading of the term that would absolve him of wrongdoing in this case.  The rule of lenity only requires dismissal if a defendant's conduct does not satisfy the more limited reading of a statute.

## **CONCLUSION**

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that the Court deny Seitz's motion to dismiss Count One.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:      /s/ *Alexis J. Loeb*
ALEXIS J. LOEB
Assistant United States Attorney, Detailee
CA Bar No. 269895
450 Golden Gate Ave., 11th Floor
San Fracisco, CA 94102
Alexis.loeb@usdoj.gov
(415) 436-7168