**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-279 (DLF)** |
| **v.** | : | |
| | : | |
| **ETHAN C. SEITZ,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNTS**
**TWO AND THREE OF THE INDICTMENT**

The United States of America, by and through its attorney, United States Attorney for the

District of Columbia, respectfully submits this opposition to defendant Ethan Seitz's Motion to

Dismiss Counts Two and Three of the Indictment (ECF No. 42), charging him with, respectively,

entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1),

and disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C.

§ 1752(a)(2).  Seitz erroneously contends that these charges fail to state an offense because, in his

view, the Vice President was not "temporarily visit[ing]" the U.S. Capitol when he was carrying

out his constitutionally and statutorily mandated obligations in the Capitol building on January 6,

2021.  His argument defies the plain text, structure, and purpose of the statute.

At least eight other judges of this District have rejected permutations of the same arguments

in other January 6 cases.  *See United States v. McHugh*, No. 21-cr-453, 2022 WL 296304, at *20-

21 (D.D.C. Feb. 1, 2022) (Bates, J.); *United States v. Andries*, No. 21-cr-93, 2022 WL 768684, at

*16-17 (D.D.C. Mar. 14, 2022) (Contreras, J.)*; United States v. Puma*, No. 21-cr-454, 2022 WL

823079, at *16-18 (D.D.C. Mar. 19, 2022) (Friedman, J.); *United States v. Bingert*, No. 21-cr-91,

2022 WL 1659163, at *15 (D.D.C. May 25, 2022) (Lamberth, J.); *United States v. Riley Williams*,

No. 21-cr-618, ECF No. 55, at 39-43 (D.D.C. June 22, 2022) (Jackson, J.); Memorandum and

Order, *United States v. Anthony Williams*, No. 21-cr-377, ECF No. 88 (D.D.C. Jun 8, 2022) (Howell, C.J.); *United States v. Fischer,* No. 21-cr-234, (5/3/22 Tr. at 39-41) (D.D.C. May 3, 2022) (Nichols, J.), Minute Entry, *United States v. Seefried,* No. 21-cr-287 (D.D.C. May 20, 2022) (McFadden, J.)*.*  No district judge has sided with Seitz's view. [1]  This Court should reach the same conclusion in this case and deny Seitz's' motion to dismiss.

## **FACTUAL BACKGROUND**

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress convened in the United States Capitol building.  The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election.  With the Joint Session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol.  At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over erected barricades.  The crowd, having breached police officer lines, advanced to the exterior façade of the building.  Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol.  At approximately 2:20 p.m., members of the United States

---

[1]     Seitz notes that "at least three courts" have addressed the applicability of Section 1752 to January 6 cases, missing much of the recent authority on the issue.  (ECF No. 42, at 11). His discussion of Judge Nichols' approach in *United States v. Fischer,* 21-cr-234, moreover, is incomplete.  Seitz states, "Judge Nichols gave the government one week to correct the Indictment in response to the issue that Mr. Seitz raises here." *Id.*  After Judge Nichols did so, however, the government filed a brief defending the indictment as written, and Judge Nichols then ruled orally in the government's favor, denying the defendant's motion to dismiss the Section 1752 charges. *United States v. Fischer,* No. 21-cr-234, (5/3/22 Tr. at 39-41) (D.D.C. May 3, 2022) (Nichols, J.). Judge Nichols found that "the indictment here doesn't relate to Vice President Pence's visit to his only or even his primary office."  5/3/22 Tr. at 40.  Thus, even if defendant were correct that the Vice President could not visit his ceremonial office at the Capitol, the Vice President could have been "temporarily visiting" other parts of the Capitol, such as the Chamber of the House of Representatives, where part of the Joint Session to certify the Electoral College vote took place. *Id.*

House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to – and did – evacuate the chambers.

On January 13, 2021, the FBI received a tip that Ethan Seitz had entered the Capitol building during the January 6 attack, posting statements on his Facebook account indicating that he had entered the building.  The FBI obtained a search warrant for Seitz's Facebook account, and found messages in which Seitz discussed his participation.  At 12:48 p.m. on January 6, 2021, Seitz wrote, "There is a militia here that wants to storm the Capitol and take the building after Trumps speech ☺."  Later, Seitz then narrated his participation in the breach in nearly real time. At 2:25 p.m., Seitz wrote "I'm goin in the capitol."  Two minutes later: "I just climbed in through a broken window."  According to U.S. Capitol Police surveillance footage, Seitz entered the Capitol Building at approximately 2:25 p.m. (when he climbed in through a broken window near the Senate Wing Doors).  Inside the Capitol Building, Seitz traveled to the Crypt, and upstairs to the Rotunda, East Foyer, and Ohio Clock corridor, before returning downstairs to climb out another window near the Senate Wing Doors at approximately 2:25 p.m.  At 3:03 p.m., Seitz sent another series of Facebook messages describing what he had done, stating "I was inside the capitol and was smashed in a group of people. They fuckin pepper sprayed us and hit us with tear gas canisters inside the capitol building," and "I was inside upstairs in the capitol pushing with a group of people and they fuckin gassed us again. And pepper sprayed us."  He continued, "I had to climb out a window.  Couldnt breath or see."  To another individual, he wrote, "I climbed through a broken window of the capitol. We pushed and pushed bro. I've been gassed 2 or 3 times. And pepper sprayed. I had to climb back out I couldnt breath."

Seitz remained in the area of the Capitol Building at least as of 4:28 p.m., grabbing a police officer's baton as the officer pushed him back.  Later that evening, near the Capitol, an individual interviewed Seitz and posted the interview on social media.  In the interview, Seitz claimed that

he "made it to the other side of the building" before encountering a door locked by the "cops" that his group pushed through in order to let rioters through another entrance.  He said his group had been tear gassed and pepper sprayed.  In another Facebook message, he wrote, "Yeah I didnt really prepare for that. I didnt expect to be on the frontline storming the capitol and taking the building lol."  He also explained that he had come to Washington, D.C. because he was concerned about a "fraudulent election," which he saw as a "coup against Trump."

On March 18, 2021, Seitz was charged by complaint in connection with his participation in the Capitol breach.  The following day, he was arrested in Bucyrus, Ohio.  ECF No. 5.  Seitz spoke with the FBI, and agreed that he had been trying to send a message to Congress on January 6 because of his belief that the presidential election was fraudulent.  He also agreed that the crowd inside the Capitol was trying to stop Congress from "doing what they were doing."  He again acknowledged that he had been part of a group inside the Capitol that was pushing and "going where the cops didn't want people."

## **PROCEDURAL HISTORY**

On April 2, 2021, the grand jury returned an indictment charging Seitz with five offenses: obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One), entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).  (ECF No. 8).

On March 4, 2022, the government moved to strike references to then Vice President-elect Kamala Harris in Counts Two and Three.  (ECF No. 36).  On March 8, the Court granted the

government's motion in a Minute Order.   On July 14, 2022, defendant filed moved to dismiss Counts Two and Three (ECF No. 42).

## LEGAL STANDARD

A defendant may move to dismiss an indictment or count thereof for failure to state a claim prior to trial.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v).  "[A]n indictment must be viewed as a whole, and the allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011).  The question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed.  *Id.*  "An indictment must contain every element of the offense charged, if any part or element is missing, the indictment is defective and must be dismissed."  *See United States v. Hillie*, 227 F. Supp. 3d 57, 70 (D.D.C. 2017).

## ARGUMENT

The Court should deny Seitz's motion.  Counts Two and Three allege violations of Section 1752 of Title 18, which prohibit the unlawful entry into and disruptive or disorderly conduct in a "restricted buildings or grounds." A "restricted building or grounds" is a "posted, cordoned off, or otherwise restricted area…where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).  At the time the defendant entered the U.S. Capitol on January 6, 2021, the Vice President, who was protected by the Secret Service, was present.  The defendant's conduct accordingly falls within the Section 1752's plain sweep because he unlawfully entered a restricted building while the Vice President was "temporarily visiting," as alleged in the indictment.

I.      **The Vice President can "temporarily visit" the U.S. Capitol.**

Contrary to Section 1752's plain terms, purpose, and structure, Seitz argues (ECF No. 42) that Vice President Pence could not have "temporarily visited" the U.S. Capitol on January 6, 2021, because he had an office there.  He is wrong.

To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)).  The "ordinary meaning" of "temporarily visit" unambiguously includes a trip to one's office. *Andries*, 2022 WL 768684, at *16 (it is "quite natural to say that a person 'temporarily visits' a place where she has an office.").  The term "temporary" means "[l]asting for a time only; existing or continuing for a limited time; transitory." *Temporary*, Black's Law Dictionary (11th ed. 2019). The verb "visit" means, *inter alia,* "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."  *See* https://www.merriam-webster.com/dictionary/visit.   Putting these definitions together, "someone is 'temporarily visiting' a location if they have gone there for a particular purpose, be it 'business, pleasure, or sight-seeing,' and for a limited time, which could be 'brief' or 'extended' while nonetheless remaining 'temporary.'" *McHugh*, 2022 WL 296304, at *20.  People commonly go to their offices for one particular purpose (business), and for a limited time, often returning home at the end of the day.  They may return the following day, but there is no reason why one cannot repeatedly "temporarily visit" the same location.  One can "temporarily visit" a place where one has an office.

Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber. While not specifically alleged in the indictment, two other Secret Service protectees (members of the Vice President's immediate family), also came to the U.S.

Capitol that day for a particular purpose: to observe these proceedings. Furthermore, as President of the Senate, Vice President Pence oversaw the vote certification. Given the nature of the presence of the Vice President (and his family members), the U.S. Capitol plainly qualified as a building where "[a] person protected by the Secret Service [was] … temporarily visiting." 18 U.S.C. § 1752(c)(1)(B). [2]  *See Anthony Williams*, No. 1:21-cr-377, ECF No. 88, at 5-6 (adopting the "plain reading of the words" in subsection 1752(c)(1)(B) urged by the government); *McHugh*, 2022 WL 296304, at *21 (reaching "a commonsense conclusion: the Vice President was 'temporarily visiting' the Capitol"); *Andries*, 2022 WL 768684, at *16  ("Vice President Pence was 'temporarily visiting' the Capitol on January 6, 2021 if he went to the Capitol for a particular purpose, including a business purpose, and for a limited time only.  Plainly he did.  He went to the Capitol for the business purpose of carrying out his constitutionally assigned role in the electoral count proceeding; he intended to and did stay there only for a limited time."); *Puma*, 2022 WL 823079, at *17 (under the plain language of Section 1752, the Vice President "was temporarily visiting the Capitol on January 6, 2021: he was there for a limited time only in order to preside over and participate in the Electoral College vote certification."); *Riley Williams*, No. 21-cr-618, ECF No. 55, at 40-41 ("Taken together then, as was plain even before the dictionary was consulted, the phrase "temporarily visiting" means being somewhere for a limited period of time, and there is no linguistic reason why the phrase could not include being there for a business purpose.").

---

[2]        In the alternative, Judge Friedman proposed another "sensible interpretation" of Section 1752 that avoids having to define the term "temporarily visiting."  *See Puma*, 2022 WL 823079, at *18.  Under that reading, Section 1752(c)(1)(B) applies to either (1) anywhere "where the President or other person protected by Secret Service is" or (2) anywhere "where the President or other person protected by the Secret Service . . . will be temporarily visiting."  18 U.S.C. § 1752(c)(1)(B) (emphasis added).  Even if the Court found that Vice President could not "temporarily visit" the Capitol on January 6, he "was" present there.  As described below, that interpretation is also consistent with the statute's context and legislative history.

Seitz's contrary contentions lack merit.  First, Seitz insists that the phrase "temporarily visiting" requires more than "physical[] presen[ce]" and must "include[] an implicit normally-lives-or-works carveout" – a carveout that, in Seitz's view, is dispositive here because "[t]he Constitution obligates the Vice President to be physically present in the Senate with some frequency."  (ECF No. 42 at 8-10).  As other judges of this Court have recognized, "[d]espite having a limited role as President of and tiebreaker for the Senate, the Vice President is generally regarded as an executive branch officer, and generally works in locations other than the Capitol." *Anthony Williams*, No. 21-cr-377, ECF No. 88, at 5 (citing U.S. Const. art. II, § 1, cl. 1); *see also, e.g., McHugh,* 2022 WL 296304, at *22 ("The U.S. Capitol is not the Vice President's regular workplace").[3]

Moreover, "a government official can clearly appear somewhere temporarily and still be doing official work in the process," *Anthony Williams,* No. 21-cr-377, ECF No. 88 at 6; a visit for an official purpose is no less a visit.  *McHugh,* 2022 WL 296304, at *21 (a visit can be for many purposes, including for business") (citation omitted).  It follows from these uncontroversial principles that "the Vice President's presence for official duties by presiding over a session of Congress" on January 6 did not "make him any less of a temporary visitor" at the Capitol on that day.  *Anthony Williams,* No. 21-cr-377, ECF No. 88 at 6.

---

[3]        Seitz says there is "no reason to think the modern Vice President 'likely spends little time' in their Senate office based on recent observations – Vice Presidents Pence and Harris have been in the Capitol nearly thirty times in the last few years *just* to provide a tiebreaker vote." (ECF No. 42 at 8).  Even assuming 28 visits (ECF No. 42 at 8) over five years, that means, on average, only 5.6 Vice Presidential visits per year – less than one visit every two months.  This only supports *McHugh*'s observation that the Vice President spends little time at the Capitol, let alone at his or her ceremonial office there.  Seitz identifies no other visits by the Vice Presidents Pence or Harris to the Capitol (let alone to the Vice President's office) for any other purpose, aside from the quadrennial visit to certify the Electoral College vote.

Seitz observes that Vice Presidents have long had "a dedicated, permanent office reserved for their use in the Senate." (ECF No. 42, at 3). That is true but irrelevant.[4] Section 1752(c)(1)(B) defines the restricted area by reference to the location of the protectee, not the location of his or her physical offices. When Vice President Pence traveled to the U.S. Capitol on January 6 to oversee the Joint Session of Congress, he was "visiting" the building. And because Vice President Pence intended to leave at the close of the session, this visit was "temporar[y]." "The fact that he has a space set aside for his occasional use – notably, not the location where he was working inside the Capitol on January 6, 2021 – makes [the Vice President] no less a 'visitor' and no less 'temporary' when he makes an appearance on the premises of the Capitol." *Anthony Williams*, No. 21-cr-377, ECF No. 88, at 5-6. "Even if there is some carveout in § 1752 for where a protectee normally lives or works, it does not apply to Vice President Pence's trip to the Capitol on January 6, 2021." *McHugh,* 2022 WL 296304 at \*22.

Moreover, a lives-and-works "carveout," taken to its logical end, would undermine the government's ability to protect the President and Vice President by deterring and punishing individuals who seek unauthorized access to the President's or Vice President's location. Section 1752(c)(1)(B) would not apply where the President or Vice President temporarily stayed at their permanent residences in Delaware or California—on the view that such a trip would not qualify as "visiting." Nor would it apply to Camp David, where there is a presidential cabin and office. In another strange scenario, a restricted area could exist when, as here, the Vice President's family

---

[4]        Seitz's suggestion that "when Congress enacted § 1752 in 1971," the Vice President had an office in the Senate but "did not even have an office in the West Wing" (ECF No. 42, at 4, 9 (emphasis omitted)) is misleading. While Vice President Walter Mondale was the first to have an office in the West Wing, Vice Presidents had used offices in the Eisenhower Executive Office Building since 1960. *See, e.g.*, The Vice President's Residence and Office, https://www.whitehouse.gov/about-the-white-house/the-grounds/the-vice-presidents-residence-office/#:~:text=The%20Vice%20President's%20Ceremonial%20Office,on%20the%20White%20House%20premises (last visited June 21, 2022).

visits the Capitol (because they are Secret Service protectees without an office there), but not when the Vice President does, affording a higher level of protection for the family of the elected official than to the elected official himself (or herself). No support exists for the defendant's effort to insert such large and irrational exceptions into the statute's sweep. *See Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) (courts will avoid a "statutory outcome … if it defies rationality by rendering a statute nonsensical").

As Judge Friedman explained, such an interpretation is "not supported by the statutory text and is out of step with the statutory context." *Puma*, 2022 WL 823079, at *17.  It defies Section 1752's clear purpose. In drafting Section 1752, Congress sought to protect "not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world." *United States v. Caputo*, 201 F. Supp. 3d 65, 70 (D.D.C. 2016) (quoting *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984)). To that end, the statute comprehensively deters and punishes individuals who seek unauthorized access to the White House grounds and the Vice President's residence—fixed locations where the President and Vice President live and work, 18 U.S.C. 1752(c)(1)(A); and also any other "building or grounds" where they (or other protectees) happen to be "temporarily visiting," 18 U.S.C. 1752(c)(1)(B). Reading Sections 1752(c)(1)(A) and 1752(c)(1)(B) together protects the President and Vice President in their official homes and wherever else they go. Interpreting the statute as the defendant suggests would create a gap in Section 1752's coverage by removing areas, such as the U.S. Capitol, from protection. It could expose the leaders of the Executive Branch even as they perform their official duties. That gap is both illogical and contrary to the statutory history of Section 1752, where, "at every turn," Congress has "*broadened* the scope of the statute and the potential for liability." *Griffin,* 2021 WL 2778557, at *5 (D.D.C. July 2, 2021); *see also Puma,* 2022 WL 823079, at *18.

Nor does it matter that Vice President Pence ordinarily resided in the District of Columbia. Section 1752(c)(1)(B) defines the restricted area by reference to "buildings or grounds," not municipal borders. "[O]bviously one can 'temporarily visit' the house next door, a neighborhood church, or a restaurant across town—simply being in the visitor's hometown does not mean a place cannot be 'visited.'" *McHugh,* 2022 WL 296304, at *21.

Seitz contrasts the Vice President's visit to the Capitol with visits to airport hangars and parks. (ECF No. 42, at 10 (citing *United States v. Bursey,* 416 F.3d 301 (4th Cir. 2005) (airport hangar); *United States v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (unpublished) (park)). But "the fact that those situations clearly qualify does not mean that the relevant situation on January 6 cannot count as well." *Anthony Williams,* No. 21-cr-377, ECF No. 88, at 6. The last case Seitz cites, *United States v. Jabr*, No. 18-cr-105, 2019 WL 13110682, at *7 (D.D.C. May 16, 2019), is even further afield. There, Judge Friedman ruled that a *different* prong of 18 U.S.C. § 1752(c)(1) – subparagraph (A), which defines "restricted building or ground" to specifically include "any posted, cordoned off, or otherwise restricted area … of the White House or its grounds" – did not cover the U.S. Treasury Building or its grounds. *Id.* at *6-10. Nothing in that ruling or its reasoning supports Seitz's position in this case. Indeed, Judge Friedman has since ruled that "the U.S. Capitol was clearly covered by the definition of 'restricted buildings or grounds' based on the Vice President's presence there, rejecting arguments similar to Seitz's. *Puma,* 2022 WL 823079, at *19.

## II.   Recognizing that the ceremonial office at the Capitol is not the Vice President's regular workplace does not create constitutional fair-notice problems.

Next, Seitz asserts (ECF No. 42, at 11-14) that the common-sense interpretation adopted in *McHugh* (and noted by other judges of the Court), which observed that the Capitol is not the Vice President's regular workplace (and thus can be temporarily visited), "creates fair notice

problems." That is so, Seitz argues, because, under that reading, "the statute's reach expands and contracts based on fluid, unidentified factors" such as "the frequency with which the Vice President casts a tie-breaking vote, their personal preference for working in their Senate office, their travel schedule, etc." *Id.* at 13. But Seitz's argument overlooks Section 1752(c)(1)'s overall structure. As Chief Judge Howell explained,

> Under § 1752, certain conduct is criminalized in certain sensitive areas around both the President and the Vice President. The residences of both, whether the occupant is present or not, are covered at all times. 18 U.S.C. § 1752(c)(1)(A). When either official is "temporarily visiting" some other location, a *de facto* bubble follows him or her and affords similar protection. *Id.* § 1752(c)(1)(B). All of this makes sense.

*Anthony Williams*, No. 21-cr-377, ECF No. 88, at 6. Not only does this structure "make[] sense"; it removes *all* uncertainty as well: a person violates Section 1752(a)(1) and (2), at a minimum, whenever, with the requisite *mens rea*, he enters or remains in (or engages in disorderly or disruptive conduct in) a posted, cordoned off, or otherwise restricted area around the President or Vice President. The government's reading, in other words, ensures that Section 1752 supplies a predictable, uniform basis for prosecution whenever a suspect breaches the "*de facto* bubble" following the President and Vice President. It is Seitz's own reading that, in contrast, "would produce absurd results" – by "inexplicably pop[ping] that bubble for an ill-defined set of destinations where the President or Vice President's presence is sufficiently 'frequent' or the reason for their presence sufficiently 'official.'" *Anthony Williams*, No. 21-cr-377, ECF No. 88, at 6 ("The Court declines to introduce such needless ambiguity into a simple statutory phrase."). *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). There is no "indeterminacy" regarding "when the Vice

President is 'temporarily visiting' the Capitol" (ECF No. 42 at 13) because any trip he or she makes there qualifies.

The issues Seitz identifies, moreover, would arise only if the Court agreed that a protectee cannot visit a place that they normally "live or work," and thus turned to *McHugh*'s secondary argument – that, even if such a carveout exists, "the U.S. Capitol is not the Vice President's regular workplace" because "the Vice President is principally an executive officer who spends little time at the Capitol and likely even less in her 'office' there." *McHugh*, 2022 WL 296304, at *22. To reach this issue, the Court would also have to reject the argument to which Judge Nichols alluded in *Fischer*, namely, that the Vice President visited other locations at the Capitol on January 6, such as the Chamber of the House of Representatives, where he does not have an office. Only then would details of the Vice President's use of the ceremonial office come into play. Otherwise, the Vice President's presence at the Capitol (or in, for example, the House Chamber) would suffice. But even if a Section 1752 charge did turn on the nature of the Vice President's use of a ceremonial office at the Capitol, it would hardly mean that the statute "specifies 'no standard of conduct at all,'" as Seitz claims, invoking constitutional vagueness concerns (ECF No. 42, at 13) (citing *United States v. Bronstein,* 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)). Determining whether the ceremonial office was the Vice President's regular workplace would turn on simple, objective facts, such as the frequency of the Vice President's presence in his or her ceremonial office and the identification of other offices that he or she uses. It would not require anything like the kind of subjective judgment – such as statutes prohibiting acts deemed "annoying," *Coates*, 402 U.S. at 611, "unjust or unreasonable," *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 86 (1921), or "indecent," *United States v. Williams*, 553 U.S. 285, 306 (2008)– that have led courts to invalidate other laws on vagueness grounds. *Cf. United States v. Nordean*, No. CR 21-175 (TJK), 2021 WL 6134595, at *16 (D.D.C. Dec. 28,

2021) (rejecting vagueness challenge to 18 U.S.C. § 231(a)(3), which prohibits any act done "to obstruct, impede, or interfere" with law enforcement responding to a "civil disorder").    It is not standardless and indeterminate.

Seitz next invites the Court to compare Section 1752 with the statute at issue in *United States v. Class,* 930 F.3d 460 (D.C. Cir. 2019), but such a comparison undermines his position.  In *Class*, the D.C. Circuit rejected the defendant's due process vagueness challenge to a statute prohibiting firearm possession on Capitol Grounds.  *Id.* at 466. Under the reasoning in *Class*, it is Seitz's interpretation of Section 1752, which would apply to only some buildings that a protectee visits, that would require a citizen to "speculate about the uses" of a particular location (*i.e.,* whether it contains a "permanent" office or living space for a protectee).  *See id.* at 468.  The government's interpretation, by contrast, is not dependent on the "use" of a building; the statute can apply to any building that a protectee temporarily visits.  Even if there were a carveout for the Vice President's regular workplace, discerning whether the Capitol qualified would not require untethered "speculation," but basic knowledge of the Vice President's modern role in the government.[5]

Like the law that passed muster in *Class,* Section 1752 does not require a defendant to "make detailed measurements, sort through voluminous real estate records, or speculate about the uses of various parcels of land."  *Class*, 930 F.3d at 468.  *Class* does not, as defendant implies, require that every term in a statute be defined by a "statute book" to satisfy fair notice.  (ECF No. 42 at 13-14).  Rather, "[f]air notice usually requires a legislature to "do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its

---

[5]        Moreover, to violate Section 1752, a defendant does not need to know the identity of the proctectee or the reason that an area is restricted; the defendant must know only that the area is restricted.

terms and to comply," and "perfect clarity and precise guidance have never been required even of regulations that restrict protected activity." *Id.* at 467 (citations omitted).  As in *Class,* the Court "cannot say that the law is so difficult to understand that it violates the Constitution." *Id.*

Just as there was no fair-notice issue in *Class,* so there is none here either.  The D.C. Circuit rejected the defendant's argument that it was too complicated to figure out whether a particular area was part of the Capitol Grounds because the statute(s) were "sufficiently clear" to inform  "a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Id.* at 469 (citation omitted).  The same is true with Section 1752, for which a defendant need only know that an area is posted, cordoned-off, or otherwise restricted—precisely the kinds of demarcations that would provide a person notice.

## III.    The rule of lenity and the canon of constitutional avoidance do not apply.

Seitz further asserts (ECF No. 43, at 14-17) that his interpretation is supported by the rule of lenity.  That claim is unavailing because there is no "grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended.'" *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (quoting *Barber*, 560 U.S. at 488).  No such ambiguity exists here.  As explained above, Section 1752's text, structure, and purpose yield a clear meaning.  The rule of lenity should, therefore, play no role in this case.[6]

---

[6]      Citing Justice Gorsuch's concurrence in the judgment in *Wooden v. United States*, 142 S. Ct. 1063 (2022), Seitz suggests that there is "ambiguity in the case law over the level of ambiguity required to trigger the rule of lenity." (ECF No. 43, at 15 n.13).  He is incorrect.  First, Justice Gorsuch's concurrence in *Wooden*, which only one other Justice joined, is not – and does not reflect – binding precedent.  Under Supreme Court precedent, "the rule of lenity does not apply when a law merely contains some ambiguity or is difficult to decipher." *Id.* at 1075 (Kavanaugh, J., concurring).  It applies only when the ambiguity is "grievous[]"– *i.e.*, "'at the end of the process of construing what Congress has expressed.'" *Ibid.* (quoting *Callanan v. United States*, 364 U.S. 587, 596 (1961)).  Justice Gorsuch's concurrence itself recognizes that the Supreme Court has set the bar for lenity at grievous ambiguity. *Id.* at 1084.  This Court should apply the controlling grievous ambiguity standard, leaving it to the Supreme Court "the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989).

The same is true of the principle of constitutional avoidance, which Seitz also invokes. (ECF no. 42 at 16-17).  Like the rule of lenity, constituional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction."  *Clark v. Martinez*, 543 U.S. at 385 (2005).  The constitutional-avoidance canon "does not apply if the statute at issue is unambiguous." *M.M.V. v. Garland*, 1 F.4th 1100, 1107 (D.C. Cir. 2021).  In light of the statute's text, structure, and purpose, Section 1752 applies unambiguously to the Vice President's presence at the Capitol, so the doctrine of constitutional avoidance, like the rule of lenity, does not apply.  *Cf. United States v. Caldwell*, 21-cr-28 (APM), 2021 WL 6062718, at *19  (D.D.C. Dec. 20, 2021) (finding that constitutional avoidance does not require limiting 18 U.S.C. § 1752(c)(2) to acts affecting evidence because the statute's actus reus ("obstructs, influences, or impedes"), while broad, was not ambiguous).  Seitz's view of Section 1752 asks the Court not simply to "interpret" the statute,  but to "rewrite" it (to add a lives-and-works carveout). *Jennings v. Rodriguez,* 138 S.Ct. 830, 836 (2018). That is beyond what the constitutional avoidance canon allows.  *Id.*

Moreover, even if the statute were susceptible to Seitz's construction, he has not shown that the government's interpretation of Section 1752 raises "serious constitutional doubts," such that the Court must choose his interpretation instead.  *Jennings,* 138 S. Ct. at 836.  This is particularly so given that Seitz's attack on the government's interpretation of statute is mainly a statutory one.  His only constitutional argument is that *McHugh*'s secondary reading of the statute (that, even if one cannot temporarily visit a place where one normally works, the Vice President does not normally work in the Capitol) creates due process fair-notice problems.  As explained

---

Second, even under Justice Gorsuch's view, lenity comes into play only "[w]here the traditional tools of statutory interpretation yield no clear answer."  *Wooden*, 142 S. Ct. at 1085-1086.  As explained above, with respect to the meaning of "restricted buildings or grounds," those traditional tools of interpretation do yield a clear answer.

above, it does not – and if the Court adopts the government's (and *McHugh*'s) primary argument, Seitz's concerns about indeterminacy do not arise in the first place because no assessment about the nature of the Vice President's presence at the Capitol is required.

Seitz also suggests that dismissing the Section 1752 counts would not undermine the government's ability to prosecute those who unlawfully enter the Capitol and threaten the Vice President, as the mob here did.  (ECF No. 42, at 18).  Seitz is wrong: his interpretation would lead to a significant coverage gap.  Not only would Section 1752 no longer punish violations that occur when the Vice President is at the Capitol (including when an individual commits violence with a deadly weapon, *see* 18 U.S.C. § 1752(a)(4) and (b)(1)(A)), it would also no longer apply to any other location where any protectee has a dedicated office or residence, aside from the White House or the Vice President's official residence.

Seitz claims that other statutes would fill the gap, identifying 18 U.S.C. § 3056(d) and 40 U.S.C. § 5104(e)(2)(D).  (ECF No. 42, at 18).  As an initial matter, it is it not clear why that argument is relevant; the potential application of other statutes is not a reason to invalidate the Section 1752 charge.  Neither of the provisions identified by Seitz, moreover, (nor any other provision of 40 U.S.C. § 5104(e)) would be a complete substitute.  40 U.S.C. § 5104 is limited to the Capitol (and some provisions, such as 40 U.S.C. § 5104(e)(2)(G), with which defendant is charged, are further limited, applying only to the Capitol Buildings, not to Capitol Grounds), and would do nothing to fill the gap relating to any other location.

For additional reasons, Section 5104 is not a substitute for Section 1752.  It does not cover merely entering and remaining in a restricted area, as Section 1752(a)(1) criminalizes.  It instead requires some additional intent or conduct (*see, e.g.,* 40 U.S.C. § 5104(e)(2)(C), requiring "intent to disrupt the orderly conduct of official business"; 40 U.S.C. § 5104(e)(2)(D), criminalizing "loud, threatening, or abusive language, or engag[ing] in disorderly or disruptive conduct") with

the exception of entry into a limited number of specific areas, such as the floor or gallery of the

House or Senate—areas that Secret Service protectees have no ostensible reason to visit. 40 U.S.C.

§ 5104(e)(2)(A)-(B). [7]  18 U.S.C. § 3056(d) applies only to those who "knowingly and willfully

obstruct[], resist[], or interfere[] with a Federal law enforcement agent engaged in the performance

of the protective functions authorized by this section or by section 1752 of this title," *i.e.*, certain

members of the Secret Service.  It requires an act of obstruction, resistance, or interference, and

thus criminalizes a much narrower range of conduct than Section 1752.  It also arguably guards

against only threats from individuals who get close enough to the protectee to obstruct, resist, or

interfere with an agent performing a protective function; Section 1752 covers a much larger

geographic area.  Section 1752, moreover, includes areas where the protectee "will be visiting"; a

violation of Section 3056 could occur only the Secret Service is present.  Finally, Section 3056

includes no enhanced penalties for the use of dangerous or deadly weapons or causing significant

bodily injury; all violations are punishable by up to one year's imprisonment. *Cf.* 18 U.S.C. §

1752(a)(1)(B) (providing for penalties of up to ten years' imprisonment in certain circumstances).

In summary, while there is some overlap between Section 1752 and other statutes (as is

"inevitable" in criminal law, *Marinello v. United States*, 138 S. Ct. 1101, 1107 (2018)), Seitz's

---

[7]        There are other mismatches too.  Section 5104's general disorderly or disruptive
conduct provision, 40 U.S.C. § 5104(e)(2)(D), requires the intent to disrupt a Congressional
session or hearings or committee deliberations, whereas the intent required under Section
1752(a)(2) (which also applies to disorderly conduct) is different, and broader, applying to the
intent to impede or disrupt "the orderly conduct of Government business or official functions."
Section 5104(e)(2)(D) thus could not substitute for Section 1752 where, for example, the
disorderly conduct is intended to impede the protection of the Vice President or other official
functions of the Vice President at the Capitol that are not Congressional sessions – frustrating the
central purpose of Section 1752, which is to protect the Vice President and Secret Service
protectees.  Section 5104 also contains no provision that would cover the conduct criminalized by
Section 1752(a)(5), which prohibits operating an unmanned aircraft system within or above a
restricted building or grounds.

reading of Section 1752 would undermine the government's ability to protect the safety of the President, Vice President, and other Secret Service protectees.

## CONCLUSION

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that the Court deny Seitz's motion to dismiss Counts Two and Three.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ *Alexis J. Loeb*
ALEXIS J. LOEB
Assistant United States Attorney, Detailee
CA Bar No. 269895
450 Golden Gate Ave., 11th Floor
San Fracisco, CA 94102
Alexis.loeb@usdoj.gov
(415) 436-7168