## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-279 (DLF)** |
| **v.** | : | |
| | : | |
| **ETHAN C. SEITZ,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO TRANSFER VENUE

Defendant Ethan Seitz, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to another district.  Seitz fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.[1]

## BACKGROUND

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election.  While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol

---

[1]      Every judge on this Court to have ruled on a motion for change of venue in a January 6 prosecution has denied the motion.  *See United States v. Garcia,* No. 21-cr-129, ECF No. 83 (D.D.C. July 22, 2022) (ABJ); *United States v. Bledsoe*, No. 21-cr-204 (July 15, 2022) (Minute Order) (BAH); *United States v. Williams*, No. 21-cr-377 (June 10, 2022) (Minute Entry) (BAH); *United States v. McHugh*, No. 21-cr-453 (May 4, 2022) (Minute Entry) (JDB); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158 (D.D.C. Dec. 14, 2021) (Minute Order) (RC); *United States v. Reffitt*, No. 21-cr-32 (D.D.C. Oct. 15, 2021) (Minute Order) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM).

building.  As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

Seitz traveled from Ohio to Washington, D.C.  On January 6, he entered the Capitol by climbing in through a window, and, according to his own social media statements and admissions to the FBI, he joined a group pushing against the police inside the building and got "tear gassed." He described himself as "on the frontline storming the capitol and taking the building."

Based on his actions on January 6, 2021, Seitz was charged with obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One); entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).  (ECF No. 8).

Seitz now moves for a change of venue.  (ECF No. 44).  He contends that prejudice should be presumed in this district for four primary reasons: (1) pretrial publicity surrounding the events of January 6; (2) the characteristics of the D.C. jury pool, including political affiliation and the number of federal employees living and working in the District of Columbia; (3) the impact of January 6 on Washington, D.C.; and (4) the timing of the proceedings.  His arguments are without merit, and the motion should be denied.

**ARGUMENT**

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958). Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

**I.   The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.**

Seitz contends that a change of venue is warranted based on pretrial publicity. (ECF No. 44 at 4-16, 24-29). "The mere existence of intense pretrial publicity is not enough to make a trial

unfair, nor is the fact that potential jurors have been exposed to this publicity."  *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process").  Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."  *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice.  *Irvin*, 366 U.S. at 723.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire.  *See Rideau v. Louisiana*, 373 U.S. 723 (1963).   In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people.  *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder."  *Rideau*, 373 U.S. at 726.  Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process.  *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . .

attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity.  *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based.  *Skilling*, 561 U.S. at 382-83.  First, the Court considered the "size and characteristics of the community."  *Id.* at 382.  Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service.  *Id.* at 382.  Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Id.*  Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse."  *Id.* at 383.  "Finally, and of prime significance,

Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). And contrary to Seitz's contention, those factors do not support a presumption of prejudice in this case.

### A.      Size and characteristics of the community

Seitz suggests (ECF No. 44 at 19-24) that an impartial jury cannot be found in Washington, D.C., despite the District's population of nearly 700,000. Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*. The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found. In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected. And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)). There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled." *Id.* As Judge Jackson recently observed, "[t]he master list of available jurors is large enough to include individuals who have paid little or no attention to the January 6 cases." *Garcia,* 21-cr-129, ECF No. 83, at 15.

### B.      Nature of the pretrial publicity

Nor does this case involve a "confession or other blatantly prejudicial information of the

type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. Even news stories that are "not kind," *Skilling*, 561 U.S. at 382, or are "hostile in tone and accusatory in content," *Haldeman*, 559 F.2d at 61, do not alone raise a presumption of prejudice. As in *Skilling* and *Haldeman*, the news coverage of Seitz is "neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.* Indeed, although any media characterizations of Seitz would be inadmissible, the photos and videos of Seitz that have been disseminated would be both admissible and highly relevant at trial. *Compare Sheppard*, 384 U.S. at 360 (noting that information reported by the media was "clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless when news media make it available to the public"), *with Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible at trial. Rather, the news reports focused on relaying mainly evidence presented at trial."); *Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found [the defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is negligible.").

Seitz argues that prejudice should be presumed based on statements by the President, Vice President, members of Congress, the Mayor of the District of Columbia, several judges of this Court, other officials, and the head coach of the Washington Commanders. But harsh condemnation of a defendant's actions is not uncommon in high-profile criminal cases, and it does not suffice to establish prejudice. In *Skilling*, the news stories about the defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. And in *Haldeman*, although some of the coverage of the Watergate scandal was "hostile in tone and accusatory in content," the bulk of the coverage

"consist[ed] of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations." *Haldeman*, 559 F.2d at 61. The D.C. Circuit concluded that the coverage "was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.* The same is true here, where news coverage has not reported on any confession or other blatantly prejudicial information about Seitz. Moreover, the statements by the President, the Vice President, and Congressional leadership are ordinarily reported across the entire country, and exposure to these statements is hardly unique to Washington, D.C.

Seitz singles out statements by members of Congress from districts bordering D.C. (ECF No. 44 at 14-16), but he makes no effort to show that other members of Congress around the country have not also condemned the January 6 Capitol attack. In fact, they have. *See, e.g.,* Manchin Statement on Anniversary of Capitol Insurrection, *available at* https://www.manchin.senate.gov/newsroom/press-releases/manchin-statement-on-anniversary-of-capitol-insurrection (statement of West Virginia Senator Joe Manchin comparing January 6 to the attack on Pearl Harbor); McConnell Statement on January 6th Anniversary; *available at* https://www.republicanleader.senate.gov/newsroom/press-releases/mcconnell-statement-on-january-6th-anniversary (statement of Minority Leader Mitch McConnell of Kentucky, stating "The United States Capitol, the seat of the first branch of our federal government, was stormed by criminals who brutalized police officers and used force to try to stop Congress from doing its job."); "Republicans criticize Ted Cruz for calling Jan. 6 a violent terrorist attack," *National Public Radio, available at* https://www.npr.org/2022/01/06/1070970440/ted-cruz-jan-6-violent-terrorist-attack-tucker-carlson (reporting on statements of Senator Cruz of Texas during a committee hearing where he referred to the "anniversary of a violent terrorist attack on the Capitol").

Other cited statements, while "hostile in tone" toward some aspect of January 6 or the events in general, *Haldeman*, 559 F.2d at 61, are unlikely to have a broad and lasting impact on the D.C. jury pool.  No trial date has been set in this case.  Assuming a trial occurs this year, it is unlikely that many potential jurors who would remember, for example, the specific words that the Washington Commanders head coach used to criticize his defensive coordinator months earlier. (*See* ECF No. 44 at 10-11.)  And that statement was just one statement among many statements made by public figures across the country criticizing what happened on January 6.  Similarly, Seitz does not show that a substantial number of D.C. residents have closely followed the District of Columbia's lawsuit against the Proud Boys and others, nor does he cite any instances where any juror in a previous January 6 trial was disqualified based on knowledge of the lawsuit (which was filed in December 2021).

Nor do statements by judges on this Court establish the need for a change of venue.  (*See* ECF No. 44, at 13-14.)  Seitz's citations for these statements are from publications with national circulation, such as CNN and Politico, suggesting that any impact these statements had would be national, not local.[2]  At any trial, moreover, jurors would be presumed to follow a court's instructions, see *Weeks v. Angelone*, 528 U.S. 727, 733 (2000), including the standard instruction that a judge's comments during trial should not be understood as favoring one party or another. There is no reason to believe that jurors cannot set aside comments made by other district judges in other cases (to the extent they are even aware of them) and follow the instructions in this case.

---

[2]    The first two statements Seitz cites, made by the Chief Judge, provide particularly weak support.  The first, which he claims refers to local damage, was made in January, 2021, in the immediate aftermath of the attack; as explained below, the local effects were generally limited to the weeks following the attack, and were not so severe and widespread to cause presumptive prejudice over 18 months later.  The second statement from the Chief Judge is from an article whose headline would seem to create more prejudice against the government: "*Almost Schizophrenic: Judge Rips DOJ Approach to Jan 6 Prosecutions*."  (ECF No. 44, at 13 n.18).

Seitz also contends that the nationally televised hearings of the House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol (Select Committee) and President Trump's second impeachment trial support a change of venue.  (ECF No. 44 at 4-5, 8).  Coverage of these hearings was not limited to Washington, D.C. Instead, the hearings and trial were carried on national networks across the country.  In similar circumstances, the D.C. Circuit affirmed the denial of a change of venue where the defendants—who were high-ranking members of the Nixon administration—complained that they were prejudiced by news coverage of the Watergate-related hearings. *Haldeman*, 559 F.2d at 62-64 & nn.35, 43.  The court of appeals observed that "a change of venue would have been of only doubtful value" where the "network news programs and legislative hearings" related to Watergate were "national in their reach." *Id.* at n.43.

Moreover, Seitz has not pointed to any evidence that D.C. residents were more likely to have watched that hearing than citizens in other parts of the country.  And even if D.C. residents tuned in at a higher rate, it is still likely that a majority of D.C. residents did not watch the hearings. Moreover, those hearings have focused on the events of January 6 as a whole, not on the actions this defendant.  There is no reason to believe that coverage of the hearings will create in D.C. such a degree of bias against this particular defendant that an impartial jury cannot be selected.

Additionally, a careful voir dire—rather than a change of venue—is the appropriate way to address potential prejudice from the Select Committee hearings.  "[V]oir dire has long been recognized as an effective method of routing out [publicity-based] bias, especially when conducted in a careful and thoroughgoing manner." *In re Nat'l Broadcasting Co.*, 653 F.2d 609, 617 (D.C. Cir. 1981).  After a careful voir dire, this Court can select a jury from those residents who either did not watch the hearings or who, despite having watched the hearing, give adequate assurances

of their impartiality.  *See Haldeman*, 559 F.3d at 62 n.35 (rejecting claim of prejudice even though "several jurors" had "seen portions of the televised Senate hearings" related to Watergate).

Seitz asserts that a fair trial cannot be had in D.C. because of the volume of news coverage of January 6.  (ECF No. 44 at 24-29).  But even "massive" news coverage of a crime does not require prejudice to be presumed.  *Haldeman*, 559 F.2d at 61.  And a comparatively small percentage of the news coverage of January 6—and none of the many statements by political officials, judges, a football coach, or the D.C. lawsuit cited in Seitz's motion—has mentioned Seitz himself.  Indeed, a Google search for Seitz's name conducted on July 25 returned his listing on the Department of Justice website, followed mostly by reporting from Ohio news outlets on his arrest on misdemeanor charges over a year ago.[3]  Nor is Seitz known to be a member of groups, such as the Proud Boys, who have been mentioned during the January 6 hearing or in the District of Columbia's lawsuit.  Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 800 people.  The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope.  *See Haldeman*, 559

---

[3]https://www.google.com/search?q=ethan+seitz&sxsrf=ALiCzsblBXdwJLxhSWpFA5tzBiM4j1s
Dw%3A1658797798724&ei=5j7fYtLhK6OgqtsPhLu-0AI&ved=0ahUKEwjS7K-sr5X5AhUjk
GoFHYSdDyoQ4dUDCA4&uact=5&oq=ethan+seitz&gs_lcp=Cgdnd3Mtd2l6EAMyBQgAEIA
EMgYIABAeEAcyBQgAEIAEMgUIABCABDIECAAQHkoECEEYAUoECEYYAFCDA1iiHB
GCTB2gBcAB4AIABuAGIAd4CkgEDMC4ymAEAoAEBwAEB&sclient=gws-wiz

F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)).  Indeed, many of the news stories that Seitz cites were published by media organizations with wide national circulation, not purely local outlets.  *See*, *e.g.,* ECF No. 44 at n.7-n.9 (citing the Associated Press, NPR, and NBC News).  Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.

### C.      Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial."  *Skilling*, 561 U.S. at 383.  In this case, 18 months have already elapsed since the events of January 6, and more time will elapse before trial.]  This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession.  *Rideau*, 373 U.S. at 724.  Although January 6 continues to be in the news, particularly with the recent Select Committee hearings, the "decibel level of media attention [has] diminished somewhat" since January 6 and will likely diminish further, especially after the Select Committee hearings conclude.  *Skilling*, 561 U.S. at 383.  Moreover, defendant cites no recent stories that have mentioned him, and the limited, mostly local coverage of his arrest from March 2021 focuses on facts of the arrest and the complaint.

### D.      The jury verdict

Because Seitz has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict

. . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.  In short, none of the *Skilling* factors supports Seitz's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

## II.     The Characteristics of the District of Columbia's Jury Pool Do Not Support a Change of Venue.

Seitz also contends that a D.C. jury cannot be impartial because of various characteristics of the District's jury pool: the political makeup of the District's electorate, the impact of January 6 on D.C. residents, and the prevalence of federal employees in the District. (ECF No. 44 at 17-24).  None of these claims has merit.

### A.     The District of Columbia's political makeup does not support a change of venue.

Seitz contends that he cannot obtain a fair trial in the District of Columbia because more than 90% of its voters voted for the Democratic Party candidate in the 2020 Presidential Election. (ECF No. 44 at 23-24).  The en banc D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968 and 1972, respectively.  *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part).  The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue."

*Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here. Defendant's citation to various polls that he claims show "partisan bias" regarding January 6 (ECF No. 44 at 17) does not change this conclusion. To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with the defendants' political aims. But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire. This Court should not presume that every member of a particular political party is biased simply because this case has a political connection. Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895). The same is true here. The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases. High-profile individuals strongly

associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, and Roger Stone, have all been tried in the District.  *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-CR-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020).  Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone."  2020 WL 1892360, at *30-31.  Just last week, a jury was seated in the trial of Stephen Bannon, another individual closely associated with the former president, in connection with charges relating to the Congressional investigation of January 6.  Minute Entries, July 18-22, 2022, *United States v. Bannon,* 21-cr-670 (CJN).  Similarly here, the fact that most District residents voted against Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

Moreover, the polls defendant cites (ECF No. 44 at 18) do not establish sufficient bias in the jury pool to support a change of venue.  Those polls show differences between how Republicans and Democrats would characterize the events of January 6.  But the venire in this case will not just be drawn from individuals who have registered or self-identify as Republicans or Democrats.  Instead, the "D.C. Master Jury Wheel is generated based on three different sources: the Registered Voters Master File of the D.C. Board of Elections, D.C. Department of Motor Vehicles records 'of individuals 18 years and older who hold a driver's license, learner's permit, or valid identification card,' and 'the list of all individuals of the District of Columbia whose income tax forms are filed with the D.C. Department of Finance and Revenue.'"  *Garcia*, No. 21-

cr-129, ECF No. 83, at 21 (citing *Jury Selection Plan for the United States District Court for the District of Columbia for the Random Selection of Grand and Petit Jurors*, United States District Court: District of Columbia, 1 (2016), https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan2016.pdf ("Jury Selection Plan"). It therefore does not follow that the D.C. venire's beliefs about the events of January 6 will match the views of Republicans and Democrats in a nationwide poll, because the D.C. jury pool includes those who have not registered to vote or who do not identify with a particular party. *See Garcia,* No. 21-cr-129, ECF No. 83, at 21 (limiting surveys to registered voters a "significant omission" that does not "target the full range of this district's jury pool").

Moreover, none of the polls—which are designed to solicit and encourage individuals to express opinions—are representative of how individuals would behave as members of a jury. The polls "shed[] little light on what members of the jury who have been screened for biases during voir dire and asked if they can put aside what they have read or heard, and who are specifically instructed that they may base their verdicts only on the evidence, will do when called upon to render a verdict with respect to an individual defendant." *Garcia,* No. 21-cr-129, ECF No. 83, at 25.[4] Moreover, although the cited polls reflect a partisan divide about whether January 6 was an "insurrection" or an attempt to "overthrow [the] government," (ECF No. 44 at 18), neither Seitz nor any other defendant charged in connection with January 6 has been charged with insurrection or attempting to overthrow the government, *see* 18 U.S.C. §§ 2383, 2385. Nor would the charges

---

[4] Defendant does not provide sufficient information about the polls' methodology for the government to determine whether other flaws exist, such as whether individuals were offered the opportunity to respond that they do not know; whether they were offered descriptions of the rioters or volunteered certain descriptions on their own, or how the participants were selected. Given courts' skepticism of the use of prospective-juror polls to establish a presumption of prejudice, these opinion polls—which do not even try to replicate the D.C. jury pool—provide even weaker support.

in this case require the jurors to determine whether Seitz was motivated by "patriotism," was "defending freedom," was a "white nationalist[]," or a "rioter[]."  (ECF No. 44 at 17.)  In short, these nationwide polls—which do not attempt to measure views in the District of Columbia itself—do not establish that the District's political makeup prevents Seitz from obtaining a fair trial here.

Indeed, even where polls have focused on the particular venue at issue, courts regularly refused to presume prejudice and forgo voir dire based solely on those polls' results.  *See Haldeman*, 559 F.2d at 64 (rejecting claim of presumed prejudice based on the results of a pre-voir dire survey); *Campa*, 459 F.3d at 1146, 1157 (no change of venue where 69% of survey respondents in the venue were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were); *United States v. Rodriguez*, 581 F.3d 775, 786 (8th Cir. 2009) (no change of venue where nearly 88 percent of respondents in the venue believed the defendant was guilty, *see* Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19); *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005) ("courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias").  As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [Seitz] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required.  *Haldeman*, 559 F.2d at 62.

**B.     The impact of January 6 on Washington D.C. does not support a change of venue.**

Seitz contends that a D.C. jury could not be impartial because D.C. residents have been particularly affected by events surrounding January 6, including the deployment of the National Guard, the mayor's declaration of a state of emergency, road closures, and a curfew.  (ECF No. 44

at 21-23).  But many of the travel disruptions were short-lived, and January 6 is now more than a year in the past.  Many D.C. residents do not live or work near the Capitol where the roads were closed and the National Guard was deployed. There is no reason to believe that the District's entire population of nearly 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon).  Much of this precedent involves crimes causing severe injuries and loss of life—a far different local harm than, for example, a temporary curfew or road closures.  In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice."  *Skilling*, 561 U.S. at 384 (quotation omitted).  "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task."  *Id.*  In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors.  There is no reason to presume prejudice.

### C.    The number of federal employees who reside in the District of Columbia does not support a change of venue.

Seitz argues that the Court should presume prejudice in this District because the jury pool would contain a high percentage of federal government employees or their friends and family members.  (ECF No. 44 at 20-21).  But Seitz does not explain how merely being employed by the

federal government would render a person incapable of serving as an impartial juror.  Although some federal employees, such as the U.S. Capitol Police, were affected by the events of January 6, many others were neither directly nor indirectly affected.  Indeed, many federal employees were nowhere near the Capitol on January 6 given the maximum telework posture at the time.  And the storming of the Capitol on January 6 was not aimed at the federal government in general, but specifically at Congress' certification of the electoral vote.  There is therefore no reason to believe that federal employees with little or no connection to the events at the Capitol could not be impartial in this case.  *See United States v. Bochene*, No. 21-cr-418 (RDM), 2022 WL 123893, at *2 (D.D.C. Jan. 12, 2022) (January 6 defendant's claim that federal employees would "have a vested interest in supporting their employer" was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection").

Even assuming (incorrectly) that every federal employee is affected by improper bias, the Court could draw a jury from those District residents who are not employed by the federal government.  According to the Office of Personnel Management, around 141,000 non-Postal Service employees worked in Washington, D.C., in 2017.  OPM, Federal Civilian Employment, available at https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.  But many federal employees who work in the District live outside the District and would not be part of the jury pool.  And the District has nearly 700,000 residents.  Thus, even if every federal employee were disqualified, the Court would be able to pick a jury in this District.

III.   **The Voir Dire Process in the First Five January 6 Jury Trials Has Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.**

At this point, multiple January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort.  *See*

*Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire").  The judges presiding over those trials – including this Court – were able to select a jury in one or two days.  *See United States v. Reffitt*, 21-cr-32, Minute Entries (Feb. 28 and Mar. 1, 2022); *United States v. Robertson*, 21-cr-34, Minute Entry (Apr. 5, 2022); *United States v. Thompson*, 21-cr-161, Minute Entry (Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (Apr. 25, 2022); *United States v. Hale-Cusanelli*, 21-cr-37, Minute Entry (May 23, 2022); *United States v. Williams*, 21-cr-377, Minute Entry (June 27, 2022); *United States v. Bledsoe*, No. 21-cr-204, Minute Entry (July 18, 2022).  Moreover, as noted above, a court in this district also seated a jury in the trial of Stephen Bannon, a public figure associated with President Trump, which related to Congress's investigation of January 6.  Minute Entries, *United States v. Bannon,* 21-cr-670 (July 18-19, 2022).

Moreover, using the first five jury trials as exemplars, the voir dire that took place undermines Seitz's claim that prejudice should be presumed.[5]  In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined).  *See Reffitt* Trial Tr. 521.  The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror.  *Reffitt* Trial Tr. 23, 30.  The Court then followed up during individual

---

[5]      Because they remain restricted on PACER, the transcripts from the voir dire proceedings in these cases, where available, are being submitted under separate cover to the Court and counsel.

voir dire.  Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or impartial jurors.[6]

In *Thompson*, the Court individually examined 34 prospective jurors, and qualified 25 of them (or 73%).  *See Thompson* 4-11-22 Tr. 169, 171, 180, 189, 192.  The court asked the entire venire 47 standard questions, and then followed up on their affirmative answers during individual voir dire.  *Id.* at 3-4, 34.  Of the nine prospective jurors struck for cause, only three (or about 9% of those examined) were stricken based on an inability to be impartial, as opposed to some other cause.[7]

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined).  *See Robertson* Trial Tr. 302.  The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict."  *Id.* at 14.  It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial."  *Id.* at 13, 15.  The Court followed up on affirmative answers

---

[6]      For those struck based on a professed inability to be impartial, see *Reffitt* Trial Tr. 49-54 (Juror 328), 61-68 (Juror 1541), 112-29 (Juror 1046), 172-73 (Juror 443), 174-78 (Juror 45), 202-09 (Juror 1747), 223-35 (Juror 432), 263-74 (Juror 514), 358-69 (Juror 1484).  For those struck for other reasons, see *Reffitt* Trial Tr. 168-172 (Juror 313, worked at Library of Congress), 209-24, 281 (Juror 728, moved out of D.C.), 284 (Juror 1650, over 70 and declined to serve), 340-51 (Juror 548, unavailability), 382 (Juror 715, anxiety and views on guns), 398 (Juror 548, medical appointments), 441-43 (Juror 1240, health hardship), 453-65 (Juror 464, worked at Library of Congress), 465-81 (Juror 1054, prior knowledge of facts).

[7]      For the three stricken for bias, see *Thompson* 4-11-22  Tr. 52 (Juror 1242), 85 (Juror 328), 158 (Juror 999).  For the six stricken for hardship or inability to focus, see *id.* at 43 (Juror 1513), 44 (Juror 1267), 49 (Juror 503), 40 (Juror 1290), 92 (Juror 229), 109 (Juror 1266).

to those questions during individual voir dire.  Of the 15 prospective jurors struck for cause, only

nine (or 18% of the 49 people examined) indicated that they had such strong feelings about the

January 6 events that they could not be fair or impartial.[8]

In *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%).

*Webster* 4-26-22 AM Tr. 6, though it later excused one of those 35 based on hardship, *Webster* 4-

25-22 PM Tr. 217-18.  The Court asked all prospective jurors whether they had "strong feelings"

about the events of January 6 or about the former President that would "make it difficult for [the

prospective juror] to serve as a fair and impartial juror in this case."  *Webster* 4-25-22 AM Tr. 19.

During individual voir dire, the Court followed up on affirmative answers to clarify whether

prospective jurors could set aside their feelings and decide the case fairly.  *See, e.g., id.* at 32-33,

41-42, 54-56, 63, 65-66.  Only 10 out of 53 prospective jurors (or about 19%) were stricken based

on a professed or imputed inability to be impartial, as opposed to some other reason.[9]  The *Webster*

Court observed that this number "was actually relatively low" and therefore "doesn't bear out the

concerns that were at root in the venue transfer motion" in that case.  *Webster,* 4-26-22 AM Tr. 7.

---

[8]        For those struck based on a professed inability to be impartial, see *Robertson* Trial
Tr. 26-34 (Juror 1431), 97-100 (Juror 1567), 121-30 (Juror 936), 136-42 (Juror 799), 160-71 (Juror
696), 189-93 (Juror 429), 256-65 (Juror 1010), 265-68 (Juror 585), 287-92 (Juror 1160).  For those
struck for other reasons, see *Robertson* Trial Tr. 23-26 (Juror 1566, hardship related to care for
elderly sisters), 83-84 (Juror 1027, moved out of D.C.), 156-60 (Juror 1122, language concerns),
193-96 (Juror 505, work hardship), 245-50 (Juror 474, work trip); 279-82 (Juror 846, preplanned
trip).

[9]        Nine of the 19 stricken jurors were excused based on hardship or a religious belief.
*See Webster* 4-25-22 AM Tr. 46 (Juror 1464), 49-50 (Juror 1132), 61 (Juror 1153), 68 (Juror 951),
78 (Juror 419); *Webster* 4-25-22 PM Tr. 102-04, 207, 217 (Juror 571), 188 (Juror 1114), 191 (Juror
176), 203-04 (Juror 1262).   Of the ten other stricken jurors, three professed an ability to be
impartial but were nevertheless stricken based on a connection to the events or to the U.S.
Attorney's Office.  *See Webster* 4-25-22 AM Tr. at 58-60 (Juror 689 was a deputy chief of staff
for a member of congress); *Webster* 4-25-22 PM Tr. at 139-41 (Juror 625's former mother-in-law
was a member of congress); 196-98 (Juror 780 was a former Assistant U.S. Attorney in D.C.).

In *Hale-Cusanelli*, the Court individually examined 47 prospective jurors and qualified 32 of them (or 68%). *Hale-Cusanelli* Trial Tr. 226, 231. The Court asked prospective jurors questions similar to those asked in the other trials. *See id.* at 72-74 (Questions 16, 20). Of the 15 prospective jurors struck for cause, 11 (or 23% of those examined) were stricken based on a connection to the events of January 6 or a professed inability to be impartial.[10]

In these first five jury trials, the percentage of prospective jurors stricken for cause based on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice." *Irvin*, 366 U.S. at 728. In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner." *Id.* at 727. The percentage of partiality-based strikes in these first five January 6-related jury trials—between 9% and 23% of those examined—is far lower than the 62% in *Irvin*. The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt." *Murphy*, 421 U.S. at 803. *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* As in *Murphy*, the number of prospective jurors indicating bias does not call into question the qualifications of others whose statements of impartiality the Court has credited.

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first five January 6-related jury trials have confirmed that voir dire can adequately screen

---

[10]     *See Hale-Cusanelli* Trial Tr. 62 (Juror 499), 67-68 (Juror 872), 84-85 (Juror 206), 92-93 (Juror 653), 124-25 (Juror 1129), 152 (Juror 182), 156 (Juror 176), 182 (Juror 890), 197-98 (Juror 870), 217 (Juror 1111), 224 (Juror 1412). For the four jurors excused for hardship, *see id.* at 77-79 (Juror 1524), 99 (Juror 1094), 132 (Juror 1014), 151 (Juror 899).

out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case.  The Court should deny Seitz's request for a venue transfer and should instead rely on a thorough voir dire to protect Seitz's right to an impartial jury.

## **CONCLUSION**

For the foregoing reasons, Seitz's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Alexis J. Loeb*
ALEXIS J. LOEB
CA Bar No. 269895
Assistant United States Attorney (Detailed)
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
Telephone No. (415) 436-7168
alexis.loeb@usdoj.gov