## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.                                            Crim. Action No.1:21CR279(DLF)

ETHAN SEITZ,

          Defendant.

## <u>MEMORANDUM IN AID OF SENTENCING</u>

The Supreme Court has recognized that in some cases, a guidelines sentence fails to reflect the factors under § 3553(a) or that a case "warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007). Congress has directed "that alternatives to incarceration are generally appropriate for first offenders not convicted of a violent or otherwise serious offense." 28 U.S.C. § 994 (j). Ethan Seitz's case is emblematic of these principles.

Ethan Seitz ("Mr. Seitz" or "Ethan") will be before the Court for sentencing on January 8, 2024, having accepted full responsibility for his conduct at the U.S. Capitol on January 6, 2021. Because of Mr. Seitz's extraordinary story, the non-violent nature of his offense, and his acceptance of responsibility, a sentence of imprisonment would be far greater than necessary to achieve the goals of sentencing, irrespective of the guideline range this Court calculates.

For the reasons set forth in this Memorandum and exhibits, Mr. Seitz, through counsel, respectfully moves the Court to fashion a sentence that will allow Mr. Seitz to keep his job, which is not only a financial lifeline for him, it is an emotional one.

## Background

As set forth in detail herein and in the video submitted to chambers,[1] Ethan Seitz has overcome significant adversity in his 34 years. Like many people in his part of Ohio, he became addicted to opiates in the early 2000s. At that time, pills were easy to come by after Pfizer Pharmaceuticals flooded the rural community with OxyContin, marketing it as non-addictive. Ethan's addiction to pills spiraled out of control when his father also became addicted after a doctor prescribed opiates to treat symptoms of Parkinson's disease. When the pills ran out, Ethan and his father started using heroin together. His father encouraged Ethan's addiction by paying Ethan to procure drugs for the pair. They used heroin together for six years before Ethan was finally able to extract himself from the toxic relationship. After hitting rock bottom following the death of his beloved dog, Zoey, Ethan decided to get clean. He took his last drug on October 18, 2018, and has been clean ever since.

Ethan now leads a productive, stable life. He is in a healthy relationship with his partner, Amy Eulett. In his little free time, he spends time with Amy, her kids, his mom, and his sister. In addition to his relationships, Ethan's job at International Paper is central to his success and stability. He works 40 hours a week and is a valued employee who takes pride in his work and the contributions he makes to the company. Having overcome his addiction, Mr. Seitz is now thriving, thanks to his innate inner-strength, resolve, and the small, supportive network of people holding him up.

---

[1] Video submitted as Exhibit 1, uploaded to chambers' USAfx on December 18, 2022.

Mr. Seitz comes from a deeply conservative community in Ohio. After the 2020 election, everyone he knew was consuming information coming from President Trump, Ohio Congressman Jim Jordan, and other political leaders that there had been widespread election fraud. Troubled by these stories, Ethan decided to travel to Washington, D.C., by himself, to protest what he earnestly believed to be election fraud. As he told his sister, he felt that President Trump had invited him to stand up beside him in protesting election fraud. Once at the Capitol, Ethan joined the swell of the crowds and ultimately entered the building. Once inside, he did not engage in violence and did not enter any sensitive spaces. He did not come in direct contact with any police officer. He did not threaten anyone. He left after about twenty minutes.

On March 19, 2021, Mr. Seitz was arrested and charged with obstruction of justice and violations of 18 U.S.C. § 1752. That day, when law enforcement interviewed him, he was candid and truthful. The recording of the interview shows that he freely admitted to all of his conduct and that his primary concerns were whether he could keep his job and whether someone could pick up his dog.

On August 8, 2023, Mr. Seitz entered into a stipulated trial agreement whereby he accepted complete responsibility for his conduct. Following the stipulated trial agreement, Mr. Seitz cooperated with the pre-sentence investigation. He has been compliant with conditions of release since his arrest.

i.   **Response to the Pre-Sentence Report's (PSR) Guidelines Calculations[2]**

a.   **Objection to application Specific Offense Characteristics**

Mr. Seitz objects to the application the three-level enhancement under §2J1.2(b)(2) and the eight-level enhancement under § 2J1.2(b)(1)(B) as a legal matter because, as Judge McFadden recently found, his offense did not involve the "administration of justice" for the reasons set forth in *United States v. Seefried*, 639 F. Supp.3d 8 (D.D.C. 2021).[3]

Mr. Seitz also objects to the application of the 2J1.2(b)(1)(B) as a factual matter. The offense characteristic requires that the offense involved "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." Mr. Seitz did not cause or threaten to cause physical injury to anyone nor did he threaten or cause property damage. As he told FBI agents, he was positioned *in the back* of a large crowd while the crowd was pushing forward, meaning moving forward. He never made contact with any officer or directly pushed any officer. Being at the back of a crowd that is collectively moving forward does not rise to the level of threatening to cause or causing physical injury.

---

[2] As of the filing of this Memorandum, the final PSR has not published. Should the final PSR grant Mr. Seitz's objections, obviously his objections will be moot. Mr. Seitz has separately moved to the stay the sentencing in this matter until after the Supreme Court resolves the question presented in *United States v. Fischer*.

[3] Undersigned counsel is aware that this Court has previously found that the specific offense characteristics apply as a legal matter and respectfully notes Mr. Seitz's objection for the record. In any event, as set forth about the 8-level offense characteristic does not apply as a factual matter.

And while Mr. Seitz climbed through a broken window, he did not cause the damage to the window. The eight-level enhancement under § 2J1.2(b)(1)(B) does not apply as a factual matter.

### b. Mr. Seitz's criminal history score overstates the nature of his criminal history.

While Mr. Seitz's conviction for possession of drug paraphernalia technically counts for one criminal history point because he was sentenced to 36 months probation, a criminal history score of 2 points overstates his criminal history. (PSR ¶ 57). This conviction resulted from police officers observing Mr. Seitz using heroin during a time when he was in the throes of active drug addiction. He was not distributing drugs nor did he possess more than a user-amount. Mr. Seitz has been clean since October 2018. Because this offense reflects that Mr. Seitz was ill with addiction and is not remotely related to the instant conviction, undersigned counsel submits that a criminal history category of 2 overstates Mr. Seitz's criminal history.

Based on an overall offense level of 12 after acceptance of responsibility, Mr. Seitz contends that the Court should begin with a guideline range of 10-16 months. [4]

## II. The sentencing factors support a sentence that permits Mr. Seitz to keep his job at International Paper.

### A. Ethan's story is one of extraordinary struggle and extraordinary resilience.

---

[4] The base offense level is 14 under 2J1.2, minus 2 for acceptance of responsibility, yielding a guideline range of 10-16 months if the Court adjusts Mr. Seitz's criminal history category to I.

Ethan Seitz was born on July 4, 1989, to Cynthia Campbell and Rodney Seitz. He was born and raised in Crawford County, a rural part of Ohio. His mother, Cynthia, was a nurse. His father, Rodney, ran a small business out of the family home, selling scraps and surplus parts he obtained from a nearby factory. Ethan enjoyed a relatively stable, middle-class childhood, though his childhood years were marred by his father's emotional abuse.

### i. Ethan came of age at a time when prescription painkillers were inundating his rural community, instigating an opioid epidemic that ravaged the region; addicted to pills by age 15, Ethan was no exception.

Ethan attended his local public elementary and high school. By the time he started high school in 2000, unbeknownst to Ethan and his family, a devastating epidemic of opioid addiction had started to take root in his community. Five years earlier, in 1995, the U.S. Food and Drug Administration made what its commissioner later called one of the "greatest mistakes of modern medicine"—the approval of OxyContin, without warning of its addictive properties.[5] Following FDA approval, Purdue Pharma, under the control of the Sackler family, launched OxyContin, along with an unprecedented marketing campaign, recommending its use for all sorts of minor ailments, and asserting that the product was non-addictive.[6] Purdue Pharma targeted rural regions like the one in which Ethan's family lived because of the

---

[5] Patrick Radden Keefe, *The Family That Built an Empire of Pain*, NEW YORKER (Oct. 23, 2017), https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain.

[6] *Id.*

number of people who worked manual-labor jobs, who would be more prone to injury.[7] OxyContin flooded into the region during the late 90s. In the video submitted to chambers, Ethan's stepfather describes how doctors pushed opiates onto residents of the rural region. In conversations with counsel not captured on the video, Ethan's mother and stepfather recounted how "pain management clinics" would fly helicopters full of OxyContin onto vacant parking lots, where lines hundreds of cars deep would wait for pill distribution. Pill mills popped up everywhere—empty stores in strip malls, people's homes, even in church basements. The opioid epidemic led to widespread poverty and unemployment in the region.[8] The devastation that had been wrought was still evident when undersigned counsel visited Ethan and his family a few months ago.

Ethan started high school as the opioids were flowing through the community seemingly without limitation. He recalls parties where kids as young as 13 and 14 would raid their parents' medicine cabinet, passing prescription pills around like candy. No one—the children and parents alike— thought of the pills as an addictive narcotic. Why would they? OxyContin had been widely touted as non-addictive and doctors were prescribing it in record number. By age 15, Ethan had experimented enough with prescription pills that he experienced agonizing withdrawal symptoms

---

[7] *Id.*

[8] Michael Betz, Bo Feng, Mark Partridge, *Taking Measure of Ohio's Opioid Crisis*, Swank Program in Rural-Urban Policy (October 2017), https://aede.osu.edu/sites/aede/files/publication_files/Swank%20-%20Taking%20Measure%20of%20Ohios%20Opioid%20Crisis.pdf.

when he did not take the pills.[9] Within a few months of taking his first pill, he was a full-blown addict. He began using different drugs and alcohol to treat painful withdrawal from opiates. Ethan was not the only one in his high school who became addicted to pills after the community was flooded with pharmaceutical opiates. In a telling vignette, Ethan's mother recalls that during his senior year, Ethan dated the beautiful homecoming queen, who was also an opiate addict.[10] Somehow, Ethan managed to graduate high school but he was too depressed to walk across the stage on graduation day. After high school, he attended some vocational school. He also tried to go to substance abuse treatment but he was not ready and was then not able to get clean.

When Ethan was 20, he was hanging out with a cousin around a bonfire when he spilled gas over himself and caught on fire. He was rushed from the hospital to the

---

[9] Symptoms of opioid withdrawal include dysphoria, muscle aches, nausea, fever, sweating, vomiting and diarrhea. Shane Drake, *Yes people can die from opiate withdrawal*, National Drug & Alcohol Research Centre, August 11, 2016, https://ndarc.med.unsw.edu.au/blog/yes-people-can-die-opiate-withdrawal. In one vivid description of opioid withdrawal, an ex-addict describes: "More than once, I've read this phrase describing opioid withdrawal: The patient will experience flu-like symptoms. That must be the most inaccurate statement in medicine. A friend says doctors always leave out the part about 'psychic death.' Two or three days into my withdrawal in rehab, the nurses took away my ice chips. They were the last source of fluid they could give me. I was vomiting so convulsively they removed them to get the spasms to stop. It didn't work. The uncontrollable retching continued. I begged for just one ice chip to no avail. My mouth, throat, and entire digestive track felt scalded. . . Sometimes I think I died in that room, that my body and mind went through an experience so brutal I was transformed into someone else." Elizabeth Grey, *As an ex-heroin addict, I know getting off opioids is near impossible*, WASH. POST (May 27, 2022), https://www.washingtonpost.com/health/2022/05/27/opioid-addict-epidemic-withdrawal/

[10] Letter to the Court from Cynthia Campbell, attached as part of Exhibit 2.

Ohio State Burn Center, where he stayed for approximately three weeks. Cynthia Campbell writes, "we were told he had burned 30% of his body." Doctors at the burn center put Ethan in a medically induced coma. He had three skin graft surgeries and spent 17 days in the burn unit of the hospital. After he was released from the burn unit, he was diagnosed with bipolar disorder, depression, and anxiety disorder.[11]

Ethan's recovery from the fire was long and painful and as one might expect, his addiction to opiates intensified. Still, he managed to enroll in the Ohio State University, where he took a few a classes. His effort to go to school ended when he moved in with his father to become his father's caretaker.

### ii.    Ethan and his father Rodney had a toxic, emotionally abusive relationship that perpetuated Ethan's addiction and depression.

It is an understatement to say that growing up, Ethan and his father's relationship was fraught. His father, Rodney, often belittled and ridiculed Ethan for all manner of reasons—he wasn't good at sports, he was chubby as a kid, he didn't make good marks in school, and the list goes on. In 2010, after 30 years of marriage, Ethan's mother, Cynthia, divorced Rodney. After the divorce, Cynthia, went back to school and earned a degree in psychology from Ohio State. A few years later, Cynthia married one of Rodney's friends, Shane, who is depicted in the sentencing video.[12]

Shortly after the divorce, Rodney was diagnosed with Parkinson's disease. Symptoms of the disease emerged rapidly and soon he needed around-the-clock care.

---

[11] Since Ethan has been clean, he has not experienced symptoms of Bi-Polar Disorder.

[12] Shane's letter to the Court is attached as part of Exhibit 2.

Since Ethan did not have steady employment, the family decided that it would make sense for him to move in with Rodney to take care of him. In approximately 2015, Ethan moved in with Rodney to serve as his full-time caretaker. Looking back on that decision now, Ethan, his mother, and his sister acknowledge it was the worst decision the family could have made at this point in Ethan's life. Though Rodney had not abused substances before, he was prescribed opiates such as fentanyl and OxyContin to manage his Parkinson's symptoms. Soon, Rodney was also addicted to pain pills. Father and son sat together all day, every day, getting high on opiates. After a few years of this, doctors stopped prescribing opiates. In the throes of active addiction, Rodney and Ethan turned to street heroin. Since Rodney was too ill to leave the house, it fell upon Ethan to go out and buy the drugs for Rodney and him.

By 2018, Rodney's illness had advanced to the point where he needed to be in a nursing home. This unfortunate turn in Rodney's life was a blessing for Ethan. He finally moved out of his father's house when his father went to a nursing home.  In 2021, Rodney passed away. Complicated as his feelings were about his dad, Ethan was devastated that he was not able to be in the room with his father when he died due to COVID restrictions.

### iii.   Ethan got clean after hitting rock bottom following the death of his beloved dog, Zoey.

Throughout the 15 years of his active addiction, Ethan tried to get clean numerous times. However, he never made it past a few months. In the summer of 2018, his beloved dog of 18 years, Zoey, died. Ethan said it felt like a part of him died

as well. On the night of Zoey's death, he seriously contemplated taking his own life.[13]
As Ethan describes it, coming so close to actually killing himself awakened an
impulse inside of him: He wanted to live. In that moment, it finally became crystal
clear that if he continued to use drugs, he would succumb to his addiction. Following
this awakening, Ethan committed himself to getting sober. He has been clean since
October 18, 2018.

Ethan took his last drug on October 18, 2018. He has been sober and steadily
employed ever since. In early 2018, he reunited with a childhood friend, Amy Eulett.
They had cared for each other over the years, but she could not handle his drug use
and refused to be his romantic partner until he was fully settled in his sobriety and
self-sufficient. Amy is positive influence on Ethan. She does not use any substances—
not even alcohol. A single mom to three kids, she works full-time at a window-making
factory. Ethan has become a part of her kids' lives and he often takes care of them
while Amy is at work.

### iv.    Ethan's current job at International Paper is a lifeline.

---

[13] Ethan's attachment to Zoey is not unique. In a study aimed at "the scientific
validation of a novel instrument [the Mourning Dog Questionnaire] designed to allow
a comprehensive quantitative analysis of grief responses in dog owners after the
death of a pet," researchers found that pet owners humanize their pets and perceive
animals "no different from humans." Ucceddu, Stegania, et. al. *Pet Humanization and
Related Grief: Development and Validation of a Structured Questionnaire Instrument
to Evaluate Grief in People who have Lost a Companion Dog*, November 7, 2019, found
at   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6912713/.   The study concluded
that "the main factors related to grief for human beings. . . are often present after the
loss of a pet." *Id*.

As soon as Ethan got clean, he went out and got a job. He went to a temp agency and was able to secure a job that day. Between December 2018 and March 2021, he worked as a cold-forge press operator for Bucyrus Precision Technology in Bucyrus, Ohio. He was terminated from that job due to his arrest in this case. He then worked at Covert Manufacturing until he landed a job at International Paper, where he currently works. Ethan's role at the facility is to work on the corrugator, which Ethan's manager describes as "the most important piece of equipment in our facility."[14] Ethan's manager writes, "Ethan understands the importance of the machine and embraces the position."[15] In his letter to the Court, Ethan's manager describes how vital Ethan is to the company.

**Photos of Ethan on the factory floor**:



---

[14] Letter of Greg Harville
[15] *Id.*



By all accounts, Ethan's job is critical to his success and stability. He enjoys the feeling of being good at what he does and valued for his work. As his mother explains in the video, Ethan is especially motivated by the positive feedback he gets at work because he never got that from his father. Having lacked stability for so many years, he appreciates being busy and productive, and the routine that his job gives him.

Undersigned counsel emailed with Ethan's manager, Mr. Harville, about whether Ethan could get his job back after a period of incarceration. Mr. Harville confirmed that Ethan would lose his job and explained that Ethan would have to resign in order to be eligible for re-hire. He would only be considered if the position is open. Mr. Harville further explained that if Ethan reapplies, he would undergo a background check and would not be eligible if convicted of an offense that required him to be away from work for an extended period of time. However, if Ethan is able to remain employed without interruption and without having to reapply, his felony conviction would not cause him to be fired.

In short, Ethan's manager has confirmed that if Ethan is imprisoned, he will lose his job and the chances that he will be able to get it back are slim. Ethan is an hourly-wage worker. He does not have a safety net to fall back on if he is unable to work because he is incarcerated. And it will be harder to get back on his feet with a felony conviction. Moreover, he will lose a job that he loves and a team that values him. These consequences—which may not have the same impact for someone with means—are far too severe for Ethan's misguided, non-violent conduct on January 6.

**B. The nature and circumstances of Mr. Seitz's offense conduct are not significantly different from January 6 defendants convicted of misdemeanors and supports the requested sentence**.

Mr. Seitz has admitted that while at the Capitol, he entered the building through a broken window and left after experiencing tear gas. Like hundreds of others at the Capitol that day, he posted bellicose real-time descriptions of his time at the Capitol, mimicking the language and words that President Trump used in his speech and in messages to his followers leading up to January 6.[16] Through his stipulated trial agreement, Mr. Seitz admitted that his conduct meets the elements of 18 U.S.C. §1512 in light of the Court's ruling on his Motion to Dismiss the Obstruction Count.

---

[16] By way of just one example, at a rally on January 4, 2021, President Trump exhorted, "If the liberal Democrats take the Senate and the White House – and they're not taking this White House – we're going to fight like hell, I'll tell you right now,"…We're going to take it back." Amy Sherman, *A Timeline of what Trump said before Jan. 6 Capitol riot*, Politifact, The Poyner Institute, January 11, 2021, available at https://www.politifact.com/article/2021/jan/11/timeline-what-trump-said-jan-6-capitol-riot/

As this Court knows having presided over dozens of January 6th cases over the past three years, the conduct of defendants convicted under Section 1512 varies greatly. Some defendants were affiliated with extremist groups, some came dressed for battle, and others engaged in violence against police officers and destroyed property. Many defendants glorified their conduct and continued to assert that their actions were righteous, long after January 6. Many defendants attempted to mitigate or hide their conduct from law enforcement.

Mr. Seitz does not fall into any of the above categories. Mr. Seitz traveled to the Capitol alone from his home in Bucyrus, Ohio. He came dressed in street clothes. He did not engage in any violence or any destruction of property. He did not go into sensitive spaces. Ethan admitted that he entered the Capitol through a broken window and he was part of a crowd—*in the back of the crowd*—that was pushing towards a line of police officers. He did not have direct contact—physical or verbal—with any police officer. When he smelled tear gas, he left immediately.

Ethan's intent to delay the obstruction of the certification of the vote was instilled in him by seemingly the most powerful person in the world—President Trump. Indeed, Mr. Seitz earnestly believed that the election had been "stolen" because the President of the United States and his powerful supporters said it was. Young men like Mr. Seitz were not only pawns of the Trump campaign, but also more organized groups on January 6, 2021, like the Proud Boys, who intended to rile up normal people in the crowd to serve their agenda. The New York Times investigated this dynamic and learned that there were different groups who went to the Capitol

building, some that simply intended to protest peacefully and others with a plan to incite the crowd and breach the building.[17] The Proud Boys called people like Mr. Seitz "normies" and had the intent to rile them up in order to support their agenda.[18] Mr. Seitz went to D.C. alone and completely unaware of the powers at be that had paved the way for the perfect storm of January 6. He was used to serve a purpose and is now a felon because of it.

Finally, when agents interviewed Ethan, he was specific and candid about what he did. He told them that he was in the back of the crowd that was pushing towards officers but that he left quickly. Unlike others, after Ethan returned home to his modest life in Ohio, he realized that contrary to what he had been told, he had not been part of something "great." He had not helped to "save America." Instead, he understands that he took part in a terrible event in our nation's history, and comes before the Court for sentencing having accepted full responsibility for his role in it.

Mr. Seitz's conduct that day is not markedly more culpable than that of defendants convicted of misdemeanor offenses and sentenced to probation. For example, *United States v. Wilson,* 1:21CR578 (APM), the defendant entered the Capitol through a broken window, posted pictures of himself inside the building to Facebook, entered Speaker Nancy Pelosi's office and took a video inside, remained

---

[17] Natalie Reneau, New York Times, *Proud Boys Led Major Breaches on Jan. 6 Video*, July 11, 2022, available at https://www.nytimes.com/2022/07/12/us/politics/proud-boys-jan-6.html
[18] Natalie Reneau, New York Times, *How the Proud Boys Breached the Capitol on Jan. 6: Rile up the Normies*, June 17, 2022, available at https://www.nytimes.com/video/us/politics/100000008392796/rile-up-the-normies-how-proud-boys-breached-the-capitol.html

inside the Speaker's office for five minutes, traversed almost the entire length of the Capitol, and lied to FBI agents after about his participation in the riot.[19] Defendant Wilson was convicted of parading and picketing, in violation of 40 U.S.C. §5104(e)(2)(G) and sentenced to 24 months' probation, notwithstanding the government's request for 14 days incarceration.

Another defendant convicted of parading and picketing was sentenced to 36 months' probation for being among a group of rioters that assaulted police officers, climbed through metal scaffolding to be one of the first to reach the Northwest Courtyard, unlawfully entered the Capitol twice, entered the Senate Conference Room menacingly chanting, "Where's  Nancy?" This defendant made social media posts in the days following January 6 in which she falsely claimed that law enforcement officers protecting the Capitol were attempting to "agitate the crowd." [20]

In yet another misdemeanor case, *United States v. Brian Sizer*, 22CR376 (JEB), the defendant observed numerous rioters climbing the scaffolding and walls and attempting to break windows. He took over 90 photos on his phone of restricted areas of the Capitol. He entered through the smashed Parliamentarian Door. At one point, instead of leaving the Capitol building, he turned the opposite direction of the exit and entered a Senate office. He took a picture of himself sitting in an office chair with his feet up. Finally, unlike Mr. Seitz, he was not truthful about his conduct when

---

[19] 1:21CR578. Government's Sentencing Memo, ECF. No. 49.
[20] 1:21CR508, Government's Sentencing Memo, ECF. No. 124.

interviewed by law enforcement.[21] Though he breached a Senate office, the district judge imposed a probationary sentence.

As the above cases demonstrate, it is difficult to pinpoint what made Mr. Seitz's conduct worse than defendants convicted of misdemeanors. Surely, the government will point to his Facebook and private messages in which he discussed the certification of the vote. It is true that Mr. Seitz intended to impede the certification of the vote. But in evaluating his culpability on this score it is important to consider *why* he had this intent and *what* he did about it. The *why* is easy—the leader of the free world had told him—a young man from rural Ohio with no college degree—that constitutional scholars had determined that the election was rigged. Everyone around him, including a popular Congressman from a neighboring district, Jim Jordan, had been promoting the idea that the election had been "rigged," "stolen."[22] President Trump and these other powerful people told their followers that in order to get a recount, they had to protest so that Vice President Pence would stop the certification and send the vote back to the states for a recount.[23] Mr. Trump had been advancing

---

[21] 1:21CR376, Government's Sentencing Memo, ECF. No. 29.

[22] For example, in November 2020, Representative Jordan stood with protestors calling for votes to stop being counted in Pennsylvania due to alleged fraud against President Trump. *See* Jacqueline Alameny, *Concerns about Jordan's election denialism flare during failed bid for speaker*, Washington Post, October 20, 2023.

[23] For example, at 1:00 a.m. on January 6, 2021, President Trump tweeted: If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect and even fraudulent numbers in a process NOT approved by their State Legislatures (which it must be). Mike can send it back! *See* Deepa Shivaram, *The House Jan. 6 committee releases its final report on the Capitol attack*, NPR, December 22, 2022, available at https://www.npr.org/2022/12/21/1144489935/january-6-committee-full-report-release.

the theory that Vice President Pence could send the votes "back" for a recount and again promoted it during his speech that day:

> And after this, **we're going to walk down, and I'll be there with you**, we're going to walk down…I know that everyone here will soon be marching over to the *Capitol building* to peacefully and patriotically make your voices heard….And they want to recertify their votes…**But the only way that can happen is if Mike Pence agrees to send it back…If not…you will have an illegitimate President.** That's what you'll have. And we can't let that happen…**We must stop the steal** and then we must ensure that such outrageous election fraud never happens again….[24]

This seemed like a reasonable idea to Ethan, who is not a constitutional law scholar or otherwise an expert in election law. This is not to say that Ethan was justified- he has accepted full responsibility for his actions. But his intent to delay the certification should be taken in context and is mitigated by the manner in which he developed that intent.

As for *what* Ethan did to attempt to delay the certification, he traveled down to D.C. alone. He joined a crowd of people he did not know. He did not join an extremist group. He did not carry weapons or gear. He followed the crowd into the building. When he felt tear gas, he left the building.  It bears repeating here that he did not threaten anyone, he got nowhere near any members of Congress, and he assaulted no one. To be sure, in the moment, he felt energized by the crowd.  For the

---

[24] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot (last viewed on Nov. 22, 2022). (emphases added).

first time in his troubled life, he felt he was part of something big, something historic. When he came back and reflected on the day, he realized that while he had been part of something big, it was wrong, and in his words, a stain on the country.

### C. A probationary sentence would not create a sentencing disparity with other January 6 obstruction cases which presented extraordinarily mitigating circumstances.

The above cases and other misdemeanor cases demonstrate that a sentence which would allow Mr. Seitz to keep his job would not create a disparity with other cases resolved involving equally culpable, if not worse, conduct than Mr. Seitz's. The cases below show that probation would not create an unwarranted disparity even when considered among other Section 1512 cases.

### i.    *United States v. Wood*

In *United States v. Wood*, 1:21CR223 (APM) the defendant was convicted of all charges in the Indictment of which the lead charge was 18 U.S.C. § 1512(c)(1). The PSR also applied the eight and 3-level enhancements under U.S.S.G. §2J1.2(b)(1)(B) and §(b)(2), respectively.[25] The government requested a sentence of 57 months based on its guidelines calculation of 51 to 63 months. Judge Mehta declined to apply the eight-level enhancement under Section 2J1.2(b)(2) despite evidence that Wood boasted about fighting police and "storming" the Capitol in messages to others such as: "We sent congress running into their escape tunnels," and "We just stormed the Capitol, we are busting into house chambers," "We busted the windows out." Wood

---

[25] *United States v. Wood*, 1:23CR233, Gov. Sentencing Memo, ECF. No. 55 at 47.

also messaged a friend, "I am fighting capitol police." According to the government, Wood climbed scaffolding, waved other protestors forward, and entered through a broken window. He was also part of a group that "terrorized" staffers present in House Speaker's suite of offices."[26] Ultimately, recognizing that Mr. Wood had mental health issues, Judge Mehta imposed a sentence of one year of home detention.

### ii.    *United States v. William Isaacs, 21CR028 (APM)*

William Isaacs, one of the Oathkeeper defendants, was found guilty following a jury trial on six counts, including obstruction of justice. *See United States v. William Isaacs*, 21-cr-028 (APM). Mr. Isaacs was accused of participating in the efforts of the Oathkeepers prior to and on the day of January 6, 2021. Leading up to January 6, he sent messages conveying his intent was either that "Trump cross the Rubicon or the citizens cross the Delaware," and that "We should attack [Mayor Bowser] upon arrival." {CITE} On January 6, 2021, Mr. Isaacs went into the Capitol building and proceeded to the Senate Hallway where he yelled, "the fight is not over!." Following January 6, 2021, Mr. Isaacs took steps to delete evidence of his involvement. Recognizing his youth and diagnosis of autism, the Court rejected the government's request of 131 months incarceration and imposed five years' probation.

### iii.   *United States v. Rafael Rondon and Maryann Mooney-Rondon*, 21CR722-JMC

Rafael Rondon and his mother, Maryann Rondon breached the Senate Wing Door ten minutes after it was breached by rioters. They traveled together to the

---

[26] *United States v. Wood*, 1:23CR233, Gov. Sentencing Memo, ECF. No. 55 at 51.

Speaker's suite where they encouraged and assisted a man in stealing a laptop from the office. After stealing the laptop from the Speaker's office, they went to the Senate Gallery and stole escape hoods. When FBI agents later searched their home, they discovered several firearms. Ms. Rooney admitted that she knew Congress was in session and certifying the results of the 2020 election when they entered the Capitol. The government requested a sentence of 51 months.[27] Judge Cobb declined to apply the eight-level enhancement under USSG 2J1.2(b)(1)(B) and imposed probation sentences for both defendants, with a condition of significant periods of home incarceration. These cases show that a sentence that reflects Mr. Seitz's unique story, as well as the non-violent nature of his conduct, would not be entirely out of step with sentences imposed in other cases involving convictions for obstruction of justice.

### D. A sentence that will allow Mr. Seitz to keep his job will achieve each of the goals of sentencing.

A sentence that will impose restrictions on Mr. Seitz but allow him to stay employed will serve as a just punishment and an adequate deterrent. The anxiety over the prospect of losing his job is enough to deter Mr. Seitz from ever breaking the law again. Indeed, in his interview with agents, after he freely admitted his conduct on January 6, he expressed two concerns to the agents. First, he kept asking, am I going to lose my job?  Second, he asked whether his mother could pick up his dog. It bears noting here that any sentence of imprisonment would be particularly harsh for someone in Mr. Seitz's position. He is an hourly-wage earner and if he cannot attend

---

[27] *United States v. Rondon*, 1:21CR722, JMC, Gov. Sentencing Memo, ECF. No. 67

his shifts, he cannot pay the bills. He lives paycheck to paycheck. The loss of a job that sustains Ethan both financially and emotionally is far more a draconian consequence than is warranted for Mr. Seitz's conduct.

As for general deterrence, locking up an unknown, lower-income, factory-worker from Ohio is not going to deter future Trump supporters from being duped into taking anti-democratic action, especially when the powerful people who promoted the lie that Mr. Trump won the 2020 election remain in positions of power and have experienced no consequences for spreading lies about the election.

Finally, a sentence that shows mercy on Ethan—a young man with a humble and troubled background who had been misled by powerful people, including the President, and who engaged in no violence—will promote respect for law. As the Supreme Court observed in Gall:

> [T]he unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."

*Gall v. United States*, 552 U.S. 38, 54 (2007).

## Conclusion

For the reasons herein, the defense submits that a sentence that will impose consequences on Mr. Seitz while allowing him to keep his job at International Paper will achieve the goals of sentencing and is the fair and just sentence in this case.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Elizabeth Mullin
Ubong Akpan
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Elizabeth_Mullin@fd.org