## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

ETHAN SEITZ,

                  Defendant.

Crim. Action No.1:21CR279(DLF)

## <u>MEMORANDUM IN AID OF SENTENCING</u>

Ethan Seitz ("Mr. Seitz" or "Ethan") will be before the Court for sentencing on one misdemeanor count of disorderly conduct in a restricted building in violation of 18 U.S.C. § 1752(a)(2). Mr. Seitz has accepted full responsibility for his conduct at the U.S. Capitol on January 6, 2021, by signing a statement of offense pursuant to his stipulated trial agreement.[1] Mr. Seitz's extraordinary story, the non-violent nature of his offense, his adherence to conditions of release for over three years, his acceptance of responsibility, and the sentences imposed in similar cases, all militate toward a finding that any period of incarceration is unwarranted in this case.

For the reasons set forth in this Memorandum and exhibits, Mr. Seitz, through counsel, respectfully moves the Court to impose a sentence that will allow Mr. Seitz

---

[1] Mr. Seitz's conviction on Count One has been vacated by the Court based on the Supreme Court's decision in *Fischer v. United States*, 144 S. Ct. 2176, 2190 (2024). In Mr. Seitz's sentencing memo filed before the sentencing hearing was stayed to await the decision in *Fischer*, undersigned counsel argued that Mr. Seitz's conduct was similar to scores of defendants charged with misdemeanors. The vacatur of the only felony against him shows that the government overcharged this case in the first instance.

to keep his job, which is not only a financial lifeline for him, but also an emotional one. A period of continued supervision is the appropriate and just sentence for Mr. Seitz.

## Background

As set forth in detail herein and in the video submitted to chambers,[2] Ethan Seitz has overcome significant adversity in his 35 years. Like many people in his part of Ohio, he became addicted to opiates in the early 2000s. After hitting rock bottom following the death of his beloved dog, Zoey, Ethan decided to become sober. He took his last drug on October 18, 2018, and has been clean ever since. Ethan now leads a productive, stable life. He is in a healthy relationship with his partner, Amy Eulett. When he is not working, he spends time with Amy, her kids, his mother, and his sister. Ethan's job at International Paper is central to his success and stability. He works 40 hours a week, and is a valued employee who takes pride in the contributions he makes to the company. Having overcome his addiction six years ago, Ethan is thriving, thanks to his innate inner-strength, resolve, and the small, supportive network of people holding him up.

Ethan comes from a deeply conservative community in Ohio. After the 2020 election, Ethan consumed information from President Trump, Ohio Congressman Jim Jordan, and other political leaders who argued that there had been widespread election fraud. Troubled by these stories, Ethan decided to travel to Washington,

---

[2] Video submitted as Exhibit 1, uploaded to chambers' USAfx on December 18, 2023 and resubmitted on September 9, 2024.

D.C., by himself, to peacefully protest what he earnestly believed to be election fraud. He dressed in street clothes and did not carry weapons or any objects that could be used as weapons. He felt that President Trump had invited him to protest election fraud. Once at the Capitol, Ethan joined the crowds and ultimately entered the building. Once inside, he did not engage in violence and did not enter any sensitive spaces. He did not come in direct contact with any police officer. He did not threaten or assault anyone. He left after about twenty minutes.

On March 19, 2021, Mr. Seitz was arrested and charged with obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2) and violations of 18 U.S.C. § 1752. That day, when law enforcement interviewed him, he was candid and truthful. The recording of the interview shows that he freely admitted to his conduct and that his primary concerns were keeping his job and caring for his dog.

On August 8, 2023, Mr. Seitz entered into a stipulated trial agreement whereby he accepted complete responsibility for his conduct. Following the stipulated trial agreement, Mr. Seitz cooperated with the pre-sentence investigation. He has been compliant with the conditions of release since his arrest over three years ago.

Shortly before Mr. Seitz was scheduled to be sentenced, the Supreme Court granted certiorari in *Fischer v. United States*, 144 S. Ct. 2176 (2024). The Court stayed the sentencing hearing. Following the Supreme Court's decision, the government conceded that Mr. Seitz's conduct does not meet the standard articulated in *Fischer* and moved to vacate his conviction on Count One. Accordingly, Mr. Seitz

stands before the Court having been convicted of Count Three, in violation of 18 U.S.C. § 1752(a)(2).

I.    **Response to the pre-sentencing report (PSR)**

   A. **A downward departure under §4A1.3 applies because Mr. Seitz's criminal history category substantially over-represents the seriousness of his criminal history and the likelihood that he will re-offend**.

If reliable information exists that indicates the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history **or the** likelihood that the defendant will commit other crimes, a downward departure may be warranted. USSG §4A1.3(b). In Mr. Seitz's case, both reasons for a criminal history category departure apply.

Mr. Seitz's 2018 conviction for possession of drug paraphernalia counts for one criminal history point because he was sentenced to 36 months of probation. He is assessed an additional point for operating a vehicle while impaired *eleven years ago*, placing him in category II. A criminal history score of two points substantially overstates Mr. Seitz's criminal history. The paraphernalia conviction resulted from police officers observing Mr. Seitz using heroin when he was in the throes of active drug addiction. He neither distributed drugs nor possessed more than a user-amount. Because his prior two offenses reflect that Mr. Seitz was ill with addiction, rather than an inherent criminality, and because they are not remotely related to the instant conviction, counsel submits that a criminal history category of II overstates Mr. Seitz's criminal history.

Criminal history category II also overstates the likelihood that Mr. Seitz will commit other crimes. The offenses for which he earned criminal history points date back to when Mr. Seitz was suffering from addiction. The conviction for operating while impaired occurred over ten years ago. The drug paraphernalia possession occurred six years ago. Mr. Seitz has been sober for six years. Now that he is clean and gainfully employed, there is no indication that he will reoffend.

Based on an overall offense level of 10 after acceptance of responsibility, Mr. Seitz contends that the Court should begin with a guideline range of **0 to 6 months**. Specifically, under USSG §2A2.4, the total offense level is 8 after acceptance of responsibility. If assessed at Category I, the guideline range is 0 to 6 months.

### B. A three-level "physical contact" enhancement does not apply.

The PSR is incorrect that a three-level "physical contact" enhancement applies. Under USSG §2A2.4(b)(1)a three-level enhancement applies if (A) the offense involved physical contact; or (B) a dangerous weapon (including a firearm) was possessed and its use threatened. There is no dispute that Mr. Seitz did not possess a dangerous weapon. As for physical contact, the only time that Mr. Seitz had contact with any officer was when he was outside the building; the video evidence shows that an officer pushed a baton towards Mr. Seitz who momentarily grasped the baton.[3] It was a slight, reflexive, unintentional act. While the guidelines do not define "physical

---

[3] Tellingly, the government did not previously share the "baton incident" video with chambers. Defense counsel has uploaded the pertinent video to chambers' USAfx. It also bears noting that the first PSR did not assess a three-point enhancement for physical contact.

contact," the Seventh Circuit has explained that although no federal court has defined "physical contact" for purposes of §2A2.4(b)(1)(A), the meaning can be derived from common law battery, which is defined as "intentional and wrongful contact with a person." *See United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000) (internal citations omitted) (ruling that the enhancement was properly applied where an inmate threw a cup of urine into a prison guard's face). Another case upholding the application of the enhancement supports that the "contact" must be more intentional than Mr. Seitz's momentary, reflexive grasp of the baton. *See United States v. Shelton*, 431 F. Supp. 2d 675, 675-77 (E.D. Tex. 2006) (applying the enhancement after defendant threw a cup containing feces and urine at a prison guard, which struck his head, face, and chest), *aff'd*, 230 F. Appx 457 (5th Cir. 2007). Moreover, the guideline itself, which calls for the +3 enhancement for physical contact *or* the possession and threatened use of a dangerous weapon, demonstrates that the application of the enhancement is not appropriate here. The Commission could not have intended for Mr. Seitz's brief, reflexive grasp of a baton to warrant the same offense-level increase as a defendant's possession and threatened use of a dangerous weapon.

Mr. Seitz's admission that he was in a crowd that was pushing (though there is no video evidence of any pushing) is also not enough to warrant the enhancement. In a similar case where there was no evidence of direct physical contact with officers, Judge Nichols declined to apply the enhancement, reasoning that there was "no direct physical contact between [the defendant] and any police officer. The videos do not

show her pushing, even pushing others close to the police line." *United States v. Hazleton*, 1:23CR237(CJN), ECF. No. 143, Sentencing Hrg' Tr. at 20. Just as the enhancement did not apply in defendant Hazleton's case, it does not apply to Mr. Seitz's conduct.

## II.   The sentencing factors support a sentence that permits Mr. Seitz to keep his job at International Paper.

### A. Ethan's story is one of extraordinary struggle and extraordinary resilience.

Ethan Seitz was born on July 4, 1989, to Cynthia Campbell and Rodney Seitz. He was born and raised in Crawford County, a rural part of Ohio. His mother, Cynthia, was a nurse. His father, Rodney, ran a small business out of the family home, selling scraps and surplus parts he obtained from a nearby factory. Ethan enjoyed a relatively stable, middle-class childhood, though his childhood years were marred by his father's emotional abuse.

### i.   Ethan came of age at a time when prescription painkillers were inundating his rural community, instigating an opioid epidemic that ravaged the region; addicted to pills by age 15, Ethan was no exception.

Ethan attended his local public elementary and high school. By the time he started high school in 2000, unbeknownst to Ethan and his family, a devastating epidemic of opioid addiction had started to take root in his community. Five years earlier, in 1995, the U.S. Food and Drug Administration made what its commissioner later called one of the "greatest mistakes of modern medicine"—the approval of OxyContin without

warning of its addictive properties.[4] Following FDA approval, Purdue Pharma launched OxyContin, along with an unprecedented marketing campaign, recommending its use for all sorts of minor ailments and asserting that the product was non-addictive.[5] Purdue Pharma targeted rural regions like the one in which Ethan's family lived because of the number of people who worked manual-labor jobs, who are more prone to injury.[6] OxyContin flooded into the region during the late 90s. In the video submitted to chambers, Ethan's stepfather describes how doctors pushed opiates onto residents of the rural region. In conversations with counsel not captured on the video, Ethan's mother and stepfather recounted how "pain management clinics" landed helicopters full of OxyContin on vacant parking lots, where lines of hundreds of cars waited for pill distribution. Pill mills popped up everywhere: in empty stores in strip malls, people's homes, and even church basements. The opioid epidemic led to widespread poverty and unemployment in the region.[7] This devastation was still evident when undersigned counsel visited Ethan and his family about one year ago.

---

[4] Patrick Radden Keefe, *The Family That Built an Empire of Pain*, NEW YORKER (Oct. 23, 2017), https://www.newyorker.com/magazine/2017/10/30/the-family-that-built-an-empire-of-pain.
    [5] *Id.*
    [6] *Id.*
    [7] Michael Betz, Bo Feng, Mark Partridge, *Taking Measure of Ohio's Opioid Crisis*, SWANK PROGRAM IN RURAL-URBAN POLICY (October 2017), https://aede.osu.edu/sites/aede/files/publication_files/Swank%20-%20Taking%20Measure%20of%20Ohios%20Opioid%20Crisis.pdf.

Ethan started high school as opioids were flowing through the community seemingly without limitation. He recalls parties where kids as young as 13 and 14 would raid their parents' medicine cabinet, passing prescription pills around like candy. No one—children and parents alike—thought of the pills as an addictive narcotic. Why would they? OxyContin had been widely touted as non-addictive and doctors were prescribing it in record numbers. By age 15, Ethan had experimented enough with prescription pills that he experienced agonizing withdrawal symptoms when he did not take the pills.[8] Within a few months of taking his first pill, Ethan was a full-blown addict. He began using different drugs and alcohol to treat painful withdrawal from opiates. Ethan was not the only one in his high school who became addicted to pills after the community was flooded with pharmaceutical opiates. In a telling vignette, Ethan's mother recalls that during his senior year, Ethan dated the

---

[8] Symptoms of opioid withdrawal include dysphoria, muscle aches, nausea, fever, sweating, vomiting and diarrhea. Shane Drake, Y*es people can die from opiate withdrawal*, NAT'L DRUG & ALCOHOL RSCH. CTR.(August 11, 2016), https://ndarc.med.unsw.edu.au/blog/yes-people-can-die-opiate-withdrawal. In one vivid description of opioid withdrawal, an ex-addict describes: "More than once, I've read this phrase describing opioid withdrawal: The patient will experience flu-like symptoms. That must be the most inaccurate statement in medicine. A friend says doctors always leave out the part about 'psychic death.' Two or three days into my withdrawal in rehab, the nurses took away my ice chips. They were the last source of fluid they could give me. I was vomiting so convulsively they removed them to get the spasms to stop. It didn't work. The uncontrollable retching continued. I begged for just one ice chip to no avail. My mouth, throat, and entire digestive track felt scalded. . . Sometimes I think I died in that room, that my body and mind went through an experience so brutal I was transformed into someone else." Elizabeth Grey, *As an ex-heroin addict, I know getting off opioids is near impossible*, WASH. POST (May 27, 2022), https://www.washingtonpost.com/health/2022/05/27/opioid-addict-epidemic-withdrawal/.

homecoming queen, who was also an opiate addict.[9] Somehow, Ethan managed to graduate high school but he was too depressed to walk across the stage on graduation day. After high school, he attended some vocational school. He also tried to go to substance abuse treatment, but he was not ready and was then not able to get clean.

When Ethan was 20, he was with a cousin around a bonfire when he spilled gas over himself and caught on fire. He was rushed from the hospital to the Ohio State Burn Center, where he stayed for approximately three weeks. Cynthia Campbell, his mother, writes, "We were told he had burned 30% of his body." Doctors at the burn center put Ethan in a medically induced coma. He had three skin graft surgeries and spent 17 days in the burn unit of the hospital. After he was released from the burn unit, he was diagnosed with bipolar disorder, depression, and anxiety disorder.[10]

Ethan's recovery from the fire was long and painful, and, as one might expect, his addiction to opiates intensified. Still, he managed to enroll in the Ohio State University, where he took a few classes. He stopped going to Ohio State after moving in with his father to become his father's caretaker.

### ii. Ethan and his father, Rodney, had a toxic, emotionally abusive relationship that perpetuated Ethan's addiction and depression.

It is an understatement to say that growing up, Ethan and his father's relationship was fraught. His father, Rodney, often belittled and ridiculed Ethan for

---

[9] Letter to the Court from Cynthia Campbell, attached as part of Exhibit 2.
[10] Since Ethan has been clean, he has not experienced symptoms of bipolar disorder.

all manner of reasons: he wasn't good at sports, he was chubby as a kid, he didn't make good marks in school, and the list goes on. In 2010, after 30 years of marriage, Ethan's mother, Cynthia, divorced Rodney. After the divorce, Cynthia went back to school and earned a degree in psychology from Ohio State. A few years later, Cynthia married one of Rodney's friends, Shane, who is depicted in the sentencing video.[11]

Shortly after the divorce, Rodney was diagnosed with Parkinson's disease. Symptoms of the disease emerged rapidly and soon he needed around-the-clock care. Since Ethan did not have steady employment, the family decided that it would make sense for him to move in with Rodney to take care of him. In approximately 2015, Ethan moved in with Rodney to serve as his full-time caretaker. Today, Ethan, his mother, and his sister acknowledge that it was the worst decision the family could have made at that point in Ethan's life. Though Rodney had not abused substances before, he was prescribed opiates such as fentanyl and OxyContin to manage his Parkinson's symptoms. Soon, Rodney was also addicted to pain pills. Both father and son sat together all day, every day, getting high on opiates. After a few years, their doctors stopped prescribing opiates. In the throes of active addiction, Rodney and Ethan turned to street heroin. Since Rodney was too ill to leave the house, Ethan bought the drugs for himself and Rodney.

By 2018, Rodney's illness had advanced to the point where he needed to be in a nursing home. This unfortunate turn in Rodney's life was a blessing for Ethan. He

---

[11] Shane's letter to the Court is attached as part of Exhibit 2. Tragically, Shane passed away on March 2, 2024.

finally moved out of his father's house. In 2021, Rodney passed away. Complicated as his feelings were about his dad, Ethan was devastated that he was not able to be in the room with his father when he died due to COVID restrictions.

### iii. Ethan got clean after hitting rock bottom, following the death of his beloved dog, Zoey.

Throughout the 15 years of his active addiction, Ethan tried to get clean numerous times. However, he never made it past a few months. In the summer of 2018, his beloved dog of 18 years, Zoey, died. Ethan said it felt like a part of him died as well. On the night of Zoey's death, he seriously contemplated taking his own life.[12] As Ethan describes it, coming so close to actually killing himself awakened an impulse inside of him: he wanted to live. In that moment, it finally became crystal clear that if he continued to use drugs, he would succumb to his addiction. Following this awakening, Ethan committed himself to getting sober.

Ethan took his last drug on October 18, 2018. He has been sober and steadily employed ever since. In early 2018, he reunited with a childhood friend, Amy Eulett. They had cared for each other over the years, but she disapproved of his drug use and refused to be his romantic partner until he was fully settled in his sobriety and self-

---

[12] Ethan's attachment to Zoey is not unique. In a study aimed at "the scientific validation of a novel instrument [the Mourning Dog Questionnaire] designed to allow a comprehensive quantitative analysis of grief responses in dog owners after the death of a pet," researchers found that pet owners humanize their pets and perceive animals "no different from humans." Ucceddu, Stegania, et. al. *Pet Humanization and Related Grief: Development and Validation of a Structured Questionnaire Instrument to Evaluate Grief in People who have Lost a Companion Dog*, ANIMALS (Nov. 7, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6912713/. The study concluded that "the main factors related to grief for human beings. . . are often present after the loss of a pet." *Id*.

sufficient. Amy is a positive influence on Ethan. She does not use any substances—not even alcohol. A single mother to three children, she works full-time at a window-making factory. Ethan has become a part of her kids' lives, and he often takes care of them while Amy is at work.

### iv.   Ethan's current job at International Paper is a lifeline.

As soon as Ethan got clean, he found a job. He went to a temp agency and was able to secure a job that day. Between December 2018 and March 2021, he worked as a cold-forge press operator for Bucyrus Precision Technology in Bucyrus, Ohio. He was terminated from that job due to his arrest in this case. He then worked at Covert Manufacturing until he was hired at International Paper, where he currently works. Ethan's role at the facility is to work on the corrugator, which Ethan's manager describes as "the most important piece of equipment in our facility."[13] Ethan's manager writes, "Ethan understands the importance of the machine and embraces the position."[14] In his letter to the Court, Ethan's manager describes how vital Ethan is to the company.

**Photos of Ethan on the factory floor**:

---

[13] Letter of Greg Harville, previously submitted with Mr. Seitz's memorandum and updated to include Ethan's work history since December 2023.

[14] *Id.*





By all accounts, Ethan's job is critical to his success and stability. He enjoys the feeling of being good at what he does and valued for his work. As his mother explains in the video, Ethan is especially motivated by the positive feedback he receives at work because he never got that from his father. Having lacked stability for so many years, he appreciates being busy and productive, and the routine that his job gives him.

Undersigned counsel emailed with Ethan's manager, Mr. Harville, about whether Ethan could return to work after a period of incarceration. Mr. Harville confirmed that Ethan would lose his job and explained that Ethan would have to resign in order

to be eligible for re-hire. He would only be considered if the position is open. Mr. Harville further explained that if Ethan reapplies, he would undergo a background check and would not be eligible if convicted of an offense for which he was incarcerated for an extended period of time. However, if Ethan is able to remain employed without interruption and without having to reapply, his misdemeanor conviction would not cause him to be fired.

In short, Ethan's manager has confirmed that if Ethan is imprisoned, he will lose his job and the chances that he will be able to get it back are slim. Ethan is an hourly-wage worker. He does not have a safety net to fall back on if he is unable to work because he is incarcerated. These consequences—which may not have the same impact for someone with means—are far too severe for Ethan's misguided, non-violent, misdemeanant conduct on January 6.

**B. The nature and circumstances of Mr. Seitz's offense conduct were non-violent and similar to scores of other defendants convicted of petty offenses and sentenced to probation.**

Mr. Seitz has admitted that while at the Capitol, he entered the building through a broken window and left after experiencing tear gas. Like hundreds of others at the Capitol that day, he posted bellicose real-time descriptions of his experience at the Capitol, mimicking the language and words that President Trump used in his speech and in messages to his followers leading up to January 6.[15]

---

[15] By way of just one example, at a rally on January 4, 2021, President Trump exhorted, "If the liberal Democrats take the Senate and the White House – and they're not taking this White House – we're going to fight like hell, I'll tell you right now. . . We're going to take it back." Sherman, Amy, *A timeline of what Trump said before Jan. 6 Capitol riot*, POLITIFACT, THE POYNTER INSTITUTE, (Jan. 11, 2021),

As this Court knows, having presided over dozens of January 6 cases over the past three years, the conduct of defendants who entered the Capitol varied greatly. Some defendants were affiliated with extremist groups. Some came dressed for battle, and others engaged in violence against police officers and destroyed property. Many defendants glorified their conduct and continued to assert that their actions were righteous, long after January 6. Many defendants attempted to mitigate or hide their conduct from law enforcement.

Mr. Seitz does not fall into any of the above categories. Mr. Seitz traveled to the Capitol alone from his home in Bucyrus, Ohio. He came dressed in street clothes. He did not engage in any violence or any destruction of property. He did not go into sensitive spaces. Mr. Seitz admitted that he entered the Capitol through a broken window and that he was part of a crowd—*in the back of the crowd*—that was pushing towards a line of police officers. He did not have direct contact—physical or verbal— with any police officer. When he smelled tear gas, he left immediately.

Mr. Seitz's intent to delay the obstruction of the certification of the vote was instilled in him by the most powerful person in the world at the time—President Trump. Mr. Seitz earnestly believed that the election had been "stolen" because the President of the United States and his powerful supporters said it was. Moreover, his intent did not translate into any pre-planning or violence. Young men like Mr. Seitz were not only pawns of the Trump campaign, but also of more organized groups on

---

https://www.politifact.com/article/2021/jan/11/timeline-what-trump-said-jan-6-capitol-riot/.

January 6, 2021, like the Proud Boys, who intended to rile up normal people in the crowd to serve their agenda. The New York Times investigated this dynamic and learned that there were different groups who went to the Capitol building, some that simply intended to protest peacefully and others with a plan to incite the crowd and breach the building.[16] The Proud Boys called people like Mr. Seitz "normies" and intended to rile them up in order to support their agenda.[17] Mr. Seitz went to D.C. alone and completely unaware of the powers that had paved the way for the perfect storm of January 6.

Finally, when agents interviewed Mr. Seitz, he was specific and candid about what he did. Unlike others, after Mr. Seitz returned home to his modest life in Ohio, he realized that, contrary to what he had been told, he had not been part of something "great." He had not helped to "save America." Instead, he understands that he took part in a terrible event in our nation's history, and comes before the Court for sentencing having accepted full responsibility for his role in it.

Mr. Seitz's conduct is equally or less culpable than other defendants convicted of petty misdemeanor offenses and sentenced to probation. For example, in *United States v. Wilson,* 1:21CR578 (APM), the defendant entered the Capitol through a broken window, posted pictures of himself inside the building to Facebook, entered

---

[16] Natalie Reneau, New York Times, *Proud Boys Led Major Breaches on Jan. 6 Vide*o, July 11, 2022, available at https://www.nytimes.com/2022/07/12/us/politics/proud-boys-jan-6.html.

[17] Natalie Reneau, New York Times, *How the Proud Boys Breached the Capitol on Jan. 6: Rile up the Normies*, June 17, 2022, available at https://www.nytimes.com/video/us/politics/100000008392796/rile-up-the-normies-how-proud-boys-breached-the-capitol.html.

Speaker Nancy Pelosi's office and took a video inside, remained inside the Speaker's office for five minutes, traversed almost the entire length of the Capitol, and lied to FBI agents about his participation in the riot.[18] Defendant Wilson was convicted of parading and picketing, in violation of 40 U.S.C. § 5104(e)(2)(G), and sentenced to 24 months' probation, notwithstanding the government's request for 14 days incarceration.

In yet another case in which the defendant was convicted of only a petty misdemeanor, *United States v. Brian Sizer*, 22CR376 (JEB), the defendant observed numerous rioters climbing the scaffolding and walls and attempting to break windows. He took over 90 photos on his phone of restricted areas of the Capitol. He entered through the smashed Parliamentarian Door. At one point, instead of leaving the Capitol building, he turned the opposite direction of the exit and entered a Senate office. He took a picture of himself sitting in an office chair with his feet up. Finally, unlike Mr. Seitz, he was not truthful about his conduct when interviewed by law enforcement.[19] Though he breached a Senate office, Chief Judge Boasberg imposed 12 months' probation.

In two other cases resolved in petty offense misdemeanors, this Court imposed a sentence of 36 months' probation. *See* Scott and Holly Christensen, 1:23CR203 (DLF). The Christensens were in the Capitol for 49 minutes. They remained in the building despite Holly being hit by pepper spray, and even though Scott, a former Capitol

---

[18] 1:21CR578, Government's Sentencing Memo, ECF. No. 49.
[19] 1:21CR376, Government's Sentencing Memo, ECF. No. 29.

intern, knew the intrusion was dangerous. Both defendants minimized the gravity of their conduct when interviewed by the FBI. Holly continued to maintain that she was allowed in the building because no police officer told her she should leave.[20] This Court rejected the government's request for 45 days incarceration and imposed probationary sentences on each defendant.

As the above cases show, Mr. Seitz engaged in similar conduct as defendants convicted of petty misdemeanors, and he should never have been charged with a felony. He traveled to D.C. alone. He joined a crowd of people he did not know. He did not join an extremist group. He did not carry weapons or gear. He followed the crowd into the building. When he felt tear gas, he left the building. He did not threaten or assault anyone and was nowhere near any members of Congress. To be sure, in the moment, he felt energized by the crowd. For the first time in his troubled life, he felt he was part of something big, something historic. When he came back and reflected on the day, he realized that while he had been part of something big, it was wrong, and in his words, a stain on the country.

### C. A probationary sentence with no period of incarceration will avoid sentencing disparities with similarly situated defendants sentenced under Section 1752.

During the four years since January 6, 2021, this Court has sentenced a handful of defendants for violations of only Section 1752. These and numerous other misdemeanor cases show that Mr. Seitz should never have been charged with a felony in the first place and a brief period of continued supervision with no active time is the

---

[20] 1:21CR203, Government's Sentencing Memo, ECF. No. 47.

appropriate sentence in this case. For example, this Court rejected the government's requests for incarceration for two defendants convicted of 18 U.S.C. 1752(a)(1), Long Duong and Julie Miller. 1:23CR219 (DLF). Duong and Miller ignored numerous signs that they should not enter the Capitol, remained in a private office while it was being ransacked, and entered the Capitol a second time after being pushed out by officers. Doung had an extensive criminal history, which included convictions for manslaughter and breaking and entering.[21] This Court imposed probationary sentences on each defendant.

In another case resolved in a plea to 1752(a)(1), this Court imposed 36 months' probation with a condition of 20 days of intermittent confinement on Treniss Evans, whose conduct was far more culpable and aggressive than Mr. Seitz's. 1:21CR225 (DLF). Evans traveled to Washington, D.C., with knowledge that violent groups like the Proud Boys would participate in the protests, and planned to meet with members of the Proud Boys. Evans entered and exited the Capitol building through a broken window and turned around to face the broken window and raised a megaphone, declaring, "bring 'em in." Inside the Capitol, he entered a Congressional conference room which he believed to be Nancy Pelosi's office and took a shot of whiskey. After January 6, Evans continued to make statements on social media demonstrating his lack of remorse and raised money off his participation. In emails to Proud Boys after the attack, he bragged about fighting alongside the Proud Boys in the streets of D.C.[22]

---

[21] 1:23CR219, Government's Sentencing Memo, ECF. No. 35.
[22] 1:21CR225, Government's Sentencing Memorandum, ECF. No. 40.

In yet another case involving a conviction for § 1752(a)(1), Verden Nalley, this Court imposed 24 months' probation on a defendant who remained in the Capitol for 30 to 40 minutes, taking photos and documenting his experience, and who threatened to "be back with guns in two weeks if [the election results were] not fixed." 1:21CR116 (DLF). In another social media post, he posted a picture of the crypt area and warned if "we have to come back we will bring guns and take our country from them."[23]

The above cases show that Mr. Seitz, who is also convicted under section 1752, should receive a probationary sentence with no incarceration. Any other result would create an unwarranted disparity with similar cases.

**D. The cases the government references are not remotely similar**.

Instead of acknowledging that Mr. Seitz stands convicted of a sole misdemeanor offense and recommending a fair, commensurate sentence, the government doubles down on hyperbole and exaggeration and attempts to compare Mr. Seitz's case to another case in which the 1512 count was vacated, Michael Sparks, 21CR87(TJK). The comparison is inapt for multiple reasons, not the least of which is Mr. Sparks was convicted of another felony, unlike Mr. Seitz. Moreover, the government tellingly fails to mention that 1) Mr. Sparks did not accept responsibility and instead had a jury trial and 2) ***Mr. Sparks was the very first rioter to enter the Capitol***. Indeed, Mr. Sparks, wearing body armor, he was the first to charge into the building and was one of the rioters who aggressively confronted Officer Eugene Goodman and chased him up the stairs. At Mr. Sparks's trial, Officer Goodman testified that Sparks was

---

[23] 1:21CR116, Government's Sentencing Memorandum, ECF. No. 93.

in his face, shouting "we are here for you guys." After January 6, Mr. Sparks took steps to destroy evidence that he was there and continued to spread lies about what happened.[24] Undersigned counsel has attached the government's sentencing memo in Mr. Sparks's case to show just how far the government strains to justify its unjust, unwarranted sentencing request for Mr. Seitz.

Next, the government references notorious defendant Thomas Robertson, a police sergeant who famously struck two officers with a wooden pole. Mr. Robertson also went to trial and was convicted of additional felonies, not just obstruction of justice. Counsel has attached the government's sentencing memo in Robertson's case, again, to demonstrate just how lacking the government's argument is in Mr. Seitz's case.

The Court should reject the government's invitation to disregard critical facts in sentencing Mr. Seitz, who engaged in fraction of the conduct that Mr. Sparks and Mr. Robertson did.

### E. A non-custodial sentence that will allow Mr. Seitz to keep his job will achieve each of the goals of sentencing.

A sentence that will continue to impose restrictions on Mr. Seitz but allow him to stay employed will serve as a just punishment and an adequate deterrent. The anxiety over the prospect of losing his job is enough to deter Mr. Seitz from ever breaking the law again. Indeed, in his interview with agents, after he freely admitted his conduct on January 6, he expressed two concerns to the agents. First, he kept asking, am I going to lose my job?  Second, he asked whether his mother could pick

---

[24] Government's Sentencing Memorandum, *United States v. Sparks*, 1:21CR87(TJK), attached hereto as Exhibit 5.

up his dog. Moreover, he has been perfectly compliant with conditions for over three years. Mr. Seitz poses no risk of recidivism.

Any sentence of imprisonment would be particularly harsh for someone in Mr. Seitz's position. He is an hourly-wage earner and if he cannot attend his shifts, he cannot pay the bills. He lives paycheck to paycheck. The loss of a job that sustains Mr. Seitz both financially and emotionally is a far harsher consequence than is warranted for his conduct.

As for general deterrence, locking up an unknown, lower-income, factory-worker from Ohio is not going to deter future Trump supporters from being duped into taking anti-democratic action. This is especially true given that the representatives who promoted the lie that Mr. Trump won the 2020 election remain in positions of power and have experienced no consequences for spreading lies about the election.

Finally, a sentence of continuing supervision and restrictions on his liberty constitutes a just punishment for Mr. Seitz's misdemeanor offense. After over three years of perfect compliance, Mr. Seitz will continue to be monitored on supervised release with restitution obligations, which is in and of itself a form of punishment. *See Mont v. United States*, 587 U.S. 514, 524 (2019) ("Supervised release is a *form of punishment* that Congress prescribes along with a term of imprisonment as part of the same sentence.") (emphasis added); *United States v. Haymond*, 588 U.S. 634, 648 n.5 (2019) ("[T]he sword of Damocles hangs over a defendant 'every time [he] wakes up to serve a day of supervised release.'"); *Gall v. United States*, 552 U.S. 38, 48 (2007) (noting that even a non-custodial sentence imposes serious restrictions on one's

liberty and constitutes punishment, not a "free pass"); *see also United States v. Cohen*, 459 F.3d 490, 496 (4th Cir. 2006) ("[R]estitution is [...] part of the criminal defendant's sentence.").

## Conclusion

For the reasons herein, the defense submits that a sentence that will impose consequences on Mr. Seitz while allowing him to keep his job at International Paper will achieve the goals of sentencing and is the fair and just sentence in this case.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Elizabeth Mullin
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Elizabeth_Mullin@fd.org